OTTERBOURG, STEINDLER, HOUSTON
   & ROSEN, P.C.
Attorneys for Israel Discount Bank of New York
230 Park Avenue
New York, New York 10169-0075
Jonathan N. Helfat
Melanie L. Cyganowski
Adam C. Silverstein
Tel. No.:  (212) 661-9100


UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------------X
In re:                             :        Chapter 7

     OAK ROCK FINANCIAL, LLC,     :

                                   :        Case No. 8-13-72251 (DTE)

                Alleged Debtor.    :
--------------------------------------------------------------------X

## DECLARATION OF JERRY HERTZMAN

JERRY HERTZMAN, under penalties of perjury, declares as follows:

1.      I am a Senior Vice President I and Head of the Managed Asset Division of Israel

Discount Bank of New York ("IDBNY").  I submit this Declaration in support of IDBNY's

application for an Order to Show Cause, pursuant to Sections 105(a), 303(f), 303(g), 303(h) and

701 of the Bankruptcy Code, Bankruptcy Rules 1011, 2007.1 and 9006 and Local Bankruptcy

Rule 9077-1, why an Order should not be entered (i) immediately appointing an interim chapter

7 trustee to oversee the affairs and operate the business of the Alleged Debtor, Oak Rock

Financial, LLC ("Oak Rock" or the "Alleged Debtor"), (ii) shortening the Alleged Debtor's time

to ten days to answer the Petition for relief, (iii) expediting any trial on the Petition to no more

than 20 days from now, and (iv) granting such other relief as is just and proper.

### Introduction

2.      A little more than a week ago, the recently appointed manager of Oak Rock -- a

specialty asset-based lending company based in Bohemia, New York that owes approximately

$33 million in accelerated secured debt (exclusive of interest, fees and expenses) to IDBNY and another approximately $57 million in accelerated secured principal debt (exclusive of interest, fees and expenses) to four other banks for which IDBNY serves as agent -- admitted that Oak Rock had perpetrated a massive fraud upon its senior secured lenders.  Oak Rock's manager acknowledged that Oak Rock's most recent borrowing base certificate representing that Oak Rock had $2.5 million of net *availability* under its credit facility was entirely fictitious and that, in fact, Oak Rock was *over-advanced* by more than $47 million.  The massive fraud, IDBNY was informed, was perpetrated by Oak Rock's founder, substantial owner and sole manager since inception, John P. Murphy ("Murphy"), who is now nowhere to be found and is the target of a Federal Bureau of Investigation ("FBI") investigation.

3.    By the time IDBNY was informed of the fraud on April 18, Murphy had resigned the previous day and, for reasons unknown, had signed documents purporting to assign sole management of Oak Rock to an insider named Tom Stephens, whose fund, Oasis Capital Management, LLC ("Oasis"), is a minority equity investor in, and loan participant with, Oak Rock and is the person who disclosed the fraud to IDNBY.

4.    Stephens -- although seemingly experienced in business -- admittedly has no experience whatsoever in commercial lending (Oak Rock's line of business).  More to the point, since taking over as manager, Stephens has essentially hijacked the company.  In his brief (less than two-week) stint as Oak Rock's manager, he has:

- denied the senior secured lenders access to critical information about the condition of the Alleged Debtor;

- written millions of dollars of checks without any disclosure to the senior secured lenders, despite their requests for such information;

- barred the senior secured lenders' representatives from the Alleged Debtor's offices;

- failed to take basic steps to safeguard the Alleged Debtor's assets; and

- consistently and deceptively pursued an agenda that elevates his personal interests and those of his co-investors over those of Oak Rock's creditors, most significantly the senior secured lenders whose rights he has gone out of his way to diminish.

5.    In the face of an admitted, massive fraud by the Alleged Debtor, which is now the subject of federal criminal investigation, lacks anyone amongst its small handful of employees competent to make day-to-day lending decisions and has grossly failed to follow basic protocols of crisis management, this Court should (i) immediately appoint an interim chapter 7 trustee to marshal, protect and preserve the assets of the Alleged Debtor's estate and to operate the business of the Alleged Debtor, (ii) shorten the deadlines necessary for granting an order for relief, and (iii) grant the limited provisional relief that IDBNY has requested, which would prevent the Alleged Debtor from transferring its assets out of the ordinary course without first seeking the permission of this Court on notice to the Petitioning Creditors and would permit those senior secured lenders that maintain accounts for the Alleged Debtor to institute an "administrative hold" on the Alleged Debtors' accounts in accordance with settled law.

6.    It is imperative that a competent and disinterested person be given control over the Alleged Debtor's affairs immediately.  The Alleged Debtor is a specialty asset-based lending company that was founded and, until days ago, solely managed by Murphy and which employs no more than a small handful of back-office personnel who lack the experience to operate the business.  The lack of experienced and qualified management and personnel, the insider status of Stephens and the uncertainty arising from a pending criminal investigation threatens a panic from the Alleged Debtor's customers and various stakeholders -- of which there are many,

including Oak Rock's senior secured lenders, subordinated debt holders, participants, equity investors and customers -- and jeopardizes the ability to liquidate the Alleged Debtor's assets in an orderly fashion.

7.    In order to achieve an orderly liquidation, it is essential that someone with actual experience operating and liquidating a finance company be engaged to run-off the Alleged Debtor's loan portfolio and make day-to-day credit decisions while the portfolio is run-off. Stephens has demonstrated a recalcitrant and inexplicable resistance to engaging such a person. An interim chapter 7 trustee should and will have no hesitation to retain an appropriately qualified person to assist him or her.  Moreover, an interim trustee is necessary to protect the rights of the senior secured lenders -- which, on account of the Alleged Debtors' fraud, also hold a substantial portion of the unsecured claims -- and all other creditors of this estate.

8.    For these reasons, and those set forth herein, IDBNY, on behalf of itself and its co-lenders in the syndicate, respectfully requests the immediate appointment of an interim chapter 7 trustee and the acceleration of the Alleged Debtor's time to answer, and of the trial on the merits of, the Petition.

## The Alleged Debtor

9.    Oak Rock is a limited liability company organized under the laws of Delaware, having its sole place of business at 3900 Veterans Highway, Bohemia, New York 11716.

10.    Oak Rock is a specialty asset-based lending company that (i) lends to dealers that, in turn, provide installment financing on consumer products, (ii) "factors," *i.e.,* purchases receivables of, operating businesses, (iii) purchases charged-off or delinquent customer or credit card receivables, and (iv) provides leasing and financing services for automobiles and equipment.  The company was founded and, until days ago, solely managed by Murphy, who

exercised complete control over the Alleged Debtor's cash management, operations and finances.

**IDBNY, the Senior Secured Lenders and the Credit Agreement**

11.     IDBNY is a full-service commercial bank chartered by the State of New York, with its principal place of business located at 511 Fifth Avenue, New York, New York.  Among the banking services that IDBNY provides are asset-based loans and credit facilities to commercial lenders and other companies.  I have been with the bank for 27 years.  As Head of the Managed Asset Division, I am responsible for overseeing all of the bank's work-outs and other distressed loan situations.

12.     IDBNY, both as lender and as agent for a bank syndicate that includes Bank Leumi USA, Capital One, N.A., Bank Hapoalim, B.M. and First National Bank of New York (the "Senior Secured Lenders"), and Oak Rock are parties to an Amended and Restated Credit Agreement, dated May 27, 2011 (as amended, the "Credit Agreement"), a copy of which is attached as Exhibit A.  The Credit Agreement amended and restated an earlier iteration, dated May 6, 2006, and, subsequently, has been amended several times – as of August 1, 2011, September 27, 2011, November 30, 2012, February 28, 2013, and March 28, 2013.  A copy of the amendments to the Credit Agreement are collectively annexed hereto under Exhibit B.

13.     Under the Credit Agreement, the Bank Group has agreed to provide, subject to the terms and conditions of the agreement, a revolving credit facility of up to $96 million to Oak Rock.  Pursuant to a contemporaneously executed Amended and Restated Security Agreement (the "Security Agreement," a copy of which is attached as Exhibit C), advances under the facility are fully secured by all of Oak Rock's personal property and other assets, including all of Oak

Rock's cash, receivables, chattel paper, furniture, equipment and books and records, on all of which IDB, for itself and as agent for the Bank Group, has a lien. <u>See</u> Exhibit C, at Section 9.

14.    The Credit and Security Agreements provide extensive rights to the Bank Group to inspect and protect its collateral. Section 2.12 of the Credit Agreement gives IDBNY the right, upon two business days' notice unless there is an Event of Default (in which case no notice is required), to access Oak Rock's premises and personnel, inspect, audit and make extracts from Oak Rock's books and records and inspect, review, evaluate and make test verifications and counts of, among other things, the Bank Group's collateral. <u>See</u> Exhibit A, at Section 2.12. Section 8 of the Security Agreement grants to IDBNY an irrevocable power of attorney to take any steps in the name of Oak Rock that are necessary to "protect [IDBNY's] interests (for the benefit of [IDBNY] [and the other] Lenders) in the Collateral." <u>See</u> Exhibit C, at Section 8. And, pursuant to Section 9 of each the Credit and Security Agreements, upon the occurrence of one or more events of default -- defined to include, among other things, (i) if any information contained in any borrowing base certificate submitted to IDBNY is untrue or incorrect (Section 9.1(f)), or (ii) Murphy no longer serves as the chief operating officer or manager of Oak Rock (Section 9.1(m)) – IDBNY, among other things, can, without notice, discontinue advances, declare all or any portion of the obligations due and payable without presentment, and exercise any rights and remedies of a secured creditor. (<u>See</u> Security Agreement, Sections 9(a) and (b)).

15.    IDBNY duly perfected its security interest in the Collateral by filing U.C.C. financing statements with the Delaware Secretary of State, copies of which are annexed hereto as Exhibit D.

**The Uncovering of a Massive Fraud at Oak Rock, the Purported**
**Appointment of Stephens as Manager and Pending FBI Investigation**

16.    On April 18, 2013, Stephens came to IDBNY's office in New York City to have a meeting that he had arranged by telephone the day before.  He met with several of my colleagues in the Asset Based Lending Department.

17.    Stephens is the manager of Oasis, which I understand invested approximately $15 million in equity in Oak Rock, $1.5 million of which was invested by Stephens personally. Stephens said that, beginning this past year, as a result of some concerns he said he had with Murphy, he began this past January to occasionally visit Oak Rock's offices to get a first-hand look at the company's operations and its books and record.  He said that, during the week of April 15, he noticed unusual collection activity with respect to one of Oak Rock's customers, AutoNow, and confronted Murphy about the unusual activity.   At that point, according to Stephens, Murphy -- who appears to have engaged in a systemic fraud that he had succeeded in covering up for the better part of a decade -- suddenly decided, for reasons unknown, to confess to Stephens that he had been creating fictitious records in order to increase Oak Rock's borrowing base.  Stephens acknowledged that the February 28, 2013 borrowing base certificate that Oak Rock provided to IDBNY showing $2.5 million of net availability was false, and that, instead, Oak Rock's true net availability was actually negative.  Specifically, Stephens conceded that Oak Rock was in an over-advance position of $47 million.

18.    According to Stephens, he demanded that Murphy immediately resign, which Stephens said Murphy did on April 17, 2013.  Stephens provided the bank with a letter of resignation purportedly signed by Murphy on April 17, 2013, a copy of which is attached as Exhibit E.

19.    Stephens also provided my colleagues with documentation purportedly signed by, among other persons, Murphy and Oak Rock's other largest equity investor, Jack Dell, appointing Stephens, as of April 17, 2013, as the sole manager of Oak Rock.  A copy of the Certificate of Sole Manager and Action of the Members of Oak Rock Financial, LLC Without a Meeting that Stephens supplied is attached as Exhibit F.

20.    Stephens acknowledged to IDBNY's representatives that, in light of Oak Rock's fraud, which Stephens estimates to be in the order of $70 million, Oak Rock cannot possibly continue as a going concern, and must be orderly liquidated.

21.    Stephens also shared with IDBNY's representatives that he had brought the evidence of Murphy's fraud to the attention of federal prosecutors in the Eastern District of New York, who have commenced a criminal investigation.

### The Notice of Default, Acceleration of Debt and
### The Senior Secured Lenders' Efforts To Inspect and Protect Their Collateral

22.    As of April 18, when Stephens notified IDBNY of the fraud at Oak Rock, the Bank Group was owed from Oak Rock $89,910,826, $32,779,869 of which was owed to IDBNY.

23.    In response to the information it learned from Stephens, IDBNY issued to Oak Rock notices of default and reservation of rights, dated April 23, 2013, copies of which are collectively attached under Exhibit G.

24.    By letter dated April 29, 2013, prior to the filing the Petition for relief under chapter 7, IDBNY, as agent, accelerated Oak Rock's payment obligation in accordance with the terms of the Credit Agreement.  A copy of Oak Rock's acceleration notice is attached under Exhibit H.

25.     In order to assess its collateral and protect its interests, IDBNY's counsel hired RAS Management Advisors, LLC ("RAS"), a crisis management firm with substantial experience with financial frauds, to examine the Bank Group's collateral – including the Oak Rock's loan documents with its customers, its computers and its books and records – to determine the nature, scope and size of the fraud perpetrated by Murphy, and sought to gain access for RAS to enter Oak Rock's premises and inspect its computers and records.  A copy of RAS's qualifications are attached as Exhibit I.

26.     IDBNY further identified a person with the requisite combination of experience making day-to-day commercial lending decisions, managing a crisis situation and, above all else, liquidating a specialty finance company to serve as Oak Rock's Chief Restructuring Officer ("CRO").  The person IDBNY identified, with the imprimatur of the entire Bank Group, was Mark Fagnani, whose qualifications are attached as Exhibit J.  Mr. Fagnani, who operates his own consulting business called MSF Associates, LLC, is the former Chief Credit Officer of Wachovia Capital Finance, an asset based lending unit of Wachovia Bank.  He is a banking veteran of 34 years, who has extensive experience with lending and credit procedures, debt restructuring, multi-lender loan syndications, facilitating workouts of troubled loans, fraud crises and, most significantly, liquidating a finance company.  (See Exhibit J.)

**Stephens's Misguided Exercise of Control over Oak Rock,
And Repeated Denial of the Senior Secured Lenders' Rights**

27.     Despite the Bank Group's clear rights under the Credit and Security Agreements to access and protect its collateral, Stephens has exercised complete control over Oak Rock and its assets to the exclusion of the Senior Secured Lenders.  More to the point, he has repeatedly denied IDBNY's reasonable, lawful and contractually-enforceable right to protect its collateral.

9

28.    Stephens initially refused to provide RAS with access to any of Oak Rock's books and records.  When RAS representatives were finally permitted onto the premises, they were given little, if anything, to review.  Eventually, more than a week after the fraud was discovered, RAS was given access to chattel paper and certain books and records, but was denied, until yesterday, access to Oak Rock's computer system and, most importantly, to Murphy's computer, which presumably is the key to unraveling Murphy's fraud but which I understand Stephens has taken sole possession of.  Stephens's cooperation was limited and short-lived.  On April 29, 2013, in plain violation of the Senior Secured Creditors' rights under the Credit Agreement, he barred RAS from the Alleged Debtor's offices without offering any explanation at the time.

29.    Moreover, contrary to the transparency that one would expect from a borrower who has admitted a massive fraud, Stephens has provided little, if any, transparency into what he has been doing over the past two weeks to operate the Alleged Debtor and utilize its cash.  Despite repeated requests, he has not disclosed any of the checks he has cut, and has not discussed any of the loan advances, which we understand total approximately $2,000,000, that he has decided to make to Oak Rock's customers.  In short, Stephens has denied the Senior Secured Lenders fundamental information concerning his use of the Senior Secured Lenders' cash collateral, all of which is required by the underlying loan documents.

30.    Furthermore, Stephens also has failed to take basic steps to protect Oak Rock's assets, *i.e.*, the Senior Secured Lenders' collateral.  To my knowledge, he continues to employ Murphy's son-in-law, who has had ongoing access to Oak Rock's computers and books and records.  Stephens has not installed any alarm or security cameras, and it was not until after the Senior Secured Lenders paid to install a security guard this past weekend that Stephens first thought to hire a security firm to safeguard the premises.  Nevertheless, as of yesterday, to my

knowledge, he still had not undertaken procedures to restrict or monitor internal employee access, including that of Murphy's son-in-law. Additionally, RAS has indicated that there still are no restraints, such as a lock, preventing access to Oak Rock's server, and Stephen's office, which houses, Murphy's computer remains open during the day. Original chattel paper, including 64,000 retail installment contracts, is in unlocked cabinets in unlocked offices. This lack of basic security created an opportunity for Murphy or others to remove and/or tamper with evidence and exposes Oak Rock to a theft of its property.

### Stephens's Resistance to Engaging an Expert
### Qualified and Experienced to Liquidate a Finance Company

31.     Stephens also has stubbornly and inexplicably resisted IDBNY's recommendation to install Fagnani as Oak Rock's CRO. He met with Fagnani briefly toward the beginning of last week, and then, through his advisors, disclosed to IDBNY that he did not like Fagnani's attitude and that he would not select him as a CRO.

32.     Instead, Stephens set out to interview his own self-selected candidates to serve as CRO of Oak Rock. Despite repeated requests, he initially refused to identify whom he was interviewing. Later, he identified the firms he was interviewing, but refused to identify the individuals and their qualifications until after he had selected (without any input from the Senior Secured Lenders) the CRO.

33.     On Friday, April 26, Stephens, through his advisors, informed IDBNY that he had decided to hire the firm of CohnReznick to serve as CRO of Oak Rock. A copy of the e-mail from Stephens's attorney apprising IDBNY of the selection is attached as Exhibit K.

34.     CohnReznick is the result of a merger of two middle-market accounting firms, J.H. Cohn and Reznick, Fedder & Silverman, that apparently also provides restructuring and

turn-around services, but has no discernible experience either operating or liquidating a finance company.

35.    IDBNY has been informed that the engagement will be headed by Cliff Zucker, a partner based in New Jersey in the "Restructuring, Litigation and Transactional Services" group whose biography is attached as Exhibit K.  Zucker's bio manifests no experience operating or liquidating a finance company.  Three other principals and/or senior managers and/or managers in the "Valuation Advisory Services" group, IDBNY has been informed, also would work on the engagement.  Like Zucker, *none* reports experience operating or liquidating a finance company in their biographical information. (See Exhibits K & L.)

36.    While a team of CohnReznick representatives might eventually learn the ins and outs of operating a finance company, neither Oak Rock nor the Senior Secured Lenders has the luxury of that time, nor the finances to pay for such an exercise.   Moreover, CohnReznick appears to have adopted, without question, the same resentful approach toward the Senior Secured Lenders that Stephens has promoted.   Shortly after CohnReznick's team arrived at Oak Rock's offices yesterday, Stephens barred RAS from the premises.

37.    The Senior Secured Lenders have advised Stephens that they do not approve of the selection of CohnReznick as CRO of Oak Rock.   Despite that, counsel to Stephens has informed IDBNY's counsel today that Stephens has hired CohnReznick.

38.    Oak Rock is in dire need of a manager with experience operating and liquidating a specialty finance company now.  Neither Stephens nor CohnReznick has that experience.

## Stephens's Self-Interested Payments

39.    Stephens's stiff-arming of the Senior Secured Lenders appears to be part of an agenda to elevate the interests of himself and other co-investors above that of the Senior Secured Lenders.

40.    Through the efforts of RAS, IDBNY has learned that Stephens recently paid himself $37,500.  That may have been a payment of Stephens's three weeks (in advance or arrears) of his self-appointed salary of $12,500 per week ($650,000 per year) – a salary that seems unusual and excessive for someone with no prior experience in the lending industry. Furthermore, given that Stephens was an equity investor who stands to lose his $1.5 million investment, the payment to himself as an insider of such a substantial salary raises serious questions regarding his self-interestedness and judgment.

41.    Equally significantly, IDBNY has learned that Stephens has paid $75,000 to a consulting firm called Gladstone Consulting Inc. ("Gladstone"), a two person restructuring firm based in Pittsburgh that Stephens informed the bank he had engaged to provide restructuring advice.  In fact, Gladstone's two principals, Aubrey and Marianne Gladstone, IDBNY has learned, were investors in Oasis whose money Stephens invested in Oak Rock.  Stephens's payment to Gladstone further confirms the appearance that Stephens's agenda is to repay himself and his co-investors at the expense of the Senior Secured Lenders.

42.    In addition, IDBNY was informed by RAS that on April 17, 2013, the day that Murphy resigned and appointed Stephens as sole manager, Oak Rock wired more than $125,000 to Elinor Yagerman, who has been identified to us as Murphy's mother-in-law and who we believe was a participant in one or more of Oak Rock's loans.

## The Relief Sought by IDBNY

43.    Stephens has less than two weeks of experience at the helm of a lending company, and the army of CohnReznick turnaround and valuation specialists he has engaged have no more experience than he does operating and liquidating a specialty finance company such as Oak Rock.  Stephens has proven himself to be unqualified and incapable of managing Oak Rock and, further, of not obtaining the professional(s) needed to operate the company through its liquidation.  More to the point, he has proven himself unqualified and incapable of fulfilling Oak Rock's responsibilities to marshal, protect and preserve the Alleged Debtor's assets and the Senior Secured Lenders' collateral.

44.    In light of the precarious situation in which Oak Rock (the subject of a massive fraud and criminal investigation) is in, and in order to protect and preserve Oak Rock's assets and the Senior Secure Lenders' collateral, the Court should appoint an interim chapter 7 trustee immediately and empower that interim trustee not only to manage the affairs and assets of the Alleged Debtor but to operate the Alleged Debtor through its liquidation pursuant to Section 721 of the Bankruptcy Code.

45.    It is essential that an independent third-party fiduciary to the Court be appointed forthwith to ensure that the assets of the Alleged Debtor are properly marshaled, protected and liquidated in accordance with the mandates of the Bankruptcy Code.  It is clear that Stephens's insider status is materially affecting his decisions with respect to managing the affairs of the Alleged Debtor and that he must be displaced.

46.    Moreover, because time is of the essence and the Alleged Debtor's position is so precarious, the Court should shorten the time for the Alleged Debtor to answer the Petition to no more than 10 days and for the trial on the merits of the Petition to occur in no more than 20 days.

14

The Alleged Debtor's estate is filled with wasting assets and every day which goes by without them being properly administered inures to the detriment of all the creditors.

47.     Finally, while the parties await a hearing, the Court should grant certain limited relief to preserve the status quo. The Court should restrict the Alleged Debtor from making any payments to creditors -- including lenders, participants and investors -- other than to pay operating expenses and from engaging in any non-ordinary course activities. Furthermore, the Court should permit those Senior Secured Lenders that maintain bank account(s) on behalf of the Alleged Debtor, specifically Capital One, N.A., to place an "administrative hold" on such account(s) until the parties can be heard. Capital One, with which the Alleged Debtor maintains certain accounts, is a co-lender in the syndicate for which IDBNY acts as agent, and is owed more than $23,400,000 in accelerated debt.

48.     IDBNY has not previously obtained or sought any of the foregoing requested relief previously.

49.     For these reasons, on behalf of IDBNY, I respectfully request the Court grant IDBNY's application.

I declare under penalties of perjury that the foregoing is truthful and accurate. Executed this 30th day of April, 2013.

JERRY HERTZMAN
Jerry Hertzman
Senior Vice President 1