Schuyler G. Carroll
John D. Penn
David F. Olsky
**PERKINS COIE LLP**
30 Rockefeller Plaza, 22nd Floor
New York, New York  10112-0085
Telephone: 212.262.6900
Facsimile: 212.977.1649
scarroll@perkinscoie.com
jpenn@perkinscoie.com
dolsky@perkinscoie.com

Attorneys for the Official
Committee of Unsecured Creditors

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>OAK ROCK FINANCIAL, LLC,<br><br>       Debtor. | Chapter 11<br><br>Case No. 8-13-72251-reg |
| THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS on behalf of the bankruptcy estate of OAK ROCK FINANCIAL, LLC,<br><br>       Plaintiff,<br><br>   v.<br><br>ISRAEL DISCOUNT BANK OF NEW YORK, Individually and as Agent Under Certain Credit Agreements, BANK LEUMI USA, BANK HAPOALIM B.M. and CAPITAL ONE, N.A.,<br><br>       Defendants. | Adv. Pro. No. _____ |

## **COMPLAINT**

The Official Committee of Unsecured Creditors (the "***Committee***") on behalf of the

bankruptcy estate of Oak Rock Financial, LLC, the debtor and debtor-in-possession in the above

captioned case (the "***Debtor***" or "***ORF***"), having been granted leave to commence, prosecute and settle claims and/or causes of action against the named Defendants, by and through undersigned counsel, alleges as follows:[1]

## PRELIMINARY STATEMENT

1.      ORF's principal pled guilty to a massive fraud that led to the collapse of its lending business and cost creditors tens of millions of dollars.  ORF raised millions of dollars by promising that it would use the new money it received to make loans to its customers who would finance consumers' purchases, and then pay returns from the consumers' loans to those who advanced the new money.  When those consumer loans defaulted, ORF camouflaged those problems.  Similar to a Ponzi scheme, by 2009, ORF was making its own payments at least in part from new money, rather than from payments generated by the consumer loans

2.      ORF's primary lender, was closer to ORF and had more contact, control and information about ORF than any other creditor.  From the outset, IDB was responsible for managing ORF's collateral.  IDB was so close and had such control that IDB was an "insider" under the Bankruptcy Code.  ███████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████  IDB even employed John Murphy's son-in-law in its credit risk department.

3.      Notwithstanding these red flags, IDB kept ORF in operation and foisted tremendous risks onto ORF's creditors.  ███████████████████████████████████

████████████████████████████████████████████  Just weeks before

---

[1]      This Complaint includes Confidential Information that is subject to one or more protective orders by this Court.  Consequently, a redacted version is filed along with a request to approve the filing of an unredacted version under seal.

ORF collapsed, ███████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████

4.      IDB was so close to ORF that their Credit Agreements required that IDB receive logins and passwords for direct 24 hour access into ORF's computerized financial records to monitor the underlying receivables in real time just like an ORF officer.  For IDB to claim that it was unaware of what ORF actually was doing, IDB had to be willfully blind to the information it was receiving ████████████████████████████ Accordingly, the Committee requests that IDB's claim be equitably subordinated to unsecured creditors.

5.      The liens that IDB asserts have defects that preclude a secured claim from being allowed.  Those defects include a UCC-1 financing statement that ceased to be effective when the underlying loan was repaid, another UCC-1 financing statement that lapsed and its last UCC-1 financing statement that must be avoided as a preference.  In short, the secured position that IDB asserts does not exist and the Complaint requests a declaratory judgment that IDB has no liens on ORF's assets.

6.      Finally, as is common in Ponzi schemes, ORF made payments and incurred debts to IDB that were part and parcel of, and in furtherance of, ORF's massive fraud.  The payments IDB received and the debts that ORF incurred must be set aside and recovered by ORF's bankruptcy estates since those transfers were made in furtherance of ORF's scheme, and IDB was not a good faith transferee.

7.      IDB presents itself as an outsider, an arms-length lender.  The truth is that IDB was an insider in every sense of the word, should be treated as such by returning what it received and having its claims subordinated to bona fide creditors.

## THE PARTIES

8.      The Committee was appointed by the United States Trustee on May 27, 2014 (Docket No. 574) and amended on June 19, 2014 (Docket No. 614) pursuant to Section 1102(a)(1) of title 11 of the United States Code (the "***Bankruptcy Code***").

9.      ORF is the Debtor on whose behalf this action is filed.  The Defendants are creditors of ORF that either filed a proof of claim in ORF's bankruptcy case or had a proof of claim filed on their behalf.

10.      In addition to the standing provided in 11 U.S.C. § 1109 and relevant precedential authority, this Court authorized the Committee to commence, prosecute and compromise causes of action on behalf the ORF's bankruptcy estate by its Order entered August 12, 2014, Docket No. 674 in ORF's bankruptcy case.

11.      The Defendants consist of: Israel Discount Bank of New York ("IDB"), Bank Leumi USA ("***Leumi***"), Bank Hapoalim B.M. ("***Hapoalim***") and Capital One, N.A. ("***Capital One***").  IDB acts as the agent under one certain Credit Agreement and prior similar agreements. IDB, Leumi, Hapoalim and Capital One are lenders under the Credit Agreement.

12.      IDB, an insured depository institution as defined in section 3 of the Federal Deposit Insurance Act, may be served with a summons by certified mail to the President of Israel Discount Bank of New York at 511 Fifth Avenue, New York, New York  10017.  For all times before May 9, 2006, IDB acted in its individual capacity.  On and after May 9, 2006, IDB acted individually and as the "agent" of the members of the syndicated bank group as the bank group was composed from time to time.  Also as noted below, all relief sought against IDB is also sought against each the members of the bank group as a result of IDB's actions.

13.     Leumi, an insured depository institution as defined in section 3 of the Federal Deposit Insurance Act, may be served with a summons by certified mail to the President of Bank Leumi USA at 579 Fifth Avenue, New York, New York 10017

14.     Hapoalim, an insured depository institution as defined in section 3 of the Federal Deposit Insurance Act, may be served with a summons by certified mail to the President of Bank Hapoalim B.M. at 1177 Avenue of Americas, New York, New York 10036.

15.     Capital One, an insured depository institution as defined in section 3 of the Federal Deposit Insurance Act, may be served with a summons by certified mail to the President of Capital One, National Association at 1680 Capital One Drive, McLean, Virginia 22102.

16.     On April 29, 2013 (the "Petition Date"), IDB, Leumi and Hapoalim filed an involuntary petition under Chapter 7 of the Bankruptcy Code in the United States Bankruptcy Court, Eastern District of New York (the "Court") against ORF.

17.      On May 6, 2013, the Court entered an Order approving ORF's motion seeking to convert this case to a case under Chapter 11 of the Bankruptcy Code and denying the relief sought under the involuntary petition.

18.     ORF continues to manage and operate its business as debtor in possession pursuant to Bankruptcy Code §§ 1107(a) and 1108 under its Chief Restructuring Officer.  On August 12, 2014, the Court authorized the Committee to commence this action on behalf of ORF's bankruptcy estate (Docket No. 674).

## JURISDICTION AND VENUE

19.     This civil proceeding arises under and otherwise relates to a case under the Bankruptcy Code.  This is a core proceeding pursuant to Section 157(b)(2) of title 28 of the United States Code.  This Court also has jurisdiction over this adversary proceeding pursuant to

28 U.S.C. § 1334, 11 U.S.C. §§ 502, 510, 544, 547, 548, 550, 551, 2201 and 2202 as well as

N.Y. Debt. & Cred. §§ 273, 274, 275 276, 276-a, 278, and 279.

20.    Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391 and 1409.

21.    This adversary proceeding is initiated under Rule 7001 of the Federal Rules of

Bankruptcy Procedure.

22.    The Court's cash collateral order in ORF's bankruptcy case required the

Committee to assert any causes of action against IDB on or before August 18, 2014.  The

Committee's preliminary review of the relevant facts and documents in the limited time available

is still underway and additional discovery will be required to better understand the facts and

circumstances.  The Committee expressly reserves is right to amend this Complaint as additional

evidence is obtained regarding the relevant facts and circumstances.

23.    Pursuant to 11 U.S.C. § 544(b), the Committee on behalf of ORF's bankruptcy

estate, is also empowered to assert claims and causes of action to  "avoid any transfer of an

interest of the debtor in property or any obligation incurred by the debtor that is voidable under

applicable law by a creditor holding an unsecured claim that is allowable" under 11 U.S.C. §

502.  There exist one or more creditors with such claims that date well before 2005.  Such

creditors include Christopher Dowd, Custodian for Matthew Dowd (a minor child), as reflected

on the proof of claim designated as Claim No. 68 on the Claims Register in this case.

## FACTUAL ALLEGATIONS[2]

24.    In 2001, ORF was incorporated in Delaware as a limited liability company.  Its

co-founder and day-to-day manager during all relevant times was John P. Murphy ("Mr.

Murphy").  ORF was an asset-based lending company that participated in financing installment

---

[2]  The factual allegations in this Complaint apply to all causes of action.

contracts for the purchase of goods ranging from automotive products, furniture and electronics to equipment and appliances. ORF obtained funding by borrowing money from commercial banks and selling "loan participations" to individuals. ORF's customers reportedly used these funds to finance installment contracts for the purchase of consumer goods or to extend small business loans.

### IDB's Close Relationship with Oak Rock Financial

25.    ORF had a banking relationship with IDB since its inception in 2001. No lender to ORF had a longer, deeper or closer relationship with ORF than IDB. IDB was to manage ORF's collateral.

26.    In 2006, IDB ceased lending to ORF in its individual capacity and instead assembled a syndicated bank group that included Leumi to lend to ORF. IDB served as the "agent" bank of the group and was authorized to act on behalf of the other lenders. Over the course of the many years that followed, IDB spent a significant amount of time and effort soliciting and retaining lenders to be part of the syndicated bank group. Over the years, a number of different lenders joined with and disassociated from the bank group. As a lender would join the syndicated bank group, it would sign an "Instrument of Accession" to bind itself to the agreements initially signed by IDB as part of the loan facility.

27.    One of the requirements under the various Credit Agreements was to allow IDB to conduct field examinations of ORF's operations and assets (the underlying loans by ORF) at ORF's expense. From and after 2001, IDB (or those acting at its direction) conducted those field examinations. Also, each loan agreement or Credit Agreement beginning in 2004 (if not earlier) through the most recent version included a requirement that ORF provide its then current computer access codes to IDB to give IDB direct and continuous access to ORF's computerized

- 7 -

books and records regarding ORF's loans, receivables and items IDB claimed as its collateral. As a result of the field examinations, real time access to ORF's financial records and the other contacts and connections between IDB personnel and ORF, IDB had more information regarding ORF's assets, liabilities and operations than any other creditor.

28.     The relationship between IDB and ORF was so close that during 2012 Christopher Dowd, the son-in-law of ORF's co-founder, Mr. Murphy, was employed by IDB as a First Vice President, Credit Risk Management.  The Credit Risk Management department at IDB is the department responsible for overseeing loans and credit policy to either prevent or mitigate the type of fraud that Mr. Murphy pled guilty to committing.  Upon information and belief, IDB identified Christopher Dowd as the potential successor to Mr. Murphy at ORF.  The Committee will obtain discovery regarding Christopher Dowd's employment will develop additional facts regarding the further connections between Christopher Dowd, IDB and ORF.

**Fraud at Oak Rock with IDB's Knowledge and / or Willful Blindness**

29.     On December 20, 2013, Mr. Murphy pled guilty to a number of allegations contained in a criminal information.  Among other things, Mr. Murphy pled guilty to committing bank fraud, including "[be]ginning in January 2009 and continuing through April 2013, the defendant JOHN MURPHY, together with others, deliberately and falsely overstated the accounts receivable on the consolidated financial statements and [Borrowing Base Certificates] that were supplied to [IDB].  According to his plea, Mr. Murphy "achieved this result by a variety of means, including: (a) changing delinquency dates to keep collateral and loans current; (b) booking fictitious payments, thereby creating fictitious accounts receivable; and (c) "reaging"

delinquent accounts receivable by copying data from timely paid accounts to make the loans appear stable and unlikely to default."[3]

30.    IDB knew or should have known of the irregularities and improprieties (including those that matured into the guilty plea) that left the inaccurate impression that ORF's financial condition was substantially better than it actually was.  These irregularities and improprieties had the effect, among others, of overstating the customer accounts that would be eligible for ORF to borrow against and otherwise masking problems with the loans and accounts receivable that ORF reflected and reported among its assets.  The overstating of consumer accounts was accurately predicted and ███████████████████████████████████████████ ███████████████████████ These irregularities were not disclosed and warnings were not heeded which permitted IDB to continue to receive payments from ORF, the proceeds from the sale of "participation agreements" and otherwise adversely affect ORF's creditors at the expense of the creditors.

31.    ORF would falsely note in its financial records (and then report to others) that it received payments from one or more of its customers' borrowers when, in truth and fact, ORF never actually received the funds and in many instances the funds never actually changed hands. Upon information and belief, certain of ORF's customers would report that they had received one or more payments.  ORF would not confirm the receipt of such funds or that the underlying loans were in fact being kept current by the end borrower. This activity was known to IDB ██ ████████████████████████████████████████████████ yet IDB permitted ORF to continue the practice over a number of years.

---

[3]  U.S. v. Murphy, Case 2:13-cr-00702-LDW-GRB, U.S. District Court for the Eastern District of New York, Docket No. 4.

32.    Reports to IDB ███████████████████████████████ ████████ show that the ████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ created the impression that delinquent accounts from a loan customer were actually current and performing when that was not the true state of ORF's affairs.   Notably, the ████████████████ ████████ included information ██████████████████████████████████████ ████████

33.    Beginning in 2009 (if not earlier), IDB had either actual or constructive knowledge of the Debtor's practices of "delinquency adjustments" and claiming credit for payments reportedly received from its customers but that that Debtor never actually received. Alternatively or additionally, IDB engaged in willful blindness with respect to these issues by consciously disregarding repeated warnings it was receiving regarding those actions.

34.    ████████████████████████████████████████████████ ███████████████████████████████████████████████████ ████████████████████████████████    Nevertheless, ORF continued to solicit and obtain "loan participations" in 2010, 2011, 2012 and 2013 with IDB's encouragement.

35.    █████████████████████████████████████████



LEGAL122943892.7



36.

---

[4]  IDB_ORF PP2004_012450 - 1, from the report of the field examination report in December 2010.  (BBR is a Borrowing Base Report).  The issue of delinquency adjustments arose at least in January 2009.

LEGAL122943892.7



mphasis supplied.)

37.

38.

Emphasis supplied)

39.

---

[5] IDB_ORF_PP2004_012452.

[6] IDB_ORF_PP2004_018031.

█████████████████████████████████████████████████████████

████████████ (Emphasis supplied.)

40.   ██████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

██████████████ ████ █████████████████████████████████████

███████████████████████████████████████████

41.   IDB did appear to be keenly aware of the irregularities and improprieties in one

respect ██████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

████████████████

42.   ███████████████████████████████████████████████████
█████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████
████████████████████████

---

[7]  IDB_ORF_PP2004_020581.

[8]  IDB_ORF_PP2004_023132.

[9]  ███████████████████████████████████████████████████████
████████████████████████████████████████████████████████

(Dell_ORF_IDB00033814)

43.    Another effect of the irregularities and improprieties is that ORF was insolvent during and after 2009, if not earlier.

44.    IDB's knowledge and / or willful blindness would also prevent IDB from requesting relief under 11 U.S.C. § 548(c) as one that acted in "good faith" since it had knowledge of the very fraud that was underway.

### Payments by Oak Rock

45.    At all relevant times, ORF paid IDB from its operating accounts.  For its part, IDB has claimed in other pending adversary proceedings, that ORF's "records reflect the commingling of the Debtor's cash receipts."

46.    Upon information and belief, most of the payments to IDB were of interest only.

### IDB's Rating of the Risk of its Loan to Oak Rock v. Risk Ratings for Junk Bonds

47.    At all relevant times, ████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████

---

[10]    IDB's Annual Report provides the following description of the CCRR

The System uses a 10-category CCRR scale with a 1-rating reflecting the best possible risk and a 10-rating reflecting the worst (loss).  In order to accommodate the Company's regulatory policies and guidelines, the four worst rating categories, which are referred to as "Criticized and Classified" categories (7 through 1 0), correspond directly to the regulatory classifications of Special Mention=7, Substandard=8, Doubtful =9, and Loss=1O. Following is a chart that summarizes the Company's 10-point scale, matching the CCRR to external ratings and bank regulatory scale:

. . .

| CCRR | External Debt Rating Equivalent |
|------|--------------------------------|
| 4    | BBB                            |
| 5    | BB                             |
| 6    | B                              |

...

Excerpt from http://www.idbny.com/pdfs/Audited_Financial_Statements_2013.pdf , p. 32.

[11]    According to NASDAQ, "**Junk Bonds** - These are the bonds that pay high yields to bondholders because the borrowers don't have any other option.  Their credit ratings are less than pristine,

███████████████████████████████████████████████████

████████████████████████████

48.     IDB, having taken the position that all of the debts payable to ORF are part of its collateral and that "loan participations" have a lower priority (that of unsecured debt), necessarily have considered the "loan participations" to have greater credit risks than IDB was exposed to.[12]

49.     As noted above, ORF obtained substantial funding for its operations through the sale of "loan participations."   Over $60 million of its outstanding obligations were created through the sale of "loan participations."

50.     ORF's records reflect that between December 31, 2007 and February 28, 2013, the amount of the "loan participations" sold went from ██████████████████████.

51.     The various Credit Agreements executed by ORF and IDB both specifically contemplated and permitted the sale of "loan participations."[13]  Further, the periodic reports IDB required ORF to submit both excluded customer borrowing related to such "loan participations" from ORF's "Borrowing Base" and reflected such borrowing as being the "Participants share of collateral." ███████████████████████████████████████████

███████████████████████████████████████████████████

---

making it difficult for them to acquire capital at an inexpensive cost.  Junk bonds are typically rated at BB/Ba or less."
http://www.nasdaq.com/investing/junk-bonds-everything-you-need-to-know.stm

[12]    See Appellant's Brief, p. 47, Case 2:14-cv-03873-SJF, Docket No. 10, U.S. District Court, Eastern District of New York.

[13]    These were defined as "Borrower Participations" in the 2011 Credit Agreement.  Sec. 7.8 of that document provided, in pertinent part, "No Credit Party shall sell, transfer, convey, assign or otherwise dispose of any of its properties or other assets, including the Stock of any of its Subsidiaries (whether in a public or a private offering or otherwise) other than (a) sales of Borrower Participations, . . . ."

- 15 -



52.

53.

54.     As such, any person or entity that was either a "loan participant" or was considering purchasing a "loan participation" and which requested copies of the loan documents reflecting ORF's borrowing from IDB would have reasonably concluded that neither IDB would have asserted that the portions of ORF's loans to customers that were related to the "loan participation" would be claimed to be part of the collateral claimed to secure the IDB debts.

---

[14]   This was apparently the final Borrowing Base certification that Mr. Murphy provided to ORF and bears Bates Numbers IDB_ORF_PP2004_014847.

[15]   IDB_ORF_PP2004_012058 (12061-2).

[16]   IDB_ORF_PP2004_11548.

LEGAL122943892.7

55.     Creditors who provided ORF with millions of dollars in exchange for "loan participations" discovered the extent of the harm they suffered when IDB argued that "loan participations" were unsecured debt notwithstanding IDB's prior statements or documentation.

### Control and Foisting High Risk Debt Onto "Loan Participants"

56.     The various formulas included in the Credit Agreements (as they were amended from time to time) effectively required ORF to seek out funding from the sale of "loan participations" or other borrowing.  In doing so, unsuspecting "loan participants" purchased very risky "loan participations" at their expense and for the benefit of IDB -- the creditor with the most insight and information into ORF's financial condition and operations and the party that knew or should have known that ORF's practices were inflating the amount of performing customer loans while suppressing a host of problems occurring within the loan and accounts portfolio.

57.     Perhaps the most telling example of this occurred in February 2013 with the execution of Amendment No. 4 to the 2011 Credit Agreement when it was realized that Waiver and Amendment No. 3 was violated immediately upon its execution (and effective November 30, 2012)  since ORF was at that moment out of compliance with the covenant that limited its loans to Merchants Advance.  ORF was given sixty days to reduce the amount of that customer's debt carried on ORF's financial statements ██████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████  This occurred at a time after IDB was particularly aware of the issues that ████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████

58. ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████      ████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████

59.    IDB had control over ORF in a number of different ways.  A variety of provisions in the loan documents provided IDB with substantial control over ORF by creating a host of technical defaults that could, and in practice did, create potential defaults continually.  The actual and potential defaults, coupled with Mr. Murphy's guaranty and his son-in-law's job at IDB, provided mechanisms for IDB to effectively control Mr. Murphy with a virtual Sword of Damocles (his guaranty and his daughter's husband's job) always hanging overhead.  The provisions in the 2011 Credit Agreement[18] (listed below) and the comparable provisions in the predecessor Credit Agreements are among those that provided such a high level of control include those listed below.  As noted above, IDB actually used those provisions to control ORF's efforts to actively solicit sales of "loan participations" to parties IDB later asserted to have general unsecured claims rather than ownership interests in various loans.

A.    The 2011 Credit Agreement included the following limitations on ORF in Section 7.17, "Borrower shall not make a loan, advance or other financial

---

[17]    Dell_ORF_IDB00000143.

[18]    The 2011 Credit Agreement is attached as Exhibit "A" to the proof of claim filed in the bankruptcy case by IDB, Claim No. 6.

accommodation to any one Client/Dealer or its Affiliates which together with all other then outstanding loans, advances and other financial accommodations to such Client/Dealer and its Affiliates which in the aggregate exceed the lesser of (a) $6,400,000 and (b) 25% of the Capital Funds of Borrower except for loans, advances and other financial accommodations to (i) Auto Underwriters of America, Inc. which shall not exceed $11,000,000 at any one time outstanding, (ii) Merchants Advance which shall not exceed $8,200,000 at any one time outstanding, and (iii) MK Auto which shall not exceed $6,900,000 at any one time outstanding." As noted herein this was amended after ORF violated this limitation and was forced to sell additional loan participations. This provision also limited the new customers ORF could provide financing for.

B.      The 2011 Credit Agreement included the following limitations on ORF in Section 7.19, "After the Effective Date, Borrower shall not enter into any Client/Dealer Loan Agreement or any other agreement to provide a Client/Dealer and Affiliates of such Client/Dealer with loans, advances and other financial accommodations in excess of $5,000,000 in the aggregate at any one time outstanding." This provision also limited the new customers ORF could provide financing for.

C.      The 2011 Credit Agreement included the following limitations on ORF in Section 7.15 that controlled what ORF could do with one of its primary operational documents - its lending manual (the "Loan Policy"), "Borrower will not make or allow to be made any amendment to the Loan Policy, other than amendments, that do not adversely affect the interest of Agent or Lenders without the prior written consent of Agent and the Supermajority Lenders."

D.      The 2011 Credit Agreement included the following limitations on ORF in Section 6.11, "No later than June 30, 2011, Borrower shall enhance its software programs to enable Borrower to provide Agent with such information as Agent shall require to determine dilution of Accounts."

E.      The 2011 Credit Agreement went even further in providing access and control to IDB when Annex D (referring to Sec. 5.1 of the Credit Agreement) required ORF to deliver to IDB "the internet access codes to Borrower's

computerized Books and Records with respect to all Loan Receivables, Customer Obligations and the Collateral."[19]   Direct access into ORF's financial records reflects an extremely close relationship since it provides the ability to monitor ORF in real time if not to alter those records and reports that such access would provide.

F.    The 2011 Credit Agreement included the following limitation on ORF in Section 7.21, "The Borrower shall not change or amend the Operating Agreement, including . . . ."   ORF's Operating Agreement effectively placed Mr. Murphy in control of ORF's internal decision making processes.

G.    Annex F to the 2011 Credit Agreement included covenants to report the following financial metrics at the risk of being declared in default:  "a Senior Debt Ratio of not more than 2.75 to 1.00," a minimum amount "Capital Funds at the end of each Fiscal Quarter," a "Interest Coverage Ratio . . . of not less than 1.25 to 1.00" and that "Borrower shall not incur a Net Loss for any Fiscal Quarter."

H.    The 2011 Credit Agreement included the following requirement on ORF in Section 9.1(m) and (l) that made it an Event of Default if either, "John P. Murphy is no longer the chief operating officer or manager of Borrower" or "any Change of Control occurs."   As a matter of fact, IDB declared on April 23, 2013 that Mr. Murphy's resignation as an officer of ORF constituted an Event of Default that ultimately became one of two bases for accelerating the debt asserted by IDB. This provision of the Credit Agreement provided IDB with control over ORF through controlling Mr. Murphy.

I.    The 2011 Credit Agreement included the following provision in Section 5.2 that provided IDB with exceptional access to ORF's advisors, information and reporting, "Each Credit Party executing this Agreement authorizes (a) Agent . . . to communicate directly with its independent certified public accountants and authorizes and shall instruct those accountants and advisors to communicate to Agent and each Lender information relating to any Credit Party with respect to the business, results of operations and financial condition of any Credit Party."  Providing a lender with direct access to a customer's certified public

---

[19]    A similar provision was included in each Credit Agreement or Loan Agreement dating to 2004.

accountant also gives a lender substantially more insight than the lender could ever obtain through obtaining periodic reports.

To the extent that other Credit Agreements included the same or similar provisions, the Committee on behalf of ORF's bankruptcy estate would show that such provisions enabled IDB to exert control over ORF and its operations.  IDB exerted such control over ORF during such times as those provisions were applicable in the Credit Agreements.

## Information regarding Loan Documents

60.    On or about July 19, 2001, ORF, as borrower, and IDB, as lender, entered into a General Security Agreement (the "*2001 Security Agreement*") and related documents and agreements (collectively, the "*2001 Loan and Security Agreements*", and such loan facility, as amended and restated, the "*2001 Loan Facility*"), pursuant to which IDB, inter alia, provided an $18,000,000.00 line of credit to ORF to finance the ORF's operations.  Under the 2001 Security Agreement, ORF provided a blanket lien on all assets for IDB's benefit.

61.    On July 31, 2001, IDB filed a UCC-1 financing statement (designated as Filing Number 10835905) (the "*2001 Financing Statement*") against ORF with the Delaware Secretary of State.  Like the 2001 Security Agreement, the 2001 Financing Statement provided a blanket lien on all of the "Debtor's now owned and hereafter acquired assets, including without limitation  all accounts, goods, inventory, equipment, instruments, documents, chattel paper, deposit accounts, letter of credit rights, commercial tort claims, financial assets, securities, and  all  other  investment property, general intangibles and all supporting obligations and products and proceeds of the foregoing."  Continuation financing statements were filed for the 2001 Financing Statement on each of May 23, 2006 (Filing Number 61736958) and May 17, 2011 (Filing Number 2011 1856387).

62.    IDB and ORF agreed to restate the terms and conditions of the 2001 Loan and Security Agreements pursuant to that certain Loan and Security Agreement, dated as of April 16, 2004 (as amended from time to time, the "***Restated 2001 Loan and Security Agreement***"). Under that agreement, IDB and ORF agreed to, among other things, increase the line of credit to $25,000,000.00, and grant to IDB a lien on all of the ORF's property and assets of any kind. *See* § 3 (definition of "Collateral"), § 10 (definition of "Property") and § 3.1 (grant of collateral).

63.    In 2006, ORF actually paid off the 2001 Loan Facility and entered into a new financing with a syndicated group of banks for whom IDB was acting as the agent. Specifically, pursuant to that certain Credit Agreement, dated as of May 9, 2006 (as amended, the "***Original 2006 Credit Agreement***, and such loan facility, the "***2006 Credit Facility***"), among ORF, as borrower, IDB, and certain lenders parties thereto, ORF borrowed $50,000,000 to (a) payoff the 2001 Loan Facility and (b) provide working capital and for general corporate purposes for the Debtor's business. *See* § 2.7 of that Credit Facility. The 2006 Credit Facility, however, neither amended nor restated IDB's 2001 Loan Facility, but *expressly* *required* that the 2001 Loan Facility be paid off in full. *See*  § 1 (Recitals) and § 2.7 (Use of Proceeds). The payoff was accomplished in 2006, the 2001 Loan Facility was paid in full and the liens securing the facility were extinguished.

64.    In addition, ORF and IDB entered into a new Security Agreement, dated as of May 9, 2006 (the "***Original 2006 Security Agreement***"). Unlike the 2001 Security Agreement and the Restated 2001 Loan and Security Agreement, the Original 2006 Security Agreement did *not* provide for a blanket lien on all of ORF's assets, but *only* granted a lien upon certain property set forth in a delineated list of assets. For example, in marked contrast to the 2001 Loan Facility, IDB was not granted a security interest in any "Goods" or "Equipment."

65.     Unlike the 2001 Financing Statement, the UCC-1 financing statement filed by IDB on May 9, 2006 (designated as Filing Number 61574979) (the "***2006 Financing Statement***") did <u>not</u> describe a blanket lien on all assets, but instead described the collateral as only certain property set forth in a delineated list of assets – which list was consistent with the express language of the Original 2006 Security Agreement.  Significantly, the 2006 Financing Statement also specifically referenced the Original 2006 Credit Agreement.  Such particularized list of collateral and express reference to the Original 2006 Credit Agreement further distinguishes the 2006 Financing Statement from the 2001 Financing Statement.

66.     After IDB filed the 2006 Financing Statement for the 2006 Credit Facility, on May 9, 2006 IDB filed two UCC-3s amending the 2001 Financing Statement:  (a) the first filing purported to change IDB's name by adding the designation "as Administrative Agent" (Filing Number 61575125) and (b) the second filing purported to assign IDB's UCC interests to IDB (Filing Number 61575133).  Neither of these filings amended the blanket lien aspects of the 2001 Financing Statement, nor amended the 2001 Financing Statement to make reference to the Original 2006 Credit Agreement.

67.     The 2006 Financing Statement was not continued and lapsed on the fifth anniversary of its filing.

68.     On October 3, 2012, IDB filed a UCC-1 financing statement (Filing Number 2012 3813302, the "***2012 Financing Statement***") with the Delaware Secretary of State (the "***UCC-1 Recordation***").  October 3, 2012 is more than 90 days but less than one year before the Petition Date.

LEGAL122943892.7

69.     Additional defects with respect to the liens, encumbrances and security interests (and the perfection thereof) asserted by IDB are detailed in Adversary Proceeding Nos. 8-13-08075 and 8-13-08077 pending in this Court and incorporated by reference herein.

## Cause of Action No. 1 - Equitable Subordination of IDB Claims

70.     The actions of IDB in its dealings with ORF and its creditors as outlined herein was inequitable.

71.     The inequitable actions by IDB as described herein resulted in substantial amounts of harm to ORF's general unsecured creditors and also conveyed an unfair advantage upon IDB also described herein.

72.     Subordination of the claims asserted by IDB, under principles of equitable subordination, would be consistent with the Bankruptcy Code.   Further, upon equitably subordinating the claims asserted by IDB, any liens and security interests that may secure the repayment of those claims be transferred to the estate pursuant to 11 U.S.C. § 510(c)(2).

73.     Additionally, IDB had either actual or constructive knowledge beginning in ██████ ███████████████████████████████████████████████████████████████████████ █████████████████████████████████████ As noted above, the Credit Agreements between ORF and IDB precluded ORF from modifying any of its practices or its credit policies without IDB's consent.   Such provisions prevented ORF from changing the policies and practices that benefitted IDB to the detriment of ORF's general unsecured and other creditors. ██████████████████████████████████████████████████ █████████████████████████ IDB waited for years to "pull the plug" on ORF's operations and did so only after ORF could no longer proceed.

74.     Pleading further, if necessary, the inequitable acts of IDB include the efforts to shift unreasonably large credit risks associated with the various Credit Agreements from the IDB books and records and onto other creditors by using IDB's control and dominion provided by the Credit Agreements to its advantage.   This specifically includes the actions whereby other creditors were solicited to join the bank group as wells as compelling ORF to obtain additional assets through selling "loan participations" that IDB would, within a few months in some cases, allege to actually be loans rather than acquiring partial ownership interests in specific debts. IDB, █████████████████████████████████████████████████████████ █████████, continued taking actions to off load and reduce IDB's exposure to the ORF loan while - at the same time - encouraging others to take on that risk.  This essentially foisted that risk onto others, including those buying "loan participations".

75.     Another effect of IDB's inequitable conduct was to encourage (or compel) ORF to sell additional "loan participations" that IDB would soon thereafter argue to this Court were mere unsecured loans rather than transferring an interest in one or more underlying loans.  These actions resulted in direct, discernable and discrete losses to those "loan participants."

76.     IDB, having more information and insight into ORF's operations and the risks it was taking on, was in effect playing a "heads I win, tails you lose" game with the creditors and parties who purchased millions of dollars of "loan participations."   IDB would be a direct beneficiary of the "loan participations" because of the increased cash they generated which was then converted into increased loans and receivables that the "loan participation" buyers would never realize.

77.     These actions, both individually and cumulatively over many years, were inequitable and resulted in substantial injury to ORF's creditors.   Pursuant to 11 U.S.C. §

510(c)(1), IDB's claims must be equitably subordinated for purposes of distribution to a priority that is junior to the general unsecured claims that are allowed against ORF. Additionally, pursuant to 11 U.S.C. § 510(c)(2), all liens upon the funds segregated with regard to the Leumi Participation should be transferred to the Committee for the benefit of ORF's estate.

### Cause of Action No. 2 - Objection to Leumi Claim Regarding its Participation Agreement for Subordination and Other Relief

78.      On or about August 30, 2013, Leumi filed a proof of claim asserting rights under "participation agreements" with Merchants Advance LLC and Amerimerchant LLC (collectively, "***Merchants Advance***"). Leumi's proof of claim was assigned Claim Number 17 upon this Court's Claim Register.

79.      The "participation agreements", including amendments, executed by ORF and Leumi (the "***Leumi Participation***") are the subject of Adversary Proceeding No. 8-13-08118-reg. Based on this Court's rulings in other adversary proceedings involving other "participation agreements", the Leumi Participation is a debt instrument rather than a "true" participation interests. *See* the *Supplemental Findings of Fact and Conclusions of Law* entered on April 10, 2014.

80.      The Committee reserves the right to intervene in Adversary Proceeding No. 8-13-08118-reg to assert that the Leumi Participation is a debt instrument rather than a "true" participation and seek additional relief therein.

81.      On or about January 31, 2013, IDB transmitted a letter to ORF (the "***Leumi Subordination***"), which ORF signed to note its agreement, describing the Leumi Participation and stating, in pertinent part, "Please be advised that Oak Rock, under the terms of its working capital facility, is permitted to enter into participation agreements. [IDB] hereby acknowledges,

confirms and agrees that [IDB's] rights with respect to the participated loans set forth above **is subject to** Leumi's rights to be paid on account of the above referenced participations." (Emphasis supplied.)

82.     The Leumi Subordination is a subordination agreement that is enforceable by the Committee pursuant to 11 U.S.C. § 510.  As a result of the agreed subordination placing any interest of IDB with respect to ORF's loans to Merchants Advance LLC and US Military Loans in a position junior to that of Leumi (an unsecured creditor), IDB has no right, title or interest in the funds currently set aside now (as well as those deposited in the future) in one or more segregated accounts on account of the Leumi Participation.  Such funds are free and clear of the liens, claims and encumbrances asserted by IDB and are general, unencumbered funds of ORF's bankruptcy estate.

83.     Further, the language of the Leumi Subordination makes it clear that IDB is precluded from asserting any liens, claims, encumbrances or rights of any kind in the segregated funds as a result of any rights granted under the Cash Collateral Order, including as a "replacement lien" or other "adequate protection."

84.     Any funds currently segregated on account of the Leumi Participation must be released from all restrictions and segregation and transferred to be part and parcel of the unencumbered assets of ORF's bankruptcy estate and declared to be unencumbered by any claims asserted by IDB.

85.     Alternatively and in addition to the request for other relief, the liens asserted by IDB must  be equitably subordinated for purposes of distribution to a priority that is junior to the general unsecured claims that are allowed against ORF.  Additionally, pursuant to 11 U.S.C. §

510(c)(2), all liens asserted by IDB upon the funds segregated with regard to the Leumi Participation must be transferred to the Committee for the benefit of ORF's estate.


### Cause of Action No. 3 - Preferential Transfer (UCC-1 Recordation in 2012)

86.      IDB's recordation of a UCC-1 financing statement (Filing No. 2012 3813302) on October 3, 2012 (the "***UCC-1 Recordation***" of the "***2012 Financing Statement***") is a transfer of an interest property of ORF as described in 11 U.S.C. § 547.

87.      IDB is an "insider" as defined in 11 U.S.C. § 101.

88.      The UCC-1 Recordation occurred within one year before the Petition Date.

89.      The UCC-1 Recordation was made to or for the benefit of IDB on account of an antecedent debt that was owed by ORF before the UCC-1 Recordation occurred.

90.      The UCC-1 Recordation occurred when ORF was insolvent as defined in 11 U.S.C. § 101.  Specifically, the sum of ORF's debts was greater than the value all of ORF's property, at a fair valuation when the UCC-1 Recordation occurred.

91.      The UCC-1 Recordation would enable IDB to receive more than it would receive if ORF's bankruptcy case were a case under Chapter 7 of the Bankruptcy Code, the UCC-1 Recordation had not occurred and IDB received payment of its claims to the extent provided by the Bankruptcy Code.  Without the UCC-1 Recordation, IDB would be a general unsecured creditor instead of asserting a secured claim.

92.      As a result of the avoidance of the UCC-1 Recordation, IDB's lacks any perfected liens upon and security interests in the assets of ORF and any claim it has would be wholly unsecured and the secured status asserted in ORF's assets must be rejected and denied.

93.     Pursuant to 11 U.S.C. § 547 and 11 U.S.C. §§ 550 and 551, the Committee on behalf of the ORF bankruptcy estate is entitled to judgment: (a) avoiding the UCC-1 Recordation, (b) directing that the UCC-1 Recordation be set aside, and (c) requiring IDB, as the recipient of the transfers of ORF property, and/or the person for whose benefit the transfer of ORF property was made, and/or a subsequent transferee thereof, to return the property that was transferred, or the value thereof, to the Committee for the benefit of ORF's bankruptcy estate. Additionally, any avoided lien is preserved for the benefit of ORF's bankruptcy estate.

### Cause of Action No. 4 - Declaratory Judgment Regarding Funds Held in Segregated Accounts and 2001 Financing Statement

94.     There presently exists a dispute regarding the funds currently held in segregated accounts under the direction and control of the Court as a result of IDB's assertion of a lien upon such funds.  A case and controversy exists with respect to the funds currently held in segregated accounts by ORF.

95.     To the extent that one or more of the causes of action stated in this Complaint are sustained and judgment is granted in favor of the Committee for the benefit of ORF's bankruptcy estate, the secured claim asserted by IDB would be reduced, eliminated or effectively rendered an unsecured claim.

96.     To the extent that the secured claim asserted by IDB is reduced, eliminated or effectively rendered an unsecured claim, the segregated funds held (or to be held) in one or more accounts as a result of collections upon receivables and notes that were payable to ORF become free and clear of liens, claims and encumbrances.

97.     The Committee prays that all funds owned by ORF and held (or to be held) in segregated accounts because of the secured claim asserted by IDB be released from all

restrictions and segregation, declared to be unencumbered by any claims asserted by IDB and transferred to be part and parcel of the unencumbered assets of ORF's bankruptcy estate.

98.    Further, the Committee is entitled to a declaratory judgment that the 2001 Financing Statement is of no further force, effect or consequence as a result of the satisfaction and payment in full of the debt evidenced by the 2001 Credit Agreement.  When IDB provided credit in favor of ORF during 2006, ORF paid all of the obligations under 2001 Credit Agreement and satisfied those obligations in full.  The Committee is entitled to a declaratory judgment that the 2001 Financing Statement was satisfied, any liens securing the 2001 borrowing and the 2001 Financing Statement became ineffective.

99.    The Committee, on behalf of the estate, also seeks a declaratory judgment that the 2001 Financing Statement be terminated and declared to be of no further force or effect.

## **Cause of Action No. 5 - Objections to IDB Claims (No. 6 and 11)**

100.    In an Order dated July 11, 2013, the Court established September 3, 2013 as the last date to file a claim in the Plaintiff's estate.  IDB filed Proof of Claim No. 6 asserting a secured claim in the amount of "not less than $89,910,826.88" and IDB filed Proof of Claim No. 11 asserting a general unsecured claim in the amount of "not less than $5,213,863.14."

101.    IDB received transfers that were avoidable under 11 U.S.C. §§ 544, 547 and 548 and IDB is in possession of property that is preserved for the benefit of the estate under 11 U.S.C. § 551and that is recoverable under 11 U.S.C. §§ 550 and 553.  As a matter of law under 11 U.S.C. § 502(d), the Court must disallow the claims asserted by IDB unless and until such time as the amounts have been paid, the property turned over, the obligations avoided or the estate has otherwise recovered the avoidable transfers IDB received.

102.    The causes of action stated herein also include counterclaims to the claims asserted by IDB that would reduce the amount of any claims that might be allowed.

103.    Additionally, as a result of the avoidance of the UCC-1 Recordation, IDB's alleged liens upon and security interests in the assets of ORF are wholly unsecured and the secured status asserted in ORF's assets must be disallowed.

104.    As a result of and in addition to the equitable subordination of the claims asserted by IDB, IDB's alleged liens upon and security interests in the assets of ORF are wholly unsecured and the secured status asserted in ORF's assets must be disallowed.

105.    As a result of and in addition to each of the other causes of action stated herein as well as other bases for objections to be developed in discovery, the proofs of claim filed by IDB must be disallowed.

### Cause of Action No. 6 -  Objection to
### "Adequate Protection" Relief, including Replacement Liens

106.    The cash collateral orders entered in this case included the grant of various adequate protection rights and replacement liens upon property owned by IDB as if IDB would have an allowed secured claim.  In the absence of an allowed secured claim, there can be neither adequate protection rights nor any "replacement liens."

107.    As a result of, and in addition to each of the other causes of action stated herein, the disallowance, in whole or in part, of the secured claim asserted by, IDB's claimed replacement liens upon and security interests in the assets of ORF are wholly unsecured and the post-petition secured status in ORF's assets asserted by IDB must be disallowed.  Likewise, IDB's claimed super-priority administrative expense claims (alleged pursuant to the cash collateral orders and 11 U.S.C. §§ 507(b) and 361) must be disallowed.

LEGAL122943892.7

**Cause of Action No. 7 - Fraudulent Transfers of Property (11 U.S.C. § 548)**

108.    During the two years preceding the Petition Date, ORF made transfers of ORF property to IDB, including cash payments.  These transfers include all payments made to IDB that may have been designated as "interest" or "principal" as well as payments of "fees" of any kind or character.  The total amount of such payments is unknown at this time and will be ascertained through discovery.

109.    As noted in the plea agreement of Mr. Murphy and alleged elsewhere by IDB, the operations of ORF were fraudulent from and after January 1, 2009, if not earlier.  Upon information and belief, ORF's operations during that time period were in furtherance of his fraudulent scheme and the transfers of ORF property to IDB were part and parcel of that fraud.

110.    The property was transferred with the actual intent to hinder, delay, or defraud entities to which ORF was or became indebted to on or after the date of each payment.

111.    From and after 2009 (if not earlier), ORF was insolvent because the sum of ORF's debts was greater than all of ORF's property, at a fair valuation.

112.    At the time of each of the transfers, IDB knew or should have known of the fraud and falsification that was ongoing at ORF because of, among other things, ███████████████ ████████████████████████████████████████.  Thus, IDB received the transfers without good faith and with knowledge of their avoidability.  Accordingly, IDB is not entitled to a replacement lien pursuant to 11 U.S.C. § 548(c).

113.    Pursuant to 11 U.S.C. § 548(a)(1)(A) and 11 U.S.C. § 550, the Committee on behalf of the ORF bankruptcy estate is entitled to judgment: (a) avoiding all of such transfers of ORF property to IDB, (b) directing that the transfers of all such ORF property be set aside, (c)

requiring IDB, as the recipient of the transfers of all such ORF property that was incurred, and/or the person for whose benefit the transfer of all such ORF property, and/or a subsequent transferee thereof, to return the property that was transferred, or the value thereof, to the Committee for the benefit of ORF's bankruptcy estate, and (d) denying IDB a replacement lien pursuant to 11 U.S.C. § 548(c). Additionally, any avoided lien must be preserved for the benefit of ORF's bankruptcy estate.

### Cause of Action No. 8 - Fraudulent Transfers
### by Incurring Debt (11 U.S.C. § 548)

114.    During the two years preceding the Petition Date, ORF incurred obligations in favor of IDB. The debt that was incurred includes increases in the amount of the obligations asserted by IDB. The total amount of such debt will be ascertained through discovery.

115.    As noted in the plea agreement of Mr. Murphy and alleged elsewhere by IDB, the operations of ORF were fraudulent from and after January 1, 2009, if not earlier. Upon information and belief, ORF's actions and operations during that time period were in furtherance of his fraudulent scheme and the incurrence of obligations in favor of, IDB were part and parcel of that fraud.

116.    Such obligations were incurred with the actual intent to hinder, delay, or defraud entities to which ORF was or became indebted to on or after the date of each payment.

117.    From and after 2009 (if not earlier), ORF was insolvent because the sum of ORF's debts was greater than all of ORF's property, at a fair valuation.

118.    At the time of each of the debt incurrences, IDB knew or should have known of the fraud and falsification that was ongoing at ORF because of, among other things, ███. Thus, IDB received

each such obligation being incurred without good faith and with knowledge of their avoidability. Accordingly, IDB are not entitled to a replacement lien pursuant to 11 U.S.C. § 548(c).

119.     Pursuant to 11 U.S.C. § 548(a)(1)(A) and 11 U.S.C. § 550, the Committee on behalf of the ORF bankruptcy estate is entitled to judgment: (a) avoiding the incurrence of such debt, (b) directing that the incurrence of such debt be set aside, (c) requiring IDB, as the counterparty to the ORF debt that was incurred, and/or the person for whose benefit incurrence of debt was made, and/or a subsequent transferee thereof, to transfer such debt that was incurred, or the value thereof, to the Committee for the benefit of ORF's bankruptcy estate, and (d) denying IDB a replacement lien pursuant to 11 U.S.C. § 548(c).  Additionally, any avoided lien must be preserved for the benefit of ORF's bankruptcy estate.

## Cause of Action No. 9 - Fraudulent Transfers of Property under New York Law regarding Fraudulent Conveyances, 11 U.S.C. §§ 544 and 550 and N.Y. Debt. & Cred. §§ 276, 276-a, 278, and 279

120.     During the six years preceding the Petition Date, ORF made transfers of ORF property to IDB, including cash payments.  These include all payments made to IDB that may have been designated as "interest" or "principal" as well as payments of "fees" of any kind or character.  The total amount of such payments is unknown at this time and will be ascertained through discovery.

121.     As noted in the plea agreement of Mr. Murphy and alleged elsewhere by IDB, the operations of ORF were fraudulent from and after January 1, 2009, if not earlier.  Upon information and belief, ORF's operations during that time period were in furtherance of his fraudulent scheme and the transfers of ORF property to IDB were part and parcel of that fraud.

122.     At all relevant times there have been one or more creditors who have held and still hold matured or unmatured unsecured claims against ORF that were and are allowable under

section 502 of the Bankruptcy Code or that were and are not allowable only under section 502(e).

123.    The transfers of such property (including payments) were made with the actual intent to hinder, delay, or defraud entities to which ORF was or became indebted to or after the date each transfers was made.  Mr. Murphy caused ORF to make such transfers to or for the benefit of IDB in furtherance of a fraudulent scheme.

124.    At the time of the transfers, IDB was aware or should have been aware of the fraud and falsification that was ongoing at ORF ████████████████████████████ ████████████████████████████ and thus IDB received the transfers without good faith and with knowledge of their avoidability.

125.    Pursuant to N.Y. Debt. & Cred. §§ 276, 278, and 279, and 11 U.S.C. §§ 544 and 550, the Committee is entitled to judgment: (a) avoiding all such transfers, (b) directing that all such transfers be transferred to the Committee for the benefit of ORF's estate, (c) requiring IDB, as a recipient of  such transfers and/or the person for whose benefit such transfers were made, to return such transfers, or the value thereof, to the Committee for the benefit of the ORF bankruptcy estate, and (d) recovering attorneys' fees from IDB.  Additionally, any avoided lien is preserved for the benefit of ORF's bankruptcy estate.

### Cause of Action No. 10 - Fraudulent Transfers Incurrence of Debt under New York Law regarding Fraudulent Conveyances, 11 U.S.C. §§ 544 and 550 and N.Y. Debt. & Cred. §§ 276, 276-a, 278, and 279

126.    During the six years preceding the Petition Date, ORF incurred obligations in favor of both IDB.  Such debt that was incurred includes increases in the amount of the

obligations asserted by IDB.   The total amount of such debt will be ascertained through discovery.

127.    As noted in the plea agreement of Mr. Murphy and alleged elsewhere by IDB, the operations of ORF were fraudulent from and after January 1, 2009, if not earlier.   Upon information and belief, ORF's operations during that time period were in furtherance of his fraudulent scheme and the incurrence of obligations in favor of, IDB were part and parcel of that fraud.

128.    At all relevant times there have been one or more creditors who have held and still hold matured or unmatured unsecured claims against ORF that were and are allowable under section 502 of the Bankruptcy Code or that were and are not allowable only under section 502(e).

129.     Each such incurrence of debt was made with the actual intent to hinder, delay, or defraud entities to which ORF was or became indebted to or after the date each such transfer was made.   Mr. Murphy caused ORF to incur the debt to or for the benefit of IDB in furtherance of a fraudulent scheme.

130.    At the time of each such incurrence of debt, IDB was aware or should have been aware of the fraud and falsification that was ongoing at ORF because of, among other things, ██ ████████████████████████████████████████████████, and thus IDB received the transfers without good faith and with knowledge of their avoidability.

131.    Pursuant to N.Y. Debt. & Cred. §§ 276, 278, and 279, and 11 U.S.C. §§ 544 and 550, the Committee is entitled to judgment: (a) avoiding the incurrence of each such debt, (b) directing that the incurrence of such debt be set aside, (c) requiring IDB, as recipient of  the incurrence of debt and/or the person for whose benefit the incurrence of debt was made, to return

- 36 -

each such incurrence of debt, or the value thereof, to the Committee for the benefit of the ORF

bankruptcy estate, and (d) recovering attorneys' fees from IDB.  Additionally, any avoided lien

is preserved for the benefit of ORF's bankruptcy estate.

## Cause of Action No. 11 - Relief Against Members of the Bank Group

132.    As noted above, IDB acted on behalf of the lenders that comprised the syndicated

bank group, including Leumi, Capital One and Hapoalim.  The relief requested against IDB in

each of the causes of action herein, including avoidance of transfers and debt as well as

judgments for monetary relief, should be ordered against all lenders, including Leumi, Capital

One and Hapoalim.

133.    The relief is sought against the lenders, including Leumi, Capital One and

Hapoalim because (a) IDB acted as their agent, and / or (b) they are either mediate or immediate

transferees (in each specific instance) and obligated to pay or return property pursuant to 11

U.S.C. §550(a)(1) and (2).    Additionally, any avoided lien is preserved for the benefit of ORF's

bankruptcy estate.

**WHEREFORE**, the Committee respectfully requests the Court to enter judgment as

requested in connection with each such Cause of Action outlined above and for such other and

further relief as the Court may deem just and proper.

LEGAL122943892.7

Dated: New York, New York                PERKINS COIE LLP
      August 17, 2014


By:       ***/s/ John D. Penn***
      Schuyler G. Carroll
      John D. Penn
      David F. Olsky
30 Rockefeller Plaza, 22nd Floor
New York, New York  10112-0085
Tel: 212.262.6900
Fax: 212.977.1649
scarroll@perkinscoie.com
jpenn@perkinscoie.com
dolsky@perkinscoie.com

Attorneys for the Official
Committee  of Unsecured Creditors