**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**
----------------------------------------------------------------------------X

In re:

                                        Case No. 13-72251-reg

OAK ROCK FINANCIAL, LLC,                  Chapter 11

                      Debtor.


---------------------------------------------------------------------- X

## MEMORANDUM DECISION

        Before the Court are cross-motions for summary judgment asking the Court to determine

the priority, extent and enforceability of a recorded lien against substantially all of the assets of

Oak Rock Financial, LLC (the "Debtor").  To resolve the issues raised in the cross-motions, the

Court will be guided in large part by the Delaware Uniform Commercial Code ("UCC") sections

which establish when liens are deemed perfected and the priority status of competing liens.  The

Delaware UCC applies a strict inquiry notice system, under which parties to commercial

transactions bear the risk of failing to discover and analyze the enforceability of a recorded lien.

The consequences of failing to undertake these basic steps can and often do create economic

hardships. Israel Discount Bank of New York as administrative agent ("IDB as Agent") for a

lending group that includes Israel Discount Bank ("IDB") and other lending institutions asserts it

was granted a lien on substantially all of the Debtor's assets in connection with an original

lending facility, which lien was perfected by IDB as of 2001. Although IDB as Agent was not

granted a lien on the Debtor's assets until 2006, and again in 2011 and 2012, IDB as Agent

claims its lien was perfected as a matter of law as of 2001 upon receiving an assignment of a

UCC financing statement from IDB to IDB as Agent in 2006.  As the assignee of the 2001

financing statement, IDB as Agent, as distinguished from IDB itself, was first in time to perfect

its lien, which perfection never lapsed through the date an involuntary petition was filed against

the Debtor.  North Mill Capital, LLC ("North Mill") and Medallion Bank and Medallion

Financial Corp ("Medallion," and collectively with North Mill, the "True Participants") also

cross-move for summary judgment, claiming that IDB as Agent cannot rely on the 2001 UCC

financing statement to perfect its lien.

The Court previously determined that the True Participants acquired interests in specific

loans made by the Debtor, as well as the corresponding loan receivables and loan proceeds

collected by the Debtor.  The True Participants assert, *inter alia*, that the 2001 UCC financing

statement does not perfect IDB as Agent's lien because  (1) IDB's loan to the Debtor was

satisfied  in 2006, and thereby as a matter of law the 2001 UCC financing statement was

extinguished, (2) the 2001 UCC financing statement became "seriously misleading" when it was

assigned from IDB to IDB as Agent, (3) the lien granted by the Debtor to IDB in security

agreements executed in 2001 and then in 2004 was never assigned to IDB as Agent, and (4) the

Debtor and IDB as Agent  relied on a  different UCC financing statement filed in 2006 to perfect

IDB as Agent's lien on the Debtor's assets, which lapsed in 2011.   Medallion also claims that

because it is a Utah company, IDB as Agent was required to file a financing statement in Utah to

perfect its lien within one year after Medallion purchased its loan participations from the Debtor.

Medallion asserts that once it purchased a loan participation from the Debtor, Medallion became

a "debtor" under the Utah UCC and due to Medallion's status as a "debtor," IDB as Agent was

required to perfect its lien by filing a financing statement in Utah, which never occurred.

For the following reasons, the Court grants IDB's cross-motion and denies the cross-motion of North Mill and Medallion.  Under applicable Delaware UCC law, IDB as Agent's perfected lien status relates back to the date the original financing statement was filed in July 2001, which did not lapse at any point pre-petition.  The July 2001 financing statement, which remained of record through the date the involuntary petition was filed in 2013, put the public on notice that a third party may have a security interest in the Debtor's assets, including the assets sold to Medallion and North Mill.  Any third party, including Medallion and North Mill, bore the burden of inquiry into the Debtor's true state of financial affairs and so long as the 2001 financing statement remained of record, they are deemed to have assumed the risk of entering into any transaction with the Debtor in the face of such financing statement. The assignment of the 2001 UCC financing statement from IDB to IDB as Agent did not render the 2001 UCC financing statement "seriously misleading" because the collateral description was sufficient to cover the collateral pledged to IDB as Agent.  Finally, the fact that IDB as Agent was not granted a security interest in the Debtor's assets until 2006 has no bearing on the date its lien is deemed perfected under the Delaware UCC.  As the first to perfect its lien, IDB as Agent holds a first lien position on the Debtor's assets under the applicable provisions of the Delaware UCC.

As for Medallion's argument under the Utah UCC, IDB as Agent was not required to take any additional steps to maintain its priority position over Medallion.   Medallion's purchase of loan participations from the Debtor did not cause it to fit within the definition of a "debtor" under the relevant Utah UCC provisions; it is a secured creditor with respect to the loans it purchased, along with the corresponding loan receivables and loan proceeds. Because Medallion is not a "debtor," IDB as Agent's lien status is unaffected by its failure to file any documentation with the Utah Secretary of State.

This decision resolves only the subject cross-motions and does not address any other claims by the parties in this case and the related adversary proceedings including, *inter alia*, whether the enforcement of IDB as Agent's lien is subject to equitable subordination and whether transfers made by the Debtor to IDB as Agent are avoidable, nor does it address the extent to which the lien subordination obtained and recorded by Summa Capital Corp, North Mill's predecessor, affects the status of North Mill's lien position with respect to IDB as Agent.

## PROCEDURAL HISTORY

The Debtor is a failed asset-based lending company which operated out of offices located in Bohemia, New York. On April 29, 2013 (the "Petition Date"), IDB, along with Bank Leumi USA ("Bank Leumi") and Bank Hapoaim B.M., filed a petition for involuntary relief under chapter 7 of the United States Bankruptcy Code (the "Bankruptcy Code") against the Debtor. On April 29, 2013, by corporate resolution, Clifford Zucker was appointed as the Debtor's CRO, and the Debtor retained CohnReznick, LLP as financial advisors in this chapter 11 proceeding. On May 6, 2013, upon the Debtor's motion, the case was converted to a case under chapter 11. By order dated March 6, 2014, the case was reassigned from Hon. Dorothy Eisenberg to Hon. Robert E. Grossman. On May 27, 2014, the United States Trustee filed a Notice of Appointment of Creditors' Committee ("Committee"), and on June 19, 2014, the United States Trustee filed an Amended Notice of Appointment of the Committee. On July 1, 2013, an order was entered approving the sale of the Debtor's interest in a 2005 loan agreement with Merchants Advance LLC (the "Merchants Loan") to BasePoint Merchant Lending Trust Series SPL-1 ("Basepoint") for $26 million. On September 30, 2013, Medallion filed an objection ("Lien Objection") asserting certain defects in, failure to attach to, and lapses of, the security interest and liens allegedly held by IDB as Agent under certain loan facilities entered into by and among the

Debtor, IDB as Agent and certain lender parties. On that same day, various parties in interest, including North Mill, filed joinders to the Lien Objection.  On April 10, 2014, the Court entered Supplemental Findings of Fact and Conclusions of Law in certain adversary proceedings filed in this case finding, *inter alia*, that North Mill and Medallion hold true participation interests in loans purchased from the Debtor.  However, the Court would not permit the release of funds held by the Debtor from the sale of the Merchants Loan to Basepoint, or funds collected by the Debtor on the underlying loans in which the true Participants purchased interests until a final determination was made as to the priority and enforceability of IDB as Agent's lien rights.[1]   On September 19, 2014, the Court entered a Stipulation and Order ("Briefing Order") Regarding Briefing, Hearing, Discovery and Related Scheduling Matters Pertaining to Perfection Issues. Pursuant to the Briefing Order, IDB, IDB as Agent and the True Participants were authorized to address perfection issues concerning IDB as Agent's claimed lien by filing motions for summary judgment.

On October 8, 2014, IDB and IDB as Agent, and the True Participants filed cross-motions for summary judgment pursuant to the Briefing Order.  On October 28, 2014, IDB and IDB as Agent filed opposition to the True Participants' cross-motion for summary judgment, and the True Participants filed opposition to IDB and IDB as Agent's cross-motion for summary judgment.  Also on October 28, 2014, the Committee filed an Objection to the cross-motion filed by IDB and IDB as Agent.  On November 10, 2014, replies were filed by IDB and IDB as Agent, and the True Participants, and on November 20, 2014, a hearing on both cross-motions was held. Thereafter, the cross-motions for summary judgment were marked submitted.

---

[1]     By order dated July 2, 2014, the Court granted North Mill's motion for release of $1.5 million from the Merchants Sale proceeds which were held in escrow and represented the portion of North Mill's participation interest in the Merchants Loan pursuant to the Summa Capital Corp. ("Summa") participation agreement.  Summa, North Mill's predecessor in interest, had obtained a UCC subordination statement from IDB, which was filed with the Delaware Secretary of State.

## FACTS

On July 19, 2001, the Debtor entered into a security agreement ("2001 Security Agreement") with IDB, in which the Debtor granted IDB a security interest in "the following properties, assets and rights of the [Debtor], wherever located, whether now owned or hereafter acquired or arising, and all proceeds and products thereof (all of the same being hereinafter called the 'Collateral')":

> all personal and fixture property of every kind and nature including, without limitation, all goods (including inventory, equipment and any accessions thereto), instruments (including promissory notes), documents, accounts (including health-care insurance receivables), chattel paper (whether tangible or electronic), deposit accounts (whether or not maintained at the Bank), letter-of-credit rights (whether or not the letter of credit is evidenced by a writing), commercial tort claims, financial assets, securities and all other investment property, supporting obligations, any other contract rights or rights to the payment of money, insurance claims and proceeds, tort claims and all general intangibles, including, without limitation, all tax refunds, payment intangibles . . .

(2001 Security Agreement, Edelman Aff., ECF No. 13-72251-REG, Doc. 733-1, Ex. 1, §1.) The agreement also authorized IDB "at any time and from time to time to file in any Uniform Commercial Code jurisdiction any initial financing statement and amendments" that describe the collateral "as all assets of the [Debtor] or words of similar effect." *Id.* §2.

On July 31, 2001, a financing statement ("2001 Financing Statement") was filed with the Secretary of State for the state of Delaware in which the Debtor was listed as the debtor and IDB was listed as the secured party. The collateral covered by the 2001 Financing Statement was described as follows:

> All of Debtor's now owned and hereafter acquired assets, including without limitation all accounts, goods, inventory, equipment, instruments, documents, chattel paper, deposit accounts, letter of credit rights, commercial tort claims, financial assets, securities, and all other investment property, general intangibles and all supporting obligations and products and proceeds of the foregoing.

(2001 Financing Statement, Edelman Aff., ECF No. 13-72251-REG, Doc. 733-1, Ex. 4.)

On April 16, 2004, the Debtor and IDB entered into an agreement ("2004 Security Agreement") in order to restate and amend the terms and conditions of its existing lending relationship commencing in 2001. The 2004 Security Agreement authorized IDB "to file financing statements and amendments to financing statements without [the Debtor's] signature in accordance with the UCC." (2004 Security Agreement, Edelman Aff., ECF No. 13-72251-REG, Doc. 733, Ex. 7, §3.3(b) at p. 17.)

In May 2006, with the addition of a new lender, Bank Leumi, the parties entered into two new agreements ( the "2006 Security Agreement" and the "2006 Credit Agreement") in which a line of credit extended by an agented group of lenders, at the time consisting of IDB and Bank Leumi, was given to the Debtor. Thus, the Debtor remained the borrower, IDB and Bank Leumi became the lenders, and IDB as Agent acted as the administrative agent for the group of lenders. The 2006 Credit Agreement provides as one of the conditions precedent to the agreement that "a UCC-3 Assignment executed by IDBNY in favor of [IDB as] Agent for the benefit of the Lenders" be filed. (2006 Credit Agreement, Edelman Aff., ECF No. 13-72251-REG, Doc. 733, Ex. 10, §4.1(t) at p. 19.)  The Debtor granted to IDB as Agent, for the ratable benefit of the lenders thereunder, a lien in the Debtor's accounts, bank accounts, chattel paper, documents, general intangibles, payment intangibles and other collateral set forth in the 2006 Security Agreement.  (2006 Security Agreement, Edelman Aff., ECF No. 13-72251-REG, Doc. 733, Ex. 11, § 2 at p. 2.)

On May 9, 2006, two UCC financing statement amendments were filed with the Secretary of State for the state of Delaware relating to the 2001 Financing Statement. One amended the name of the secured party of record from "Israel Discount Bank of New York" to

"Israel Discount Bank of New York, as Administrative Agent" (File No. 61575125). (2006 UCC-3 Amendment, Edelman Aff., ECF No. 13-72251-REG, Doc. 733-2.)  The other made an "assignment" of the 2001 Financing Statement from "Israel Discount Bank of New York" to "Israel Discount Bank of New York, as Administrative Agent" (File No. 61575133). (2006 UCC-3 Assignment, Edelman Aff., ECF No. 13-72251-REG, Doc. 733-2.)

Also on May 9, 2006, a UCC Financing Statement ("2006 Financing Statement") was filed with the Secretary of State for the state of Delaware in which "Oak Rock Financial, LLC" was listed debtor and "Israel Discount Bank of New York, as Administrative Agent" was listed as the secured party. The collateral covered by the 2006 Financing Statement is described as "[t]hose assets of the Debtor listed on Schedule A annexed hereto." Schedule A contains a description of the collateral as "[a]ll of the following property now owned or at any time hereafter acquired by the Debtor or in which the Debtor now has or at any time in the future may acquire any right, title or interest . . ." (2006 Financing Statement, Edelman Aff., ECF No. 13-72251-REG, Doc. 733-2.) The document then provides an expansive list of types of property and assets. The 2006 Financing Statement was not timely continued and thus lapsed.

On May 23, 2006, a UCC Financing Statement Amendment was filed with the Secretary of State for the state of Delaware by "Israel Discount Bank of New York, as Administrative Agent" with the Secretary of State for the state of Delaware continuing the 2001 Financing Statement (File No. 61736958). (2006 Continuation, Edelman Aff., ECF No. 13-72251-REG, Doc. 733-1.)

On May 17, 2011, a UCC Financing Statement Amendment was filed by "Israel Discount Bank of New York, as Administrative Agent" with the Secretary of State for the state of

Delaware continuing the 2001 Financing Statement (File No. 2011 1856387). (2011 Continuation, Edelman Aff., ECF No. 13-72251-REG, Doc. 733-1.)

On or about May 27, 2011, the Debtor entered into an "Amended and Restated Credit Agreement" with IDB, Bank Leumi and Capital One, N.A., as lenders ("Lenders"),[2] and IDB as Agent. Contemporaneously with the execution of 2011 Credit Agreement, pursuant to an Amended and Restated Security Agreement ("2011 Security Agreement"), the Debtor granted to IDB as Agent, for itself and the benefit of the Lenders, a lien "upon all of its right, title and interest in, to and under all personal property and other assets, whether now owned by or owing to, hereafter acquired by or arising in favor of such Grantor and regardless of where located . . . " (2011 Security Agreement, Edelman Aff., ECF No. 13-72251-REG, Doc. 733-6.) The 2011 Security Agreement then provides an expansive list of types of property and assets.  Pursuant to amendments or supplements to the 2011 Credit Agreement, Bank Hapoalim and First National Bank of New York became Lenders under the 2011 Credit Agreement.

On October 3, 2012, a financing statement ("2012 Financing Statement") was filed with the Secretary of State for the state of Delaware in which the Debtor was listed as the debtor and "Israel Discount Bank of New York, as Administrative Agent" was listed as the secured party. The collateral covered by the 2012 Financing Statement was described as "[a]ll assets and all property of the Debtor, whether now owned and/or hereafter acquired." (2012 Financing Statement, Edelman Aff., ECF No. 13-72251-REG, Doc. 733-6.)

On March 27, 2014, this Court issued "Supplemental Findings of Fact and Conclusions of Law" with regard to the parties claiming to have purchased loan participations from the Debtor. The Court found that only Medallion and North Mill hold "true participations." The

---

[2]      The lenders have since changed and include other entities. The Court shall refer to the current lenders as "Lenders."

Debtor holds bare legal title to the underlying loans, loan receivables and loan proceeds, and the True Participants hold equitable title to the underlying loans sold to them, along with the loan receivables and loan proceeds.  However, these assets could not at the time be excluded from the Debtor's estate because IDB as Agent asserts a lien on substantially all of the Debtor's assets, which lien existed prior to the dates that North Mill and Medallion purchased the loan participations from the Debtor.  Because IDB as Agent claims to have a perfected lien on substantially all of the Debtor's assets, which would include the cash collected and currently held by the Debtor on the underlying loans, further findings regarding the nature, extent and effect, if any, that IDB as Agent's lien has on the True Participants' interests were necessary before the rights of the various parties in and to the loans, the loan receivables and loan proceeds could be ascertained.[3]

IDB as Agent has cross-moved for summary judgment seeking a determination that it holds, and at all times since July 31, 2001, through the Petition Date, has held, a valid, perfected, first priority security interest in substantially all of the Debtor's prepetition assets.  Medallion and North Mill have cross-moved for summary judgment, seeking a determination as to whether IDB as Agent's lien is subject to perfection deficiencies due to lapsing financing statements and limitations upon the collateral, which deficiencies have caused IDB as Agent to hold, at best, a lien perfected only as of October 12, 2012, against certain assets of the Debtor, which assets exclude the loans, loan receivables and loan proceeds purchased by the True Participants.  While Medallion and North Mill assert that the relief sought by IDB as Agent is too broad, and extends beyond the issues specified by the Court, the Court disagrees.  The Court is charged with

---

[3]       The Court shall not rule on whether the subordination of IDB's lien to Summa applies to the funds the Debtor currently holds from the sale of loans pursuant to which North Mill has a participation interest.  Therefore, any findings regarding the priorities between North Mill and IDB may be affected by a subsequent ruling on this undecided issue at a later date. Likewise, the Court is not deciding whether IDB as Agent's lien is subject to avoidance or equitable subordination under applicable law.

determining the priorities of the parties' interests in the Debtor's assets, and in order to make

these determinations, the Court must determine the *prima facie* validity, as well as the priority

and extent of IDB as Agent's lien. The outcome of these issues will have an impact on whether

the True Participants purchased loans from the Debtor free and clear of any lien claimed by IDB.

## DISCUSSION

1. <u>Standard for Summary Judgment</u>

Rule 56 of the Federal Rules of Civil Procedure states, in pertinent part, that summary

judgment is appropriate "if the movant shows that there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  In ruling

upon a summary judgment motion the Court is to determine whether a genuine issue of fact

exists, not to resolve disputed issues of fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 330

(1986). "When viewing the evidence, the Court must "assess the record in the light most

favorable to the non-movant and . . . draw all reasonable inferences in [the non-movant's] favor."

*Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000) (citing *Delaware & Hudson*

*Railway Co., v. Consolidated Rail Corp.*, 902 F.2d 174, 177 (2d Cir. 1990)), *cert. denied*, 540

U.S. 811 (2003).  In a case such as this where there are cross-motions for summary judgment, the

Court is charged with examining each motion independently.  *Heublein*, *Inc. v. U.S.*, 996 F.2d

1455, 1461 (2d Cir. 1993) (citing *Schwabenbauer v. Board of Educ. of Olean*, 667 F.2d 305, 313

(2d Cir. 1981)).  The Court must also draw all reasonable inferences against the party whose

motion is under consideration. *Id*. Where, as in this case, the relevant facts are undisputed,

summary judgment may be granted.  This is especially true in this case where, even if the Court

draws all reasonable inferences against IDB as Agent on its motion, summary judgment in favor

of IDB as Agent is warranted as a matter of law.

2.    Choice of Law and Burden of Proof

In order to determine the issues raised in the cross-motions, the Bankruptcy Court is charged with applying the choice of law rules of the forum state.  *In re Hydrogen*, *LLC*, 431 B.R. 337, 346 (Bankr. S.D.N.Y. 2010).   The operative loan documents specify that New York law governs the rights of the parties.  Issues regarding the validity and attachment of the lien are governed by New York law.  N.Y. U.C.C. §§ 1-105 and 9-301 (West 2001).   Perfection of IDB as Agent's security interest is governed by the state where the Debtor is incorporated, which is Delaware in this case.  N.Y. U.C.C. §§ 9-301, 9-307(e) (West 2001). Therefore, Delaware law governs issues regarding the perfection and priority of IDB as Agent's security interest in the Debtor's prepetition assets.  *In re Motors Liquidation Co*., 755 F.3d 78, 82 (2d Cir. 2014). However, while Delaware law governs, the Court may look to decisions from any state or federal courts considering comparable UCC provisions. *In re Motors Liquidation Co*., 486 B.R. 596, 616 (Bankr. S.D.N.Y. 2013), *rev'd on other grounds*, 777 F.3d 100 (2d Cir. 2015). Pursuant to 11 U.S.C. §363(p)(2), IDB as Agent has the burden of proof regarding the validity, priority or extent of its lien.

3.    Relevant UCC Provisions

In a prior decision, this Court ruled that Medallion and North Mill purchased participations in specific loans made by the Debtor to third parties.  In order to determine whether IDB's claimed lien has any effect on the True Participants' interests in these loans, the loan receivables and loan proceeds, the Court must undertake an examination of the relevant UCC provisions. Under UCC Article 9, as adopted into Delaware law by Delaware Code Annotated Title 6, Section 9, loan participations are treated as secured transactions. DEL. CODE. ANN. TIT. 6 §9-102 and cmt. 5(d) (West 2013) ("The sale of a payment intangible is subject to

this article.").  Upon purchasing their interests in specific loans, the True Participants' interests were automatically perfected under U.C.C. §9-309(3), without the need to file financing statements. Therefore, under applicable law, the True Participants are deemed to have a perfected lien with respect to the subject loans as of the effective date of each loan participation in question.  The existence and perfection of the True Participants' liens are not in dispute. Because IDB as Agent claims to have a perfected lien on the same collateral, the Court must determine whether IDB as Agent has a prior perfected lien, and whether it lapsed at any point in time prepetition.

The two critical UCC concepts applicable to the cross-motions are "attachment" and "perfection."  4 White, Summers and Hillman, *Uniform Commercial Code* § 31-1 (6th ed. 2014). Attachment gives the creditor a lien on an asset of the debtor, and occurs when the debtor grants the lien, usually in a security agreement.  The security agreement describes the specific assets pledged by the debtor, and gives the creditor the right to collect the asset and liquidate it to satisfy the debtor's obligation upon default. *Id*. A security interest attaches to collateral when it becomes enforceable against the debtor with respect to the subject collateral. Del. Code. Ann. Tit. 6 § 9-203(a) (West 2013); N.Y. U.C.C. § 9-203(a) (West 2001). A security interest is enforceable against the debtor and third parties with respect to collateral only if value has been given, the debtor has rights in the collateral or the power to transfer rights in the collateral to a secured party, and the debtor has authenticated a security agreement that provides a description of the collateral. Del. Code. Ann. Tit. 6 § 9-203(b) (West 2013); N.Y. U.C.C. § 9-203(b) (West 2001). The security agreement must include a description of the collateral, which is deemed "sufficient, whether or not it is specific, if it reasonably identifies what is described." Del. Code. Ann. Tit. 6 § 9-108(a) (West 2013); N.Y. U.C.C. § 9-108(a) (West 2001).

Perfection is governed by Article 9 of the UCC in this case, as is priority among multiple secured creditors. White, Summers and Hillman at § 31-4. Pursuant to U.C.C. §9-322(a)(1), "[c]onflicting perfected security interests . . . rank according to priority in time of filling or perfection," such that "[p]riority dates from the earlier of the time a filing covering the collateral is first made or the security interest . . . is first perfected, if there is no period thereafter when there is neither filing nor perfection." DEL. CODE. ANN. TIT. 6 § 9-322(a)(1) (West 2013). According to the Official Comments to this section, "[t]he justification for determining priority by order of filing lies in the necessity of protecting the filing system." DEL. CODE. ANN. TIT. 6 §9-322(a)(1), cmt. 4 (West 2013).

"[A] security interest is perfected if it has attached and all of the applicable requirements for perfection [under the UCC] have been satisfied." DEL. CODE. ANN. TIT. 6 § 9-308(a) (West 2013) (emphasis added). Perfection occurs in this case by the filing of a financing statement. *See* DEL. CODE. ANN. TIT. 6 § 9-310 (West 2013). The UCC provides that the "financing statement may be filed before a security agreement is made or a security interest otherwise attaches." DEL. CODE. ANN. TIT. 6 § 9-502(d) (West 2013). The contents of a filed financing statement are sufficient if it provides the name of the debtor, the name of the secured party, and "indicates the collateral covered by the financing statement." DEL. CODE. ANN. TIT. 6 § 9-502(a)(1)-(3) (West 2013). Under the UCC, a financing statement need only contain "a description of the collateral pursuant to Section 9-108" or indicate "that the financing statement covers all assets or all personal property." DEL. CODE. ANN. TIT. 6 § 9-504 (West 2013). Minor errors or omissions in the financing statement that otherwise substantially satisfies the requirements of the statute are still effective, unless the errors or omissions make the financing statement "seriously misleading." DEL. CODE. ANN. TIT. 6 § 9-506(a) (West 2013). The Official

Comments clarify that because searches are not conducted under the secured party's name, "an error in the name of the secured party or its representative will not be seriously misleading." DEL. CODE. ANN. TIT. 6 § 9-506(a) cmt. 2 (West 2013).

The financing statement need contain "only enough information to notify a reader that the creditor named may claim an interest in described collateral of the debtor."  White, Summers and Hillman at § 31-4.  The UCC operates under a notice system. *See* DEL. CODE. ANN. TIT. 6 § 9-502 (West 2013).  The Official Comments to this section state that "[t]he notice itself indicates merely that a person may have a security interest in the collateral indicated" and third parties have the burden of inquiring to determine "the complete state of affairs."  DEL. CODE. ANN. TIT. 6 § 9-502, cmt. 2 (West 2013).  The purpose of the financing statement is not to create a lien, but to give notice to third parties of the possible existence of a lien.  DEL. CODE. ANN. TIT. 6 § 9-502 (West 2013); *WSFS v. Chillibilly's Inc*., No. Civ.A. 03C-11-021THG, 2005 WL 730060 at *13 (Del. Mar. 30, 2005).  Accordingly, the third party is "put on notice that an underlying security agreement may be outstanding."  *Bramble Transp*., *Inc*. v. *Sam Senter Sales*, *Inc*., 294 A.2d 97, 103 (Del. Super. Ct. 1971).   Such third party is charged with conducting a "reasonable inquiry" into the status of the collateral in question.  *Chillibilly's*, 2005 WL 730060 at *13.

Any party authorized by the debtor may file the initial financing statement or an amendment to the financing statement.  DEL. CODE. ANN. TIT. 6 § 9-509(a)(1) (West 2013).  Such amendments adding collateral are effective as to the added collateral only as of the date of the filing of the amendment.  DEL. CODE. ANN. TIT. 6 § 9-512(c) (West 2013).  However, there is no similar restriction on the applicability of amendments adding a creditor or assigning the financing statement to another creditor. "If an amendment of a financing statement which provides the name of the person as a secured party or a representative of a secured party is filed,

the person named in the amendment is the secured party of record." DEL. CODE. ANN. TIT. 6 § 9-511(b) (West 2013) (emphasis added).

Where the lender is paid in full and makes a new loan to the debtor, the UCC makes clear that the original financing statement perfects the lien regarding the new loan, so long as the financing statement covers the collateral pledged by the borrower. DEL. CODE. ANN. TIT. 6 § 9-502 (West 2013). According to the Official Comments to the UCC:

> A financing statement is effective to encompass transactions under a security agreement not in existence statement is sufficient to cover the collateral concerned. Similarly, a financing statement is effective and not contemplated at the time the notice was filed, if the indication of collateral in the financing to cover after-acquired property of the type indicated and to perfect with respect to future advances under security agreements, regardless of whether the after-acquired property or future advances are mentioned in the financing statement and even if not in the contemplation of the parties at the time the financing statement was authorized to be filed.

DEL. CODE. ANN. TIT. 6 § 9-502, cmt. 2 (West 2013). As leading commentators have observed: "[o]ne of the greatest boons to the secured creditor under Article 9 is the ability to file a financing statement even before any credit is extended . . . Because priority generally dates from the instant of filing rather than perfection, later extensions of credit relate back to the original financing statement." 1 Barkley Clark & Barbara Clark, *The Law of Secured Transactions under the Uniform Commercial Code*, § 2.13[1], at 2-250 (3d ed. 2014).

A financing statement is effective for a period of five years after the date of filing unless a continuation statement is timely filed. DEL. CODE. ANN. TIT. 6 § 9-515(a) & (c) (West 2013). In order to continue the effectiveness of the original financing statement for an additional five years, a continuation statement must be filed within six months before the expiration of the five-year period. DEL. CODE. ANN. TIT. 6 § 9-515(d) (West 2013).

4. <u>Legal Analysis</u>

Based on the relevant Delaware UCC provisions, IDB as Agent had a perfected first-priority lien on substantially all of the Debtor's assets as of July 31, 2001, the effective date of the 2001 Financing Statement. IDB's lien attached when the Debtor granted a lien to IDB on substantially all of the Debtor's assets in 2001, pursuant to the 2001 Security Agreement.[4] IDB's security interest was perfected by the filing of the 2001 Financing Statement with the Secretary of State for the state of Delaware, which listed the Debtor as debtor and IDB as the secured party.  IDB as Agent's security interest attached when the Debtor granted it a lien in substantially all of the Debtor's assets in 2006, pursuant to the 2006 Security Agreement and the 2006 Credit Agreement and then again in 2011, pursuant to the 2011 Security Agreement, which amended and restated the lien granted in the 2006 Security Agreement. Along with the 2006 Security Agreement, the parties also filed two UCC financing statements relating to the original 2001 Financing Statement. One amended the name of the secured party of record from "Israel Discount Bank of New York" to "Israel Discount Bank of New York, as Administrative Agent." The other made an "assignment" of the 2001 Financing Statement from "Israel Discount Bank of New York" to "Israel Discount Bank of New York, as Administrative Agent." Therefore, as of 2006, IDB as Agent was listed as a "secured party" on a financing statement that was first filed in 2001.  It is undisputed that the 2001 Financing Statement was timely continued on May 23, 2006, and May 17, 2011, and thus, never lapsed from 2001 through the Petition Date.

Along with the execution of the 2006 Security Agreement, the 2006 Financing Statement was filed, naming the Debtor as the debtor, IDB as Agent as the secured party and describing the collateral as substantially all of the Debtor's assets. The 2006 Financing Statement was not timely continued and thus lapsed.

---

[4]     See *infra* for description of the collateral.

Because the 2006 Financing Statement lapsed, IDB as Agent cannot rely on this financing statement to perfect its lien.[5]  This leaves the 2001 Financing Statement, which was assigned to IDB as Agent, as the only source of perfection of IDB as Agent's lien.  As discussed above, under U.C.C. § 9-502(d), the financing statement may be filed prior to the grant of security. DEL. CODE. ANN. TIT. 6 § 9-502(d) (West 2013). Therefore, the fact that the 2001 Financing Statement was originally filed for the benefit of IDB, and was filed approximately five years before the Debtor granted a lien to IDB as Agent, does not vitiate its effectiveness under the Delaware UCC.  Article 9 adopts a liberal attitude towards assignment of security interests, and endows the assignee with the priority rights held by the assignor. DEL. CODE. ANN. TIT. 6 § 9-302 (West 2013); *Interbusiness Bank*, *N.A. v. First Nat'l Bank of Mifflintown*, 318 F. Supp. 2d 230, 239 (M.D. Pa. 2004).  There is nothing in the UCC which prohibits or limits the effectiveness of an assigned financing statement.  Case law supports a reading of the UCC to permit assignments to relate back to the original filing date, thereby giving the assignee the same priority that was held by the assignor:

> Assignment of a 'bare' financing statement, divorced from any underlying security interest, is nonetheless a valuable asset. . . priority is determined from the date of the first-filed financing statement. See [Pa. UCC] § 9312(e)(1) (1999). It matters not whether the financing statement was filed before or after the security interest attached or whether the current secured party filed the statement initially. See § 402(a), (d) (1999).  Regardless of subsequent amendments to the secured party of record, a financing statement continues to provide notice to creditors of a claimed security interest in the debtor's collateral from the date on which it is

---

[5]    A security agreement may grant a security interest in after-acquired collateral, or may provide that the collateral secures future advances or other value. DEL. CODE. ANN. TIT. 6 §9-204.  A lien granted under a security agreement can extend to subsequent borrowings pursuant to a "dragnet clause" in the original security agreement, or the parties can enter into a new security agreement.   In this case, the sufficiency of any alleged "dragnet clause" is not relevant to determining whether IDB as Agent had a perfected lien from 2001 through the Petition Date. Because IDB as Agent is not the same legal entity as IDB, whatever rights the Debtor granted to IDB in the 2001 Security Agreement or the 2004 Security Agreement remained with IDB.  Absent a specific assignment of the 2001 or 2004 Security Agreements, IDB as Agent cannot, and at oral argument conceded that it does not, rely on the grant of security by the Debtor to IDB.

> filed. Assignments affect neither the filing date of the statement nor the ability of
> subsequent assignees to take the superior priority status that accompanies an
> earlier filing date. See § 9302, 9303(a), 9402(a), (d) (1999); Whatever the path
> followed, as soon as a party holds a security interest (arising through attachment
> of collateral) and is named as a secured party in a financing statement covering
> the collateral, the interest is perfected and priority is established as of the original
> date of filing.

*Interbusiness Bank*, 318 F. Supp. 2d at 240 (footnotes omitted). "It is worth [noting] that 'perfection' does not apply to a particular *party*, but the *interest* itself." *Id.* at 239, n7 (internal citations omitted).   Any third party searching the public record would discover that the 2001 Financing Statement was assigned to IDB as Agent, and upon reviewing the operative documents, would discover that the Debtor granted to IDB as Agent a security interest in substantially all of its assets in 2006.  Any third party would also discover that in 2011, the Debtor granted to IDB as Agent a security interest in substantially all of its assets again, pursuant to the 2011 Security Agreement.  Both descriptions of collateral in the 2006 Security Agreement and the 2011 Security Agreement sufficiently match the collateral identified in the 2001 Financing Statement.

As between IDB and the True Participants, the priority rules place IDB as Agent in the first position.  Under U.C.C. § 9-322(a)(1), "[p]riority dates from the earlier of the time a filing covering the collateral is first made or the security interest is first perfected, if there is no period thereafter when there is neither filing nor perfection." DEL. CODE. ANN. TIT. 6 §9-322(a)(1) (West 2013). Therefore, "[t]he first secured party who files or perfects has priority."  DEL. CODE. ANN. TIT. 6 §9-322, cmt 3 (West 2013).  Because the 2001 Financing Statement remained of record and never lapsed, nor was it terminated, IDB as Agent is entitled to claim a first priority lien position as of the effective date of the 2001 Financing Statement.  At any point in time from the effective date of the 2001 Security Agreement to the Petition Date, a third party examining

the underlying relevant agreements would discover the lending relationship between the Debtor and IDB as well as the subsequent lending relationship between the Debtor and IDB as Agent. Any third parties, including the True Participants, who failed to discover or who chose to ignore the 2001 Financing Statement acted at their peril. Ignorance or negligence is no defense as they are charged with knowledge of the 2001 Financing Statement and the "true state of affairs" between the Debtor and IDB as Agent. Whether they were aware of the existence of the filing and chose to ignore it or failed to discover the filing, the legal consequences are the same.

Under the UCC, the True Participants acquired their liens subject to the prior recorded lien of IDB as Agent. As a matter of law they stand in the position of junior lienholders, except to the extent they obtained subordinations from IDB as Agent.  Under the UCC, which is a notice statute, the burden is on the parties searching the public record to take appropriate action upon discovering a financing statement. *See Ardmor's Office World, Inc. v. Bank Leumi Trust Co. of New York (In re Admor's Office World, Inc.)*, Bankr. No. 91-B-10773, 1992 WL 350577 *4-5 (Bankr. S.D.N.Y., Nov. 12, 1992) (finding that so long as a reasonably diligent search likely would have discovered the financing statement, the searcher is charged with knowledge of the security interest). The burden was on the True Participants to obtain and record a subordination of any prior perfected lien, or to suffer the consequences.

As discussed below, the analysis the True Participants ask the Court to adopt is fundamentally at odds with the most basic goals of the UCC:

> One of the most important roles that the UCC plays is facilitating the efficient procession of commerce by permitting parties to rely in good faith on the plain terms of authorized public filings. The UCC thus enabled the crafting of contractual arrangements that generate wealth and the investment of capital in commercial enterprises because parties are able to rely on a clear and predicable set of rules to govern their transactions.

*Official Comm. of Unsecured Creditors of Motors Liquidation Co. v. JPMorgan Chase Bank,*

*N.A.*, 103 A.3d 1010, 1016-17 (Del. 2014) (internal citations omitted). Transacting parties bear

the burden of investigating and ensuring the meaning and effect of documents filed pursuant to

the UCC. *See id.*

     5.  <u>Challenges to IDB's as Agent's Lien</u>

According to the True Participants, IDB as Agent cannot claim a first priority lien on

substantially all of the Debtor's assets as of 2001 because the 2001 Financing Statement was no

longer effective as of 2006.  The Participants base their arguments on a variety of legal theories

discussed below.  Medallion also asserts that IDB did not comply with certain Utah UCC

provisions applicable to Medallion's rights as a perfected lien holder.   The Court shall address

these issues in serial order.

     a.  <u>The Payoff of the 2001 and 2004 Loans</u>

The True Participants assert that because the Debtor paid off the 2001 and 2004 loans to

IDB, IDB as Agent cannot rely on the 2001 Financing Statement, which they argue became

ineffective upon the satisfaction of the underlying loans.  In support of this theory, the True

Participants cite to *Harder v. United States*, No. CIV. A. 91-10513-WD, 1993 WL 667770 (D.

Mass. Aug. 18, 1993), where a secured creditor was deemed to have lost its first priority status to

an intervening federal tax lien holder when funds from a subsequent loan were used to pay off

the secured creditor's previous loan facility.  Like the case before this Court, a UCC financing

statement listing the debtor and the secured creditor was filed properly.  The financing statement

never lapsed.  A security agreement was entered between the debtor and the same secured

creditor approximately eight years later.  Approximately four years later, the IRS filed a federal

tax lien against the Debtor.  One month after that, the debtor and the secured creditor executed a

new promissory note and the proceeds from the new borrowing were used to pay off the outstanding debt on the earlier obligations, and the creditor filed a new UCC-1 financing statement. *Id*. at *6. The resolution of the lien dispute turned on whether the secured creditor, FNB, "relinquished its priority over the federal tax lien after the lien was filed, not by any lapse in filing, but by destroying its old lien and creating a new one which attached (and therefore was perfected) after the federal tax lien." *Id*. at *6. The court found that using loan proceeds to pay a prior loan, "without any external manifestations that the parties intended the transaction as a renewal, is usually treated as a cancellation and extinguishment of the debt and its underlying security." *Id*. at *9. Because the court could not conclude that FNB intended to renew its old obligation, and thus extinguished its underlying security, the federal tax lien was found to have priority over FNB.

The position espoused in *Harder* is in the minority. "There are numerous cases holding that once a financing statement has been filed; the lender may advance funds, pay off loans, and readvance funds, all of which will be perfected by the original financing statement without the need to file additional financing statements." *In re Martin Color-Fi, Inc*., No. 98-10145-W, 1999 WL 33486094, at *15 (Bankr. D.S.C. Sep. 24, 1999) (citing *Comprehensive Review Tech., Inc. v. Star Bank* (*In re Comprehensive Review Tech., Inc*.), 138 B.R. 195, 199 (S.D.Ohio 1992); and *In re Gilchrist Co*., 403 F.Supp. 197, 202–03 (E.D.Pa. 1975), *aff'd*, 535 F.2d 1246 (3d Cir.1976) (emphasis added)). As the court in *In re Gilchrist Co*. held when examining similar lines of cases:

> The better view holds that, where originally a security agreement is executed, an indebtedness created, and a financing statement describing the collateral filed, followed at a later date by another advance made pursuant to a subsequent security agreement covering the same collateral, the lender has a perfected security interest in the collateral not only for the original debt, but also for the later advance.  . . .  [The court holds] that a duly filed financing statement,

showing the same debtor, the same secured party, and the same collateral, serves to perfect a security interest created in a transaction other than for which the financing statement was originally filed.

403 F. Supp. at 202.

The Court agrees with the reasoning as set forth in the majority line of cases, which are consistent with the comments by the Review Committee for Article 9 of the Permanent Editorial Board for the Uniform Commercial Code ("Review Committee"). In its Final Report in 1971, the Review Committee stated:

> [A]n appropriate financing statement may perfect security interests securing advances made under agreements not contemplated at the time of the filing of the financing statement, even if the filing of the advances then contemplated have been fully paid in the interim. Under the notice-filing procedures of the Code, the filing of a financing statement is effective to perfect security interests as to which the other required elements for perfection exist, whether the security agreement involved is one existing at the date of the filing with an after-acquired property clause or a future advance clause, or whether the applicable security agreement is executed later . . .

*In re Gilchrist Co.*, 403 F. Supp. at 203 (citing Final Report at 226-227).  This provision regarding future advances is codified in U.C.C. § 9-323.  While the Review Committee considered proposed amendments to the UCC that would have clearly rejected the minority line of cases that seemed to require a new financing statement for every new transaction, it ultimately "concluded that the existing Code is clear enough, and should not be disturbed just to overrule some lower court cases."  *Id.*

In the instant case, had IDB remained the lender through 2006 and up to the Petition Date, section 323 of the Delaware UCC would govern, and consistent with the *Gilchrist Co.*  line of cases, the Court would conclude that even if the original loan was paid off with loan proceeds from subsequent borrowings, IDB as Agent's perfected lien status remained unaffected through the Petition Date.

However, the facts of this case render *Harder* and the minority line of cases it represents inapposite. In *Harder*, the vitality of the underlying security interest and whether the parties intended to cancel and discharge the original debt were at issue. In this case, whether IDB as Agent can rely on the 2001 Financing Statement to perfect its lien is at issue. It is undisputed that IDB as Agent was granted a security interest in the Debtor's assets in 2006 and 2011. It is also undisputed that the 2001 Financing Statement was assigned to IDB as Agent in 2006. The security interest granted in 2006 and again in 2011 was perfected by the assignment of the 2001 Financing Statement. In the words of *Harder*, "most courts have found that security agreements may be perfected by earlier filings, even when those agreements were not contemplated at the time of the filing." *Harder*, 1993 WL 667770, at *5. However, the reasoning of *Harder* does not apply with respect to whether IDB as Agent, as assignee of the 2001 Financing Statement, has a perfected lien as of 2001. The failure of IDB as Agent to obtain an assignment of the lien granted to IDB in the 2001 Security Agreement is irrelevant to whether IDB as Agent has a first priority lien as of 2001.

b. <u>Key-Man Proceeds Argument</u>

The True Participants further argue that because the lien granted to IDB in the 2001 Security Agreement was only assigned to IDB as Agent with respect to one type of collateral, IDB as agent cannot rely on the 2001 Financing Statement to perfect its lien granted by the Debtor under the 2006 Security Agreement and the 2006 Credit Agreement or the 2011 Security Agreement. Under the 2006 Security Agreement, IDB specifically assigned its lien on Mr. Murphy's Key-Man life insurance policy and its proceeds ("Key-Man Proceeds") to IDB as Agent. The True Participants allege that the Key-Man Proceeds "were the only perfected collateral interest under the Prior IDB loan facility that was transferred to [IDB as Agent] under

the 2006 [Security Agreement]," and if IDB as Agent sought an assignment of IDB's lien on all the collateral previously held by IDB, it would have obtained such an assignment.

The True Participants urge the Court to infer from these facts that the 2006 UCC-3 assignment notice only relates to the Key-Man Proceeds. However, this argument is contradicted by the UCC-3 assignment notice itself. It says nothing about any particular collateral—it is an unrestricted, general assignment of the 2001 UCC Financing statement from IDB to IDB as Agent. It confers upon IDB as Agent the priority status enjoyed by IDB as of 2001. The relevant language of the 2006 Security Agreement does not support North Mill and Medallion's argument either. The 2006 Security Agreement requires the filing of a UCC-3 assignment executed by IDB in favor of IDB as Agent, and does not contain any restriction on the type of collateral it covers.

The True Participants cite to *Katz v. Feinberg*, 167 F. Supp. 2d 556, 566-67 (S.D.N.Y. 2001) *aff'd*, 290 F.3d 95 (2d Cir. 2002) for the proposition that that where parties knew how to, and actually drafted, different provisions with different rights, such differences demonstrate the actual intent of the parties. *Katz* does not address interpreting UCC financing statements and security agreements, which are clear and unambiguous in this case. In fact, reading the UCC filings restrictively would contradict the plain words chosen by the parties. In line with the recent Delaware Supreme Court ruling, the intent of the filer is evidenced by the plain language of the filing, not by some subjective intent that is not reflected in the filing itself. *Official Comm. of Unsecured Creditors of Motors Liquidation Co. v. JPMorgan Chase Bank, N.A.*, 103 A.3d 1010, 1017 (Del. 2014).

In any event, discussing whether IDB assigned its security interest to IDB as Agent misses the point. IDB as Agent does not claim to be an assignee of IDB's lien, and does not

purport to succeed to any lien granted to IDB under the 2001 Security Agreement or the 2004

Security Agreement.  Rather, IDB as Agent rightfully claims the status of a secured creditor

based on the lien granted by the Debtor in the 2006 Security Agreement and the 2011 Security

Agreement.

c.  <u>Intent of the Debtor and the Lenders</u>

The True Participants argue that the intent of the parties in filing the 2006 Financing

Statement and whether IDB or the Lenders relied on the 2006 Financing Statement to perfect the

lien is relevant in this case. However, the subjective intent of the parties in filing the 2006

Financing Statement has no effect on the legal consequences of the intentionally-filed financing

statements and amendments to the 2001 Financing Statement, wherein IDB as Agent was added

as a secured party and IDB assigned its secured position to IDB as Agent. *See In re Motors

Liquidation Co.*, 777 F.3d 100, 102 (2d Cir. 2015) (citing *Official Comm. of Unsecured

Creditors of Motors Liquidation Co. v. JPMorgan Chase Bank, N.A.*, 103 A.3d 1010, 1018 (Del.

2014)) ("'The Delaware UCC contains no requirement that a secured party that authorizes a

filing subjectively intends or otherwise understands the effect of the plain terms of its own

filing.'").

On the question of intent and UCC filings, the Court of Appeals for the Second Circuit

recently certified the following question to the Delaware Supreme Court:  "Under UCC Article

9, as adopted into Delaware law . . ., for a UCC-3 termination statement to effectively extinguish

the perfected nature of a UCC-1 financing statement, is it enough that the secured lender review

and knowingly approve for filing a UCC-3 purporting to extinguish the perfected security

interest, or must the secured lender intend to terminate the particular security interest that is

listed on the UCC-3?" *Official Comm. of Unsecured Creditors of Motors Liquidation Co. v.*

*JPMorgan Chase Bank*, *N.A.*, 103 A.3d at 1011. The Delaware Supreme Court answered that it was enough for the secured lender to have reviewed and approved for filing the UCC-3 which purportedly extinguished the perfected security interest, and the subjective intent of the filer could not override the unambiguous provisions of the Delaware UCC statutes. *Id.* at 1018.

In *In re Motors Liquidation*, a UCC-3 termination statement was filed with the Delaware Secretary of State on behalf of General Motors Corp. which inadvertently terminated the financing statement for a term loan security interest granted by General Motors Corp. ("General Motors") to JPMorgan Chase Bank ("JPMorgan"). *In re Motors Liquidation Co*., 777 F.3d 100, 101 (2d Cir. 2015). Neither party subjectively intended to terminate the financing statement perfecting the term loan security interest and the error went unnoticed by both parties at the time the statement was filed. *Id*. General Motors filed for relief under Chapter 11 of the Bankruptcy Code, and the Official Committee of Unsecured Creditors in the case commenced a proceeding against JPMorgan seeking a determination that the prior financing statement had been terminated, rendering JPMorgan an unsecured creditor as to that particular loan. The Bankruptcy Court for the Southern District of New York found in favor of JPMorgan, deeming the UCC-3 filing unauthorized because neither party intended the legal consequences of the UCC-3 termination statement. *In re Motors Liquidation Co.*, 486 B.R. 596, 647-48 (Bankr. S.D.N.Y. 2013) *rev'd*, 777 F.3d 100 (2d Cir. 2015). The Creditors Committee appealed to the Second Circuit, and the Second Circuit certified the above question to the Delaware Supreme Court. In connection with the adversary proceeding, the Second Circuit sought guidance on this narrow issue of law. *Official Comm. of Unsecured Creditors of Motors Liquidation Co. v. JPMorgan Chase Bank*, *N.A.*, 103 A.3d at 1013. The Delaware Supreme Court reviewed the relevant language of the Delaware UCC and concluded that the unambiguous language compelled its

conclusion that the UCC "contains no requirement that a secured party that authorizes a filing

subjectively intends or otherwise understands the effect of the plain terms of the filing." *Id.* at

1018. As noted by the Delaware Supreme Court which is equally applicable here:

> [T]he UCC is a system of notice filing, and . . . such a system contemplates that
> later lenders may need to conduct diligence to determine that a filing was
> authorized by the secured party of record.  But consistent with the purpose of
> setting up a notice system, one of the most important roles the UCC plays is
> facilitating the efficient procession of commerce by permitting parties to rely in
> good faith on the plain terms of authorized public filings. . . . To hold that parties
> cannot rely upon authorized filings unless the secured party subjectively
> understood the effect of its own action would disrupt and undermine the secured
> lending markets.

*Id.* at 1017.

The rationale is equally applicable here. Had a UCC search been conducted in the

Debtor's name at any point in time between July 31, 2001, and the Petition Date, the party

inquiring would have discovered the 2001 UCC Financing Statement, that it covered

substantially all of the Debtor's assets, and that in 2006, IDB assigned its position as secured

party of record to IDB as Agent. Furthermore, the 2001 Financing Statement never expired or

lapsed.

If a third party undertaking a search of the UCC records were to ask one of the Lenders

post-2006 which UCC Financing Statement they were relying on to perfect their security

interest; the answer would not affect the validity of the 2001 Financing Statement. Whether the

Lenders believed that the 2006 Financing Statement perfected their lien does not control the

issues before the Court.  The filing of the 2006 Financing Statement, and any reliance on the

2006 Financing Statement, is not determinative of when IDB as Agent first perfected its lien.

The 2006 Financing Statement can be viewed as a "back-up" financing statement that does not

harm IDB as Agent's position.  See *Matter of Giddens*, 205 B.R. 349, 353 (Bankr. M.D. Ga.

1997). In *Giddens*, to resolve a priority battle, the court had to decide the legal significance of a second UCC-1 financing statement that was filed by the same creditor and covering the same collateral as contained in a previously filed UCC-1 financing statement. *Id*. at 351. The court was "reluctant to conclude the second filing [had] no significance," and also did not want to go so far as to construe the second filing in a way that would be harmful to a creditor holding a first-lien position. *Id.* at 353. Thus, the second UCC-1 was deemed to be a "back-up financing statement" with its own separately established priority, allowing the holder of the lien to rely upon it as necessary. *See id.* Thus, here, as in *Giddens*, the filing of the 2006 Financing Statement and its lapse will not be construed as negatively affecting the validity of the 2001 Financing Statement.

### d.    True State of Affairs

The True Participants next allege that "further inquiry" into the true state of affairs between IDB as Agent and the Debtor would have revealed that that "underlying operative documents confirm  that [IDB as] Agent's liens never attached to the True Participations." (Memo. of Law of True Participants in Support of Summary Judgment, ECF No. 13-72251-REG, Doc. 731 at 55.) The True Participants allege that the granting language in the various security agreements notwithstanding, the existence of liens or claims upon any of IDB as Agent's collateral, such as the interests claimed by the True Participants, constituted breaches of representations and warranties by the Debtor to IDB as Agent, and rendered the Debtor in default with respect to the loan documents. The sales of the participation interests also constituted breaches of negative covenants to keep IDB as Agent's collateral free of liens and claims except for permitted liens and claims, and continuing affirmations of such representations upon each amendment. Medallion also points to additional evidence confirming that IDB as Agent never

retained an interest in the loan participations sold to the True Participants, such as the borrowing base certificates which contain express deductions for the "Participants' share of the collateral." Amendments to the 2011 Credit Agreement contained express waivers with respect to specified events of default, but the enumerated events of default did not include the sale of loan participations. According to the True Participants, these facts all evidence that at the time of the 2011 Security Agreement, the Debtor did not own nor did it have any property interests in the True Participations, as the participations were sold prior to 2011.  Therefore, IDB as Agent could not have granted a security interest to IDB as Agent in such assets.

This argument fails for multiple reasons. Whether the lien granted to IDB as Agent on assets sold to the True Participants triggered defaults in the underlying loan documents has no bearing on the existence of the lien granted to IDB as Agent pursuant to the various security agreements or on the perfected status of that lien under applicable UCC law. The loan covenants and provisions neither confer nor negate the perfection of IDB as Agent's lien. Further, U.C.C. § 9-507(a) provides that "[a] filed financing statement remains effective with respect to  collateral that is sold, exchanged, leased, licensed, or otherwise disposed of and in which a security interest . . . continues, even if the secured party knows of or consents to the disposition." DEL. CODE. ANN. TIT. 6 § 9-507(a) (West 2013). Therefore, the sale of the participation interest did not, as a matter of law, remove IDB as Agent's lien on the participation interests, which lien is deemed perfected as of 2001.

        e.     Seriously Misleading Financing Statement

The True Participants argue that the 2001 Financing Statement is ineffective because it is seriously misleading. The basis of this argument is that "a review of the filed documents and further inquiry of the underlying operative documents demonstrates that the 2001 Financing

Statement would be seriously misleading if applied to the Current Bank Group facility." (Memo. of L. of True Participants in Support of Summary Judgment, ECF No. 13-72251-REG, Doc. 731 at 25.) This line of reasoning has no merit. The UCC provides that a "financing statement substantially satisfying the requirements of this part is effective, even if it has minor errors or omissions, unless the errors or omissions make the financing statement seriously misleading." DEL. CODE. ANN. TIT. 6 § 9-506(a) (West 2013). The UCC offers only one example of a seriously misleading error, which would be in the case of a financing statement failing to correctly provide the name of the debtor in accordance with U.C.C. § 9-503(a). Here, the True Participants do not point to any specific errors or omissions within the 2001 Financing Statement that would render it seriously misleading. The 2001 Financing Statement substantially satisfies the requirements of the UCC as it correctly states the name of the Debtor, the secured party and sufficiently describes the collateral pledged to IDB as Agent in order to notify the public that a person may have a security interest in the subject collateral. DEL. CODE. ANN. TIT. 6 § 9-502 (West 2013). Further, a search of the records using the Debtor's name would result in disclosure of each of the financing statements, in compliance with U.C.C. § 9-506. The Official Comments clarify that because searches are not conducted under the secured party's name, "an error in the name of the secured party or its representative will not be seriously misleading." DEL. CODE. ANN. TIT. 6 § 9-506, cmt. 2 (West 2013). In addition, the description of collateral in the 2001 Financing Statement sufficiently describes the collateral pledged under the 2006 Financing Statement and the 2011 Financing Statement. Thus, the argument that the 2001 Financing Statement is ineffective because it is seriously misleading fails.

       f.      <u>Utah Filing Requirements</u>

Lastly, Medallion, a Utah bank, asserts that IDB and IDB as Agent were required to file financing statements with the Utah Secretary of State upon Medallion's acquisition of its loan participations. Medallion claims that since it purchased a "payment intangible" within the meaning of the UCC, it became a "debtor" under U.C.C. § 9-102(28)(A). UTAH CODE ANN. § 70A-9a-102(28)(a) (West 2014). A "payment intangible" is "a general intangible under which the account debtor's principal obligation is a monetary obligation." UTAH CODE ANN. § 70A-9a-102(61) (West 2014). A "debtor" is defined as a "person having an interest, other than a security interest or other lien, in the collateral." UTAH CODE ANN. § 70A-9a-102(28)(a) (West 2014). Thus, by this logic, a party holding any interest other than a security interest or lien becomes a debtor. By acquiring a payment intangible, Medallion claims it holds something in addition to a security interest or lien. Medallion concludes that U.C.C. § 9-316(a) mandates that IDB and IDB as Agent, as secured parties, file a new financing statement whenever the "debtor" changes and is incorporated in a different state than the previous debtor. UTAH CODE ANN. § 70A-9a-316 (West 2014). Once Medallion first purchased its loan participation from the Debtor, IDB, and IDB as Agent were obligated to file a new financing statement in Utah, where Medallion is incorporated.

This argument is flawed for a number of reasons. To accept this argument, the Court would have to find that Medallion is both a debtor and a secured party. When Medallion purchased its participation interest it acquired an automatically perfected security interest in the payment intangibles. UTAH CODE ANN. § 70A-9a-309(3) (West 2014). This purchase did not render Medallion a debtor under any theory. Further, a "debtor" is also defined as "a seller of . . . payment intangibles," not a buyer, as Medallion would be in this case. UTAH CODE ANN. § 70A-9a-102(28)(b) (West 2014)(emphasis added). As such, because Medallion purchased

payment intangibles and holds a perfected security interest therein, IDB as Agent was not required to file a financing statement with the Utah Secretary of State in order to maintain its perfected status.

      6.      <u>True Participants' Motion to Compel</u>

On October 3, 2014, the True Participants filed a Motion to Compel against IDB as Agent and the Lenders in order to aid in further challenging IDB as Agent's position as first-lienholder, and the True Participants rely on this motion to support their request for alternative relief under Federal Rule of Civil Procedure 56(d).  Fed. R. Civ. P. 56(d) enables the Court to forestall deciding a motion for summary judgment if a nonmovant can show by affidavit or declaration that "it cannot present facts essential to justify its position." The Court finds that there are no material issues of fact in dispute with respect to the parties' cross-motions and that no fact could be uncovered from the discovery sought by the True Participants that would change the Court's ruling. Thus, the request by the True Participants for relief pursuant to FRCP 56(d) is denied.

## CONCLUSION

For the reasons set forth above, the cross-motion by IDB as Agent is granted, and the cross-motion by the True Participants is denied. The Court shall enter an order consistent with this Memorandum Decision forthwith.


Dated: Central Islip, New York
           March 19, 2015                    <u>***/s/ Robert E. Grossman***</u>
                                            Robert E. Grossman
                                            United States Bankruptcy Judge