Schuyler G. Carroll
John D. Penn
David F. Olsky
**PERKINS COIE LLP**
30 Rockefeller Plaza, 22nd Floor
New York, New York 10112-0085
Telephone: 212.262.6900
Facsimile: 212.977.1649
SCarroll@perkinscoie.com
JPenn@perkinscoie.com
DOlsky@perkinscoie.com

Attorneys for the Official Committee of
Unsecured Creditors

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**

---------------------------------------------------------- X

In re:                                          Chapter No. 11

OAK ROCK FINANCIAL, LLC,                        Case No. 8-13-72251-REG

     Debtor

---------------------------------------------------------- X

### AMENDED FINAL FEE APPLICATION OF PERKINS COIE LLP FOR COMPENSATION AND REIMBURSEMENT OF EXPENSES

| Fee Application: | Final |
|---|---|
| Applicant: | Perkins Coie LLP |
| Application Period: | June 4, 2014 - October 31, 2018 |
| Capacity: | Counsel to the Official Committee of Unsecured Creditors |
| Total Amount Requested: | $11,258,484.30 |
| Total Fees: | $10,404,501.95 |
| Number of Hours: | 14,999.9 |
| Blended Hourly Rate: | $763.94 |
| Total Expenses: | $778,982.35 |
| Retainer Received: | $0.00 |
| Amounts Previously Paid: | $0.00 |

Perkins Coie LLP (**"Perkins Coie"** or **"Perkins"**), counsel for the Official Committee of

Unsecured Creditors (the **"Committee"**) of Oak Rock Financial, LLC (**"Oak Rock"** or **"Debtor"**),

respectfully submits this amended final Application outlining Perkins Coie's request for compensation for professional services incurred in this case from June 4, 2014 through October 31, 2018 (the "**Application Period**"), and reimbursement of the actual out-of-pocket expenses Perkins Coie advanced in this case during the Application Period, under Bankruptcy Code § 330 and Bankruptcy Rule 2016(a).  Consistent with the Order Approving Disclosure Statement (Docket No. 1346 entered in this case, Perkins reserves the right to update this Application with information regarding the actual fees and expenses incurred after November 1, 2018 and before the effective date of a plan of reorganization.[1]

## INTRODUCTION

Perkins Coie submits this Application for more than four years of time and expenses spent in highly contested litigation against sophisticated counsel.  The Debtor could not or would not contest the secured creditors' assertions regarding their position.  Only the Committee – and its counsel Perkins Coie – represented the estate's interests to secure a recovery for the estate's creditors in this bankruptcy case.  As the assignee of the estate's claims, the Committee and its counsel were pursuing the claims for the benefit of all creditors, not just those creditors that were deemed unsecured creditors in a plan that was filed, for the first time, in 2018.  Creditors would not receive anything for their claims against the Debtor without those efforts.[2]  It is no understatement that, but for Perkins Coie investing four years of time, millions of dollars of fees and expenditures without interim compensation of any kind, creditors would not receive any distribution on account of their claims.

---

[1]     An *ex parte* application filed on November 27, 2018 requesting that the Court shorten notice was granted on November 28, 2018 providing the deadline for objections and setting the hearing date for any such objection..

[2]     At the outset of the case, the US Trustee refused to appoint a committee.  Perkins Coie filed two motions for the appointment of a committee and ultimately prevailed.  The fees incurred to create the Committee that could assert rights that the Debtor forsook are not included in this Application.  The fees and expenses that were incurred for the Committee to both represent the Committee and assert rights, claims and causes of action on the estate's behalf are requested in this Application.

142033171.5

Perkins Coie asserted rights and causes of action on behalf of the estate when no other professional was willing or available to do so.

This bankruptcy case began by the Lenders selecting this Court and the bankruptcy process with an involuntary petition and the case played out in three principal phases:

The first phase had the Debtor and Lenders assert that "Participants" – investors in the Debtor's loans to dealers (**"Dealer Loans"**, many of which had gone bad) – were only unsecured creditors with positions junior to the Lenders. The Lenders asserted that all of these Participants were victims of the Debtor's Ponzi Scheme and were unsecured creditors rather than partial owners of the Dealer Loans. The Lenders and Debtor clearly showed their intent was for the Lenders to receive the estate's assets after a carve out for the Debtor's professional fees.

The second phase began after the Court ordered the formation of the Committee to represent the interests of the unsecured creditors. The Committee filed suit on behalf of the estate against the Lenders to recover fraudulent conveyances and fraudulent transfers of property and debt and requested equitable subordination of the Lenders' claims. When it became clear that the Committee's lawsuit for the estate would proceed through discovery and likely a trial, the Lenders and the Debtor filed a joint plan for a payment to creditors of less than $2.4 million. That plan remained on file throughout the entire trial of the first phase of the Committee's litigation.

The third phase began after more than 50 days of depositions, the production of millions of pages of documents and a 22-day trial on the Committee's lawsuit for the estate. The trial involved allegations regarding the manner in which the Debtor obtained funding from third parties.

The trial also involved the "good faith" defense asserted by the Lenders.

The value Perkins Coie provided is easily demonstrated by the joint plan filed in 2018 where the Debtor, the Lenders and others proposed distributions of either 35% or 51.4% of their claims. The

proposed distributions exceed $11.7 million. This payout exceeds joint plan filed in 2015 that proposed to pay the exact same creditors less than $2.4 million. The dramatic increase of over 500% came shortly after the last post-trial submissions from the first phase of the trial of the Committee's lawsuit on behalf of the estate. The massive increase in creditors' recoveries conclusively demonstrates the fallacy of any assertion that the Committee should not have brought the litigation or should not have diligently prosecuted the claims.

The Lenders made clear from the commencement of this case that they had no intention that other creditor would receive any distribution from the Debtor's estate. Lenders and Debtor in the cash collateral orders and elsewhere made very clear that neither had any intention that creditors would ever receive any payment whatsoever. While the Debtor and its professionals believed that they had to forfeit all rights and distributions to the Lenders as a cost of moving forward with the bankruptcy case that the Lenders initiated, the Committee never accepted this premise and pressed to maximize the recoveries of all creditors.

Perkins Coie began the task of protecting the estate's rights and those of unsecured creditors after the Committee was formed and it was engaged as the Committee's counsel. Perkins investigated the Debtor, its assets, causes of action, the secured debt and the Lenders' actions and deliberate inactions to maximize the value of assets and the distribution to unsecured creditors on an expedited basis. After the investigation contemplated by the cash collateral order in this case, the Committee commenced the litigation against the Lenders. The attorneys' fees were incurred in pursuing the estate's claims against the Lenders.

Perkins Coie also made direct and substantial contributions to the total amount of creditor recoveries by pursuing claims that the Debtor could have pursued but did not and by expending the

resources necessary to maximize recovery when the Debtor would not.[3]    The Committee secured

standing to pursue claims against the Debtor's accountants (EisnerAmper) on behalf of the estate

when the Debtor took no action regarding those claims.    Perkins Coie secured standing to pursue

estate's rights against certain insiders (the "Dell/Stephens Parties") when the Debtor was preparing

to settle for far less.    Perkins Coie also took the laboring oar in actions it filed jointly with the Debtor

against others, such as Valley National Bank and North Mill, including drafting complaints and

arguing motions.    The Committee negotiated settlements with EisnerAmper, the Dell/Stephens

Parties, and Valley National Bank that increased the cash in the estate by almost $5 million – amounts

that would never have been recovered but for the Committee's efforts and Perkins Coie's investment

of time and expenses.    This amount would have been $2 million higher but for the Lenders' insistence

on rejecting a $4 million negotiated resolution with EisnerAmper while the Lender's insisted on

asserting claims for their sole benefit against that firm.    The Lenders solo efforts failed, recovered

nothing and cost the estate an additional $2 million in the process.

   The value provided by Perkins Coie is more than sufficient to demonstrate that the requested

fees and expenses should be allowed.    While the $11.7 million in proposed cash distributions to

creditors is considerable in its own right, the proposal can also be viewed as the Lenders' agreement

to a substantial part of the equitable subordination that the Committee requested (and proved) in its

litigation on the estate's behalf.    It can also be viewed as the equivalent of recovering an additional

$10.5 million for a total distribution valued at $22.2 million.[4]

---

[3]    The Lenders could also have consented to the use of the accumulated cash to pursue these claims. Their objections show that they are disingenuously happy to take the benefits of Perkins Coie's efforts while simultaneously refusing to pay the cost of obtaining that benefit.

[4]    The $10.5 million increase in the total recovery would be the "round trip" recovery of 35% to unsecured participation claims asserted by $30 million of additional participation claims asserted by Redstone

While Perkins Coie's Application is substantial, the benefits were substantial and were extraordinary in this case. These extraordinary results, obtained through over four years of work against adversaries dedicated to paying nothing to unsecured creditors and including obtaining an exceptionally rare recovery against an auditor and insiders with considerable offshore assets, justify an enhancement. At the very least, enhancing the compensation to provide an imputed interest rate recovery for carrying the cost of this litigation for so long without any interim compensation would be reasonable.

Even if Perkins Coie had not provided such substantial value, there can be no question that the requested fees and expenses should be allowed under the applicable legal standards. In considering fee requests, courts in the Second Circuit objectively consider whether the services rendered were reasonably likely to benefit the professional's constituents, from the perspective of the time when such services were rendered. An examination of each service provided by Perkins Coie easily demonstrates that (a) each action taken by Perkins Coie on behalf of the estate was reasonably likely to benefit the estate at the time when rendered and (b) that each action taken by Perkins Coie on behalf of the Committee was reasonably likely to benefit the Committee and its constituents and provided those benefits at the time when rendered. The facts, including the undeniable and quantifiable benefit to the estate and unsecured creditors conclusively show that the decisions were correct and provided that benefit when the services were rendered. The requested fees and expenses must be allowed as requested.

## MEDIATION AGREEMENT TO RECEIVE LESS THAN THE AMOUNT INCURRED

---

Business Credit ($20.8 million), Israel Discount Bank of New York (in its individual capacity for participations in Luther Appliance totaling $5.2 million) and Bank Leumi (in its individual capacity for participations totaling $4 million).

It is beyond dispute that in the absence of Perkins Coie's efforts on representing the Creditors Committee and in prosecuting a variety of estate causes of action, non-Lender creditors in this case would not receive a distribution in this case. In addition, as more fully discussed below, Perkins Coie's efforts in asserting estate claims against non-Lenders increased the bankruptcy estate by millions of dollars.

However, since creditors have waited since 2013, need funds before all litigation could be concluded and are willing to take significant discounts to receive recoveries in the near future, Perkins Coie has agreed in this case to accept payment of substantially less than the reasonable fees and expenses incurred in this case. The agreement to receive a cash payment of $5,325,000.00 for fees and expenses for its work in connection with this case was reached at a mediation that involved the Lenders, counsel for the Debtor and the Chief Restructuring Officer of the Debtor.[5]

As noted below, Perkins Coie (a) requests an order that the fees and expenses requested in this Amended Final Application be allowed under Section 330 of the Bankruptcy Code and (b) agrees that it will accept $5,325,000.00 on the timetable outlined in the Mediation Agreement for its work in this case.

## SUMMARY CHARTS

The Charts reflecting summaries of the individual professionals' time, hourly rates and total charges are located at the end of this Application (before Exhibit B outlining all invoices for Perkins Coie's fees and expenses during the Application Period).

---

[5]   The Mediation Agreement executed on November 15, 2018 includes the specific terms of Perkins Coie's agreement with the Mediation Parties (defined therein) regarding its fees and expenses, including that commercially reasonable efforts shall be made to indefeasibly pay in collected funds (by wire transfer or check) to be received by Perkins Coie no later December 31, 2018, and, in all events, such payment shall be indefeasibly paid in collected funds to be received by the Perkins Coie on or before January 31, 2019.

142033171.5

## APPLICATION

### A.    Background

1.    On April 29, 2013 (the **"Petition Date"**), Israel Discount Bank of New York, Bank Leumi USA and Bank Hapoalim B.M. filed an involuntary petition was filed against the Debtor for relief under chapter 7 of the Bankruptcy Code (Docket No. 1) to commence this bankruptcy case – an action that ultimately led to the appointment of the Creditors Committee and the granting of standing to challenge the liens and claims asserted by the petitioning creditors and Capital One Bank N.A.[6]

2.    On May 6, 2013, this Court entered an order granting Debtor's Motion to convert the case from an involuntary Chapter 7 to a voluntary Chapter 11 case (Docket No. 37).

3.    The agreed cash collateral orders prohibited the Debtor from "challenging or objecting to the asserted extent, validity, enforceability, priority, perfection and/or non-avoidability of the" Lenders' purported lien on that collateral.  (*See* Docket No. 152 at 13.)

4.    The Court approved the engagement of Clifford A. Zucker as the Chief Restructuring Officer (the **"CRO"**) to operate the Debtor's business during the Chapter 11 proceeding on May 30, 2013.  (Docket No. 157).

5.    Also on May 30, 2013, the Debtor began filing adversary proceedings seeking declarations that the loan participations were not sales of interest in Dealer Loans but that the Dealer Loans were property of the estate and subject to the Lenders' lien.  Many of these investors had been

---

[6]    Israel Discount Bank of New York (individually and as Agent), Bank Leumi USA, Bank Hapoalim B.M. and Capital One Bank N.A. are referred to herein as the "Lenders" or the "Bank Group."

142033171.5

defrauded by the Debtor into purchasing loan participations in Dealer Loans that were actually in default. *See, e.g.*, Docket No. 164.

6.      On May 27, 2014, after the Court ruled that many of the loan participations agreements created unsecured loans, the Office of the United States Trustee (the "**UST**") appointed two (2) members of the Committee pursuant to Sections 1102(a) and 1102(b) of the Bankruptcy Code (Docket No. 573).  On June 19, 2014, the UST appointed three (3) additional committee members (Docket No. 614).

7.      This Court has jurisdiction over this chapter 11 case under 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding under 28 U.S.C. § 157(b)(2).  Venue is proper in this district under 28 U.S.C. §§ 1408 and 1409.

8.      The Debtor continues to manage and operate its very limited business as debtor-in-possession under 11 U.S.C. §§ 1107 and 1108.

9.      In accordance with the *Final Order Granting Application for an Order Authorizing Employment and Retention of Perkins Coie LLP as Attorneys for the Official Committee of Unsecured Creditors Nunc Pro Tunc to June 4, 2014* (the "**Employment Order**"), Perkins Coie has acted as counsel to the Committee from June 4, 2014 through the present.

10.     Perkins Coie has not entered into any agreement with any other person for the sharing of compensation received or to be received for legal services rendered in connection with this case. Perkins Coie has received neither payment for any portion of its services nor reimbursement for any of the considerable expenses incurred and advanced in its engagement.

**B.      Services Rendered During the Case**

11.     Exhibit B (which includes Exhibits B-1 through B-13) to the original filing of this Application (Dkt. No. 1357), incorporated by reference herein and referred to as Exhibit B herein, is

142033171.5

a copy of each of the billings that Perkins Coie provided to the Committee for the services performed and the expenses advanced during the Application Period. The redactions are limited and note that the litigation with the Lenders has not been finally resolved and the redactions protect the Committee's privileges (including the attorney-client privilege) regarding each entry and the events described therein. The time narratives contained in Exhibit B describe all of the services Perkins Coie attorneys and paralegals rendered to the Committee during the Application Period. All time narratives were made contemporaneously with the services provided. Perkins Coie maintains computerized records of daily time entries. In accordance with applicable guidelines regarding fee applications, Perkins Coie ensured that all of those involved in providing services to the Committee recorded all time in six-minute increments.

12.     The Committee received each of the invoices included within Exhibit B to this Application shortly after the month during which the services were performed and has approved the request for the compensation requested in this Application.

13.     *Committee Representation.* During the Application Period, Perkins Coie spent a total of 118.6 hours, for fees of $38,685.00, for disbursements/expenses of $243,685.10, related to committee representation. Services rendered in this category including general administrative matters, including data management, in connection with the representation. Charts A-1 summarize the hours spent and fees incurred by the attorneys, paralegals and other professionals working in this category during the Application Period together with the expenses that were incurred. Exhibit B-1 contains all of the invoices for this matter.

14.     *Case Administration.* During the Application Period, Perkins Coie spent a total of 26.4 hours, for fees of $13,613.50, for disbursements/expenses of $5,481.15 related to case administration. Services rendered in this category include administrative matters in connection with

preservation of the Debtor's electronic records as the Debtor closed its operations. Charts A-2 summarize the hours spent and fees incurred by the attorneys and paralegals working in this category during the Application Period together with the expenses that were incurred. Exhibit B-2 contains all of the invoices for this matter.

15.    *Committee Communications.*    During the Application Period, Perkins Coie spent a total of 229.2 hours, for fees of $191,035.00, related to Committee communications. Services rendered in this category include various telephone conferences, meetings and written communications with members of the Committee and, in some instances, counsel for the Committee member. The services also include the in person and telephonic meetings of the Committee. Chart A-3 summarizes the hours spent and fees incurred by the attorneys and paralegals working in this category during the Application Period. Exhibits B-3A, B-3B and B-3C contain all of the invoices for this matter.

16.    *Asset Sale/Analysis Recovery.*    During the Application Period, Perkins Coie spent a total of 65.9 hours, for fees of $55,101.50, related to asset sale/analysis recovery. Services rendered in this category include reviewing various motions and requests regarding the proposed disposition of the Debtor's Dealer Loans and other assets. It also includes some of the work performed preserving causes of action by creating and obtaining tolling agreements (and the extension thereof) from numerous creditors to preserve potential causes of action that would otherwise have been lost had they not been asserted before the applicable statute of limitations. Chart A-4 summarizes the hours spent and fees incurred by the attorneys and paralegals working in this category during the Application Period. Exhibit B-4 contains all of the invoices for this matter.

17.    *Business Operations.*    During the Application Period, Perkins Coie spent a total of 0.6 hours, for fees of $591.00, for disbursements/expenses of $1,177.85 related to business operations.

Services rendered in this category include dealing with the limited operations of the Debtor and the efforts by the Lenders to wind down those operations (both prematurely and then ultimately), including the efforts to shut down the Debtor's operations and to obtain server hosting. Charts A-5 summarize the hours spent and fees incurred by the attorneys and paralegals working in this category during the Application Period together with the expenses that were incurred. Exhibit B-5 contains all of the invoices for this matter.

18.     *Claims Administration & Objections.*  During the Application Period, Perkins Coie spent a total of 53.4 hours, for fees of $41,774.00, related to claims administration and objections, excluding litigation with Israel Discount Bank of New York and the other members of the Lenders. Services rendered in this category include drafting and reviewing objections to proofs of claim – excluding the claims asserted by Israel Discount Bank of New York and other members of the Bank Group. The services include the efforts by Israel Discount Bank of New York to object to the proofs of claim filed by substantially all of the other creditors in the case and the Committee's specific response to Israel Discount Bank of New York's objection to the claim asserted by MK Auto and its affiliates. Chart A-6 summarizes the hours spent and fees incurred by the attorneys and paralegals working in this category during the Application Period. Exhibit B-6 contains all of the invoices for this matter.

19.     *Fee/Employment Applications.*  During the Application Period, Perkins Coie spent a total of 520.7 hours, for fees of $384,035.50, for disbursements/expenses of $60.00 related to fee/employment applications. Services rendered in this category reviewing the preliminary drafts of information to be included in fee applications and revising the drafts to conform to the requirements for a final fee application as well as the initial drafting of this Application and addressing the concerns raised in connection with the Application. Additionally, the services include addressing issues with

the application to employ professionals on behalf of the Committee and the expansion of the CohnReznick engagement. Chart A-7 summarize the hours spent and fees incurred by the attorneys and paralegals working in this category during the Application Period together with the expenses that were incurred. From the outset, Committee members and many other unsecured creditors repeatedly expressed concerns over the fees incurred by the Debtor and CohnReznick. Accordingly, Perkins Coie carefully ensured that the rights to object to those was fully preserved. Exhibit B-7 contains all of the invoices for this matter.

20.    *Fee/Employment Objections.*    During the Application Period, Perkins Coie spent a total of 21.8 hours, for fees of $16,107.00, related to fee/employment objections. Services rendered in this category include addressing issues raised in connection with the initial objections to Perkins Coie's engagement in this case. Chart A-8 Expenses summarizes the hours spent and fees incurred by the attorneys and paralegals working in this category during the Application Period. Exhibit B-8 contains all of the invoices for this matter.

21.    *Financing/Cash Collateral.*    During the Application Period, Perkins Coie spent a total of 208.6 hours, for fees of $166,645.00, for disbursements/expenses of $790.21 related to financing/cash collateral. Services rendered in this category include reviewing proposed revisions to the various cash collateral orders in this case, reviewing and commenting on cash collateral budgets and dealing with the attempt by Israel Discount Bank of New York and other Lenders to terminate the authority to use cash collateral and hearings in connection with the same. The services also include the motion by Israel Discount Bank of New York seeking an interim distribution of funds notwithstanding the fact that it lacked then (and lacks today) an allowed claim that would entitle it to a distribution. Charts A-9 summarize the hours spent and fees incurred by the attorneys and paralegals

142033171.5

working in this category during the Application Period together with the expenses that were incurred. Exhibit B-9 contains all of the invoices for this matter.

22.    *Litigation - General.*  During the Application Period, Perkins Coie spent a total of 1,698.4 hours, for fees of $1,237,535.00, for disbursements/expenses of $4,154.54 related to litigation other than the litigation with Israel Discount Bank of New York, and others.  Services rendered in this category include the initial review of documents and the (at that time) potential claims against Israel Discount Bank of New York, coordination with the Debtor's former CEO to arrange for interviews to obtain information regarding the Debtor, the Rule 2004 examination of John (Jack) Dell, the review and ultimate resolution of claims against EisnerAmper, John (Jack) Dell (and his related onshore and offshore entities), the avoidance action against Valley National Bank and the evaluation of other potential causes of action.  The resolution of the causes of action being investigated under this section included the Debtor's estate receiving approximately $5 million in settlements that would not have otherwise been recoverable but for the credible threat of significant litigation by Perkins Coie LLP.  It also includes litigation regarding the settlement of such claims and causes of action and data management services, obtaining and reviewing numerous documents obtained from third parties and the successful litigation with Bank Leumi where the Committee successfully obtained a summary judgment that its participation agreements provided Bank Leumi with only unsecured loans and no priority with respect to the millions of dollars of claims it asserted.  The services also included data preservation and data management services, litigation regarding loan participations, obtaining tolling agreements (and extensions thereof) to preserve estate causes of action.  A significant percentage of the court hearings – excluding the trial of the adversary proceeding against the Bank Group –  were charged to this billing number as were the joinder in pending appeals, the appeal of this Court's summary judgment and the Lender's July 2016 attempt to disable the Debtor and the Committee's

14

litigation for the estate by shutting down all operations and access to data shortly before the trial of the major adversary proceeding. The Committee also drafted various complaints that are reflected among the charges under this category, including complaints against the following (in which some of the potential defendants settled before the complaints were filed) – "Dell / Stephens" (and their affiliates), Valley National Bank, Mr. Sroufe, Mr. Salvatore, Equilend, North Mill and Technologent. The Committee's efforts to secure separate funding to provide a separate source of funding for the litigation being pursued and litigation being contemplated was also charged to this billing number.

23.    The results of the efforts in this category include negotiating settlements with EisnerAmper for $4 million (that was reduced to $2 million as a direct result of actions by the Lenders), $2 million from Jack Dell and his entities and $750,000 from Valley National Bank. The review, monitoring and, as appropriate, participation in other litigation is also included in this category. Also, this category includes negotiating and securing the execution of various tolling agreements to preserve the Estate's ability to pursue litigation in the future. A recovery of almost $5 million for these difficult actions by incurring less than $1.4 million in fees in connection with those settlements and all of the other litigation related services is an exceptional result.

24.    Charts A-10 summarize the hours spent and fees incurred by the attorneys and paralegals working in this category during the Application Period together with the expenses that were incurred. Exhibit B-10 contains all of the invoices for this matter.

25.    *Plan & Disclosure Statement.* During the Application Period, Perkins Coie spent a total of 470.8 hours, for fees of $401,708.00, related to plan and disclosure statement issues. Services rendered in this category include reviewing, commenting upon and objecting to plan proposals by Israel Discount Bank of New York and the other Lenders and preparing a draft plan and disclosure statement to implement a settlement the Committee negotiated with EisnerAmper that, had it been

approved, would have yielded almost $2 million more for the Estate than was ultimately obtained after the Committee's plan was scuttled by Israel Discount Bank of New York and the other Lenders. The services also include services regarding the September 2014 request by Israel Discount Bank of New York to convert the case to a Chapter 7 liquidation. Chart A-11 summarizes the hours spent and fees incurred by the attorneys and paralegals working in this category during the Application Period. Exhibit B-11 contains all of the invoices for this matter.

26.     *Creditor Inquiries.*  During the Application Period, Perkins Coie spent a total of 22.7 hours, for fees of $19,515.50, related to creditor inquiries.  Services rendered in this category including responding to inquiries by, and communications from, creditors with claims against the Debtor.  Chart A-12 summarizes the hours spent and fees incurred by the attorneys and paralegals working in this category during the Application Period.  Exhibit B-12 contains all of the invoices for this matter.

27.     *IDB Litigation and Claims Objection.*  During the Application Period, Perkins Coie spent a total of 11,562.8 hours, for fees of $7,838,155.95, and disbursements/expenses of $523,633.50, related to the litigation with the Bank Group, including objecting to the proofs of claim filed by the Lenders.  It is not an understatement to note that, but for this contentious and extensive litigation against the Lenders, there would not be any distribution to creditors since the Lenders would have relied upon the provisions negotiated by the Debtors in the cash collateral orders that essentially provided all funds to the Lenders unless a creditor could prove that the lien asserted by the Lenders either did not cover certain assets or might be subject to the interest asserted by that creditor.

28.     Services rendered in this category include the extensive pre-trial, trial and post-trial litigation with Israel Discount Bank of New York and other members of the Lenders.  This includes the expedited review of documents and testimony and drafting an extensive complaint within the

strict deadline set forth in the cash collateral orders entered in this case. It also includes substantial discovery litigation (including motions to compel parties to produce documents and information), coordination with John Murphy's criminal defense attorney to obtain information and testimony from him regarding his actions at the Debtor, the production and review of extensive electronic data and communications from each of the Lenders, summary judgment litigation (and appeal) regarding the Lenders' attempt to prove that one certain UCC-1 had not been released or otherwise discharged (including the appeal of that decision), the unsuccessful mediation among the primary parties in interest and other actions initiated by Israel Discount Bank of New York and other Lenders. It also includes the preparation for and attendance at numerous depositions of a host of party and non-party witnesses (both in New York and other places within the U.S.), including the depositions by Israel Discount Bank of New York of almost every creditor of the Debtor. Further, the pre-trial preparation and trial preparation – such as preparing witness examination outlines and exhibits and meeting with various witnesses. The request also includes expenses in connection with the trial, including travel expenses, document preparation, electronic data (and discovery) management and transcription charges. Finally, the request also includes services provided in response to the purported "third party complaint" that Israel Discount Bank of New York filed to assert that fraudulent and preferential transfer claims existed as to the Debtor's creditors even though Israel Discount Bank of New York neither requested nor obtained standing to assert such a cause of cation on behalf the Debtor's estate.

29.    The results obtained to date include litigating such that the Committee's efforts successfully raised the settlement proposals to unsecured creditors and owners of participation interests in loans by the Debtor from $0.00 to $2.3 million in a plan filed in October 2015 to $11.7 million in a plan filed in May 2018. The May 2018 reflects an increase, on a percentage basis, is infinitely greater than the initial proposal and more than a 500% increase above the pre-trial proposal

in the October 2015 plan of reorganization.   *See Tronox Inc. v. Anadarko Petroleum Corp. (In re Tronox, Inc.)*, 464 B.R. 606, 617 (S.D.N.Y. Bankr. 2012)("[T]he possibility of recovery in this action already has benefited creditors by making the [debtor's chapter 11] plan possible.") (J. Gropper)

30.    As noted in the Committee's Objection to Joint Disclosure Statement (D.E. # 1318 – which document is incorporated by reference herein), a significant amount of the work in this category could have been reduced or eliminated had the Lenders litigated differently and had not required that the Committee provide testimonial evidence to establish facts that were never in material dispute.

31.    As noted elsewhere, the trial to date is only a part of the litigation between the Committee and the Lenders – the first phase of the trial – and additional litigation will be needed in the event a global settlement is not agreed upon.  The Debtor wholly lacked the ability to undertake any significant litigation with the Lenders since the Debtor – early in the process – rendered itself incapable of litigating against the Lenders as a result of the cash collateral orders entered in this case.

32.    The increased / increasing value the Committee and Perkins Coie provided to the Estate – as reflected by the 500% increase in the amount proposed to be paid to creditors under the Lenders' proposed plan – is strong evidence that the requested fees were fully earned and should be allowed as requested.  But for the Committee and Perkins stepping up to litigate with the Lenders on the estate's behalf, claims and causes of action would have been lost forever and the distribution to unsecured creditors would have been non-existent.

33.    Charts A-13 summarize the hours spent and fees incurred by the attorneys and paralegals working in this category during the Application Period together with the expenses that were incurred.  Exhibits B-13A and B-13B contain all of the invoices for this matter.

**C.    Expenses Incurred During Application Period**

34.    Perkins Coie maintains computerized records of all expenses advanced in connection with the performance of its professional services.  All expenses are actual, out-of-pocket costs that Perkins Coie incurred.  A summary of the amounts and categories of the expenses that Perkins Coie actually and reasonably incurred during the Application Period, and for which Perkins Coie now seeks reimbursement, is attached to this application as **Exhibit C**.

**D.    Basis for Relief**

35.    Perkins Coie seeks compensation under Bankruptcy Code § 330, Bankruptcy Rule 2016(a), the Employment Order, and the applicable guidelines of the Office of the United States Trustee.  While over $200,000 is currently on deposit in an escrow account to pay professional fees incurred by the Committee, Perkins Coie has not received any funds from any parties for the services provided to the Committee or the expenses advanced in connection with those services nor has it received any distribution from that trust account.

36.    The "salutary objective" in calculating an attorney fee award is "that attorneys should not be deterred from undertaking the representation of debtors in bankruptcy cases, including cases that may pose significant challenges and an uncertain outcome, due to a risk of inadequate compensation." *In re Korea Chosun Daily Times, Inc.*, 337 B.R. 758, 767 (Bankr. E.D.N.Y. 2005).

37.    In accordance with Bankruptcy Code § 330, Perkins Coie has calculated the amount of compensation requested for services performed for the Committee (and on behalf of the estate) during this chapter 11 case using the hourly rate for the attorneys involved.  This has also been referred to as the "lodestar" or basic fee, which, if warranted, can be adjusted upward or downward.

> "The customary way to determine a reasonable fee is to begin with the "lodestar" test, and then decide whether to apply any appropriate enhancements under *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714, 717–720 (5th Cir.1974). *In re MiniScribe,* 309 F.3d

at 1243. The 'lodestar' approach involves multiplying the reasonable billing rate by the reasonable number of hours expended. *See Blum v. Stenson,* 465 U.S. 886, 898–901, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984). The "lodestar" includes "most, if not all" of the factors relevant to determining a reasonable fee. *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air,* 478 U.S. 546, 566, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986)."[7]

38.     In calculating the amount to be awarded, "the Court must not penalize attorneys by viewing the efforts of counsel with the benefit of '20/20 hindsight.' Hours for an activity or project should be disallowed only where a Court is convinced it is readily apparent that no reasonable attorney should have undertaken that activity or project or where the time devoted was excessive." *In re Korea Chosun Daily Times, Inc.,* 337 B.R. at 767 (citation and internal punctuation omitted).

39.     In a case where the Lenders' counsel served as counsel to that creditors committee and unsecured creditors had yet to receive the less than 1% return provided in the confirmed plan of reorganization, the Lenders' counsel prevailed upon Judge Peck to award the requested fees when recovery to unsecured creditors was uncertain at best. "[T]here is no basis under applicable law to condition the final allowance of professional compensation on the timing or amount of a distribution to the unsecured creditors under a confirmed plan." *In re Value City Holdings, Inc.,* 436 B.R. 300, 303 (Bankr. S.D.N.Y. 2010) (awarding over $7 million in professional fees even though recovery for unsecured creditors was uncertain); *see also id.* at 306 ("Here, the Professionals rendered services in a manner 'commensurate with the expected gain' from those efforts. Even if the Professionals turned out to be wrong in dedicating themselves to their clients a court does not determine 'reasonableness' through hindsight.") (citation omitted).

40.     Perkins Coie satisfied each of the requirements of 11 U.S.C. § 330(a):

---

[7]     *In re Brous,* 370 B.R. 563, 570 (Bankr.S.D.N.Y. 2007).

(3) In determining the amount of reasonable compensation to be awarded to an examiner, trustee under chapter 11, or professional person, the court shall consider the nature, the extent, and the value of such services, taking into account all relevant factors, including—

> (A) the time spent on such services;

> (B) the rates charged for such services;

> (C) whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;

> (D) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed;

> (E) with respect to a professional person, whether the person is board certified or otherwise has demonstrated skill and experience in the bankruptcy field; and

> (F) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

(4)    (A) Except as provided in subparagraph (B), the court shall not allow compensation for—

> (i) unnecessary duplication of services; or

> (ii) services that were not—

> > (I) reasonably likely to benefit the debtor's estate; or

> > (II) necessary to the administration of the case.

These elements will be addressed separately below.

41.    <u>Time Spent</u>. A bankruptcy case and related litigation of this magnitude requires the investment of a substantial amount of professional time when a committee properly challenges well-funded group of counsel seeking to prevent creditors from receiving any of the approximately $69 million in Dealer Loan collections or approximately $5 million recovered by the Committee pressing claims of the Debtor and estate that the Debtor opted not to pursue. The amount of time and effort

21

that was expended was appropriate for the scope of the issues presented and the magnitude of the legal and factual issues being presented. The Committee could easily have replicated the Debtor's approach of simply acceding to all of the Lenders' assertions without mounting the serious challenge that the facts, circumstances and legal issues demanded. Had the Committee taken that approach, there is no doubt that the substantial proposal would not have been made and the case could have been concluded with no distribution to unsecured creditors many years before. That, in fact, was this case's trajectory when Perkins Coie was employed.

42. Without question, the majority of the fees and expenses were incurred in connection with the litigation with the Lenders. Such litigation is incredibly fact specific and requires "deep dives" into Lenders' records and communications – especially electronic communications from and among the four Lenders. Without Perkins Coie taking the time to wade deeply into the documents provided by each of the Lenders, the numerous concrete examples of the Lenders' actions and inactions would never have come to light. Becoming very familiar with the documents allows attorneys to place documents into context and allowed the Committee to fully illuminate the actions by the Lenders and their knowledge of "red flags" of fraud during the course of the litigation.

43. <u>Rates Charged</u>. The rates charged by Perkins Coie, while changing annually, reflect reasonable rates when compared to other attorneys with offices in the New York market. The rates charged by Perkins Coie for attorneys with similar experience are commensurate with those charged by the attorneys the Lenders selected for this case.

44. The reasonableness of the rates charged by Perkins Coie's attorneys is demonstrated by comparison to market standards for rates of comparably experienced attorneys. Indeed, rates charged by each of the Perkins Coie's attorneys were, at all relevant times, lower than the current

market rates for comparable firms. In fact, each and every Perkins Coie attorney billed at rates lower than the current market rates at the time the services were rendered.

45.    An annual survey by Valeo Partners (https://www.valeopartners.com/) establishes this as a demonstrable fact. Valeo describes its mission in the legal space as one to provide pricing transparency to the legal marketplace by, among other things, providing quantitative hourly rate and fee information to its clients.

46.    The Valeo 2017 Rate Report is an in-depth look at Attorney hourly rates for large, middle market and small Law Firms in the United States and the United Kingdom by providing details of hourly rates that are publicly disclosed by over 1,200 Firms in over 300 cities worldwide. By using public disclosures, Valeo uses the actual rates billed to a client rather than self-reported or estimated rate information.

47.    A comparison of the rates (through 2017, the last full year that is available) reveals that Perkins Coie has already provided the estate with a significant discount from the market rates for comparably-experienced attorneys in this market.

| Name | Billing Year | Perkins Rate | Valeo Rate | Variance |
|------|------|------|------|------|
| Baker, Ann S. | 2015 | 695 | 964 | (28%) |
| Banzhoff, Elizabeth M. | 2015 | 470 | 728 | (35%) |
| Baranowicz, Adrienne C. | 2015 | 555 | 728 | (24%) |
| Baranowicz, Adrienne C. | 2016 | 555 | 742 | (25%) |
| Carroll, Schuyler G. | 2014 | 855 | 1,035 | (17%) |
| Carroll, Schuyler G. | 2015 | 895 | 1,067 | (16%) |
| Carroll, Schuyler G. | 2016 | 930 | 1,088 | (15%) |
| Carroll, Schuyler G. | 2017 | 985 | 1,190 | (17%) |
| Chenetz, Sara L. | 2014 | 680 | 936 | (27%) |
| Cosman, Bradley A. | 2014 | 455 | 706 | (36%) |
| Cosman, Bradley A. | 2015 | 500 | 728 | (31%) |
| Cosman, Bradley A. | 2016 | 550 | 742 | (26%) |
| Delanghe, Benjamin J. | 2015 | 435 | 588 | (26%) |
| Dunn, Lindsey E. | 2016 | 350 | 600 | (42%) |

| Name | Billing Year | Perkins Rate | Valeo Rate | Variance |
|---|---|---|---|---|
| Dunn, Lindsey E. | 2017 | 410 | 624 | (34%) |
| Fang, Anyu | 2014 | 410 | 571 | (28%) |
| Frenkel, Jessica R. | 2017 | 410 | 624 | (34%) |
| Gamliel, Amir | 2014 | 445 | 571 | (22%) |
| Graham, Daniel A. | 2017 | 525 | 624 | (16%) |
| Haider, Shan A. | 2014 | 490 | 706 | (31%) |
| Haider, Shan A. | 2015 | 545 | 728 | (25%) |
| Hopkins, Dennis C. | 2015 | 750 | 964 | (22%) |
| Howland, Sarah V. | 2017 | 265 | 624 | (58%) |
| Jennings, Brian A. | 2016 | 595 | 983 | (39%) |
| Joseph, Jeanine N. | 2014 | 225 | 571 | (61%) |
| Lybecker, Martin E. | 2015 | 1,020 | 1,067 | (4%) |
| Mohammed, Furqan I. | 2014 | 360 | 571 | (37%) |
| Mohammed, Furqan I. | 2015 | 395 | 588 | (33%) |
| Mohammed, Furqan I. | 2016 | 460 | 600 | (23%) |
| Olsky, David F. | 2014 | 650 | 844 | (23%) |
| Olsky, David F. | 2015 | 675 | 869 | (22%) |
| Olsky, David F. | 2016 | 695 | 886 | (22%) |
| Olsky, David F. | 2017 | 735 | 939 | (22%) |
| Penn, John D. | 2014 | 795 | 1,035 | (23%) |
| Penn, John D. | 2015 | 825 | 1,067 | (23%) |
| Penn, John D. | 2016 | 865 | 1,088 | (20%) |
| Penn, John D. | 2017 | 915 | 1,190 | (23%) |
| Schultz, Christopher M. | 2014 | 560 | 844 | (34%) |
| Sink, Michael A. | 2016 | 560 | 983 | (43%) |
| Vanacore, Jeffrey D. | 2014 | 580 | 844 | (31%) |
| Vanacore, Jeffrey D. | 2015 | 625 | 869 | (28%) |
| Vanacore, Jeffrey D. | 2016 | 675 | 886 | (24%) |
| Vanacore, Jeffrey D. | 2017 | 725 | 939 | (23%) |

48.    The value that the estate received from Perkins Coie's lower than market rates is readily apparent from the table provided above. None of the rates for Perkins Coie attorneys exceeded the Valeo rate for an attorney with comparable experience. The amount can be quantified by applying the rates identified by Valeo Partners for the four (4) primary attorneys during each year from 2014 through 2017. The summary of that information is:

| | Year | Actual | Valeo Rate | Differential | Hours | Undercharge |
|---|---|---|---|---|---|---|
| Carroll, Schuyler G. | 2014 | 855 | 1,035 | 180 | 403.0 | 72,540 |
| Cosman, Bradley A. | 2014 | 455 | 706 | 251 | 311.5 | 78,187 |
| Olsky, David F. | 2014 | 650 | 844 | 194 | 183.5 | 35,599 |
| Penn, John D. | 2014 | 795 | 1,035 | 240 | 650.9 | $156,216 |
| | | | | | | **$342,542** |
| | | | | | | |
| Carroll, Schuyler G. | 2015 | 895 | 1,067 | 172 | 462.8 | $79,602 |
| Cosman, Bradley A. | 2015 | 500 | 728 | 228 | 236.3 | $53,876 |
| Olsky, David F. | 2015 | 675 | 869 | 194 | 1,155.5 | $224,167 |
| Penn, John D. | 2015 | 825 | 1,067 | 242 | 842.8 | 203,958 |
| | | | | | | **$561,603** |
| | | | | | | |
| Carroll, Schuyler G. | 2016 | 930 | 1,088 | 158 | 390.9 | 61,762 |
| Cosman, Bradley A. | 2016 | 550 | 742 | 192 | 123.1 | 23,635 |
| Olsky, David F. | 2016 | 695 | 886 | 191 | 1,755.3 | 335,262 |
| Penn, John D. | 2016 | 865 | 1,088 | 223 | 1,348.6 | 300,738 |
| | | | | | | **$721,398** |
| | | | | | | |
| Carroll, Schuyler G. | 2017 | 985 | 1,190 | 205 | 46.6 | 9,553 |
| Olsky, David F. | 2017 | 735 | 939 | 204 | 1,533.6 | 312,854 |
| Penn, John D. | 2017 | 915 | 1,190 | 275 | 1,001.3 | 275,358 |
| | | | | | | **$597,765** |
| | | | | | | |
| | | | | | | ***$2,223,307*** |

49.    The information from Valeo Partners shows that the estate received substantial savings from Perkins Coie's rates being below market rates for comparably experienced attorneys. The information also shows that fees of at least $2,225,000 more than those charged by Perkins Coie would be reasonable and appropriate for the amount of work performed in this case.

50.    The information provides a further demonstration that a fee enhancement of approximately $2,225,000 would also be reasonable.  The results achieved through Perkins Coie's litigation efforts on behalf of the estate, the savings on its hourly rates and factoring in an adjustment for the lack of payments to date provide additional justification for an upward adjustment.

142033171.5

51.    <u>Necessary or Beneficial When Service Was Rendered</u>. On this standard (necessary or beneficial when service was rendered), each of the services that were provided was intended to serve the Committee with its duties and obligations, maximize the value of the estate, address proofs of claim filed against the estate, provide appropriate representation to prosecute or resolve estate causes of action or otherwise represent the Committee. For matters upon which the Committee acted on behalf of the estate, the services that were provided were intended to benefit the estate - and actually provided substantial benefits to the state.

52.    Having been assigned the role of litigating with the Lenders, the attorneys for the Committee took on the duty and responsibility to zealously represent the estate in that litigation. The services provided in that role, while extensive, were consistent with that duty and were necessary to properly prosecute the estate's causes of action.

53.    Assertions by the Lenders that the litigation was driven by Counsel – rather than the Committee for the benefit of the estate (thereby benefitting all creditors) should be seen for what they have always been: part of the Lender's ongoing effort to obtain as much of the estate's cash as they can. The Lenders' engaged in ongoing and outrageous *ad hominem* attacks on Perkins Coie while (until only recently) refusing to provide other creditors with a reasonable settlement that would end the litigation. Nearly all creditors have argued that they were defrauded, and all understand that they would receive nothing absent the Committee pursuing these claims. Perkins Coie has not been paid anything on its fees and expenses to date and has no incentive to increase the administrative expenses beyond what was necessary to pursue the litigation. Perkins Coie has kept its fees and expenses to a minimum since it was not being paid on an ongoing basis.

54.    The Lenders are largely the cause of the increased amount of time expended by Perkins Coie. The Lenders actions repeatedly refused to provide discovery that was due to the Committee,

objected and/or filed lawsuits against every other unsecured creditor,[8] objected to the admission of almost every exhibit at trial, repeatedly made baseless objections at trial to witness testimony, and refused to admit to basic facts about the Debtor's scheme that would have substantially streamlined the trial. Perkins Coie had to address all of these actions and doing so increased the attorney time that was expended. The reality is that the Lenders would not have given a penny to the creditors in this proceeding but for Perkins Coie expending the resources that the firm did.

55. A review of the overall services provided by Perkins Coie – in the context of the time at which the work was done – makes clear that each of the services was necessary and beneficial. Similarly, a review of each of the specific services also shows how each of the services was both necessary and beneficial.

56. A complete review of each of the services that were performed would require scores of additional pages. Accordingly, Perkins Coie reserves the right to address any objection to a specific action or service that was provided. As noted elsewhere, the results achieved reflect that the firm properly executed its duties in providing services for the estate and for the Committee that were both beneficial and necessary.

57. <u>Performed in a Reasonable Amount of Time</u>. At the outset of the representation, Perkins Coie had a very limited amount of time to undertake a review of the Lenders' loan documents and actions to make an assessment of whether to challenge the positions they asserted and to assert avoidance actions against them. The review and drafting of the initial complaint were undertaken swiftly under the circumstances and the complaint was filed before the court-imposed deadline

---

[8]    Filing a lawsuit against every other creditor was an impermissible and obvious attempt by the Lenders to intimidate potential witnesses against them at the Committee's trial against the Lenders. They neither sought nor obtained leave of court to assert fraudulent conveyance actions owned by the estate.

142033171.5

negotiated by the Debtor in a cash collected order. Thereafter, each of the actions that were undertaken was performed in an amount of time that reflected both the prudent use of time and estate resources while also fulfilling the attorneys' duties to the Committee and the Committee's duties on behalf of the estate.

58.     As noted in the Committee's Objection to Joint Disclosure Statement (D.E. # 1318 – which document is incorporated by reference herein), the actions undertaken by the Lenders and their strategy in defending the litigation against them required the Committee to expend more time and resources than might have been expended had the Lenders stipulated to facts not in material dispute or stipulated to the admissibility of documents that were not subject to reasonable objection. The additional fees and expenses incurred by Perkins Coie as a result of the Lenders' litigation tactics were reasonable under the circumstances and became necessary as a consequence of the Lenders' actions and tactics.

59.     <u>Skill and Expertise, Including Board Certification</u>.   The three primary attorneys providing services to the Committee have demonstrated the skill, experience and expertise to ably represent the Committee in this case.

60.     John D. Penn, first licensed to practice law in 1982, currently serves as the Firmwide Chair of the Bankruptcy & Restructuring Practice of Perkins Coie and his biographical information is available at https://www.perkinscoie.com/en/professionals/john-d-penn.html.   He became the Firmwide Chair on October 1, 2017.  He has been Board Certified in Business Bankruptcy Law by both the American Board of Certification and the Texas Board of Legal Specialization for over twenty-five years and served as both the Chair of the Board and the Chair of the Standards Committee of the American Board of Certification as well as the Chair, President and Vice President –

28

Publications of the American Bankruptcy Institute.  He has represented debtors, creditors, trustees and committees during his over thirty-five-year legal career.

61.     Schuyler G. Carroll, first licensed to practice law in 1993, served as the Managing Partner of Perkins Coie's New York office during much of the relevant time period and his biographical information is available at https://www.perkinscoie.com/en/professionals/schuyler-g-carroll.html.  In his over twenty-five-year legal career, he has represented a wide variety of debtors, committees, trade creditors, claims traders, secured and unsecured creditors, bondholders, indenture trustees, trustees, landlords, investors and purchasers in and outside of bankruptcy cases.

62.     David F. Olsky, first licensed to practice law in 2002, served as a law clerk to Hon. Bruce Selya, U.S. Court of Appeals for the First Circuit and his biographical information is available at  https://www.perkinscoie.com/en/professionals/david-olsky.html.   In his over fifteen-year legal career, he has litigated on behalf of financial institutions, public companies, private companies, creditor committees, broker-dealers and individuals (as plaintiffs and as defendants) in litigation involving payment processing, price fixing, fraudulent transfers, Ponzi schemes, breach of contract, antitrust and unfair competition, breach of non-disclosure agreements and broker-dealer regulations. He has also represented some of the world's leading financial institutions in high-profile investigations by government agencies and self-regulatory organizations, including the DOJ, SEC, FINRA, Office of the Comptroller of the Currency and state attorneys general.

63.     Reasonable Based on Comparably Skilled Practitioners.  As noted with respect to the professionals' rates and the reasonableness of the time expended in the representation, the product of those two components produces a reasonable lodestar calculation.

64.     The reasonableness can also be viewed separately within each of the various groups of services or tasks in addition to viewing reasonableness of the total amount requested.  A

representation that covers four years of contentious disputes, where the Lenders opposed almost every action suggested or undertaken by the Committee – including actions that would bring additional assets into the estate to be distributed among creditors[9] – requires a substantial amount of time and effort.  For example, the amount incurred in "Litigation – .0001.0010" that included both various court hearings and both the prosecution and preservation of causes of action is roughly 25% of the settlements that the Committee negotiated.  The amount incurred in litigating with the Lenders is roughly 25% of the effective recovery that would be achieved by the currently proposed joint plan.[10] An effective fee of approximately 25% for successfully litigating against well-funded defendants is more than reasonable for the estate.

65.    <u>No Unnecessary Duplication</u>.  Perkins Coie avoided unnecessary duplication by dividing the workload as much as possible among the three primary attorneys working on the engagement.  When time or effort overlapped, it was not redundant and was instead focused to assure that all necessary and appropriate issues and evidence were brought to bear at any given time.  The relatively few times when more than two attorneys participated in any action or event were limited to occasions when each attorney was present for a distinct purpose or where each needed "real time" participation.  Even though the Lenders had no fewer than five (and frequently seven) attorneys at the trial of the Committee's lawsuit, Perkins Coie's trial team consisted of two attorneys and two para-professionals.  Trying a lawsuit of its magnitude with the number of exhibits, number of witnesses,

---

[9]    The Lenders' opposition to the first proposed settlement with EisnerAmper cost the estate $2 million, plus the additional fees and expenses ultimately incurred to renegotiate a settlement that was ultimately approved and funded.

[10]    As noted above, the proposed joint plan can be viewed as effectively a $30 million recovery. Had the case been handled on a contingent fee basis, the amount requested would be well within the range of reasonableness for contingent fee engagements.  The fees and expenses of approximately $8.3 million for the litigation with the Lenders, divided by the $30 million effective recovery produces a yield of approximately 27.6% while the $7.83 million in fees (exclusive of expenses) produces a yield of less than 25%.

number of issues and number of opposing attorneys with only one attorney would not be reasonable and would likely result in a loss of the lawsuit.

66.    Perhaps the best example of eliminating unnecessary duplication is that Perkins Coie attorneys were almost always outnumbered or evenly numbered when compared to the number of attorneys representing the Lenders at any deposition, hearing or day of the trial.  During the trial against the Lenders, Perkins Coie staffed the trial with two attorneys, one paralegal and one trial specialist (who handled the data projected on the screen while also creating and maintaining the networking used by all parties in the presentation of the documentary evidence on the courtroom's display screens).  By comparison, the Lenders had between five and seven attorneys in the courtroom for each of the trial days.  During the discovery phase of the litigation, Perkins Coie had either one or two attorneys at many depositions while the Lenders had two or more attorneys.  Depositions that needed only one attorney saw only one Perkins Coie attorney in attendance.  Perkins Coie attorneys were often outnumbered by the Lenders' attorneys during court hearings and the trial by 3 to 4 lawyers.[11]  There were also a number of instances where multiple depositions occurred concurrently. That made handling the litigation with only one attorney an impossibility.

67.    Perkins Coie also avoided duplication with the Debtor and its attorneys by dividing the workload and taking on claims and causes of action that the Debtor opted not to assert or would not adequately pursue – including claims involving EisnerAmper, the Dell/Stephens Parties and Valley National Bank.

---

[11]    It could even be argued that the cash collateral orders' restrictions on the Debtor's attorneys (prohibiting most actions that could be considered to be adverse to the Lenders) and their frequent support for the positions asserted by the Lenders would support including those attorneys in the count of those opposing the Committee's counsel at any given time.  The Debtor's attorneys are not included within the count of attorneys for any of the court hearings in this case.

142033171.5

68.    <u>Not Unlikely to Benefit the Estate or Unnecessary for Administration</u>.    Although framed in the negative, this aspect of 11 U.S.C. § 330 essentially overlaps the cumulative effect all the preceding elements of the statute in § 330(a)(3) & (4).  For the sake of brevity, those will not be repeated here.  Should there be any question regarding any service provided by Perkins Coie, the firm will promptly address the questions.

69.    "Section 330 of the Bankruptcy Code authorizes a bankruptcy court to award reasonable compensation to a fee applicant based on actual, necessary services rendered, and to reimburse him for his actual, necessary expenses. . . . Under the fee-shifting statutes, there is '[a] strong presumption that the lodestar figure—the product of reasonable hours times a reasonable rate—represents a "'reasonable'" fee.'" (Citing *In re Quigley Company, Inc.,* 500 B.R. 347, 356 (Bankr.S.D.N.Y.2013). [12]

70.    "[A] court does not determine 'reasonableness' through hindsight, *Brous,* 370 B.R. at 570, or penalize counsel simply because it rendered services prosecuting an application that failed or opposing one that succeeded. *[citations omitted]*  The test is an objective one, and considers 'what services a reasonable lawyer or legal firm would have performed in the same circumstances.' *In re Ames Dep't Stores, Inc.,* 76 F.3d 66, 72 (2d Cir.1996) (*citing In re Taxman Clothing Co.,* 49 F.3d 310, 315 (7th Cir.1995) (Posner, C.J.)); *accord In re Angelika Films 57th, Inc.,* 227 B.R. 29, 42 (Bankr.S.D.N.Y.1998), *aff'd,* 246 B.R. 176 (S.D.N.Y.2000); *In re Keene Corp.,* 205 B.R. at 696; *In re Drexel Burnham Lambert Grp., Inc.,* 133 B.R. 13, 23 (Bankr.S.D.N.Y.1991)." *In re Quigley,* 500 B.R. at 357.

---

[12]    *In re GSC Group, Inc.* 502 B.R. 672, 741-2 (Bankr.S.D.N.Y 2013).

142033171.5

71.    A fee application is to be reviewed according to the standards set forth in Section 330 of the Bankruptcy Code.

> There is no basis under applicable law to judge the reasonableness of professional compensation based on the distributions to creditors that are contingent on future recoveries. Fee applications are to be evaluated in light of all "relevant factors" as set forth in section 330(a)(3) of the Bankruptcy Code. The amount or timing of distributions to creditors, however, is not one of the specific factors identified in that section, and the Court does not believe that it should be. Moreover, none of the cases cited by the UST rely on creditor recoveries, or representations of potential creditor recoveries, as a factor to consider in evaluating the reasonableness of professional fees. *In re Value City Holdings, Inc.*, at 306.

> The Court will not use hindsight to determine whether Genser's litigation strategy was the appropriate one to take, especially in light of the various paths that Genser could have taken and the complexities, as Debtor acknowledges, of the matters that it was handling. It appears that the actions taken by Genser were reasonable, and did in fact benefit the estate. *In re Parkview Care and Rehabilitation Center, Inc.*, 2010 WL 3517069, 53 Bankr.Ct.Dec. 191 (Bankr.E.D.N.Y. 2010)

72.    The results obtained by Perkins Coie during the Application Period illustrate the complexity, importance, and nature of each task. Perkins Coie: (a) used the skill required to perform the legal services properly; (b) provided services necessary to the administration of the case; (c) performed the services within a reasonable amount of time, commensurate with the complexity, importance, and nature of each task; and (d) benefitted the estate by the services it provided at rates that are fair and reasonable under the present circumstances.

73.    In light of the results Perkins Coie has obtained for the Committee and the estate and the skill level and expertise of the Perkins Coie professionals providing service to the Committee, the hourly rates Perkins Coie charged for its attorneys and paralegals in this case are not only reasonable

but are consistent with the hourly rates those attorneys and paralegals charge other Perkins Coie clients in non-bankruptcy matters and the hourly rates that comparably experienced attorneys in bankruptcy cases charge their clients in this District.

74.    It cannot be overlooked that the investment of time, fees, effort, capital and perseverance by Perkins Coie has brought this case from one where the Lenders sought to take all of the assets to one with a plan on file that would pay $11.7 million to creditors in Classes 2 and 3 under that plan.  Those efforts and that investment deserves to be recognized for the value that has been provided.  The fact that the primary objections to this Application will come from the Lenders – the very group that chose this Court as the forum and has been the Committee's chief (and in most situations, only) adversary – is not surprising.  Their objections should be seen for what they are.

75.    Perkins Coie's services for the Committee and for the estate can placed in context with a chronological review of the Court's dockets in both the bankruptcy case and the litigation with the Lenders.

| Date | Bankruptcy Docket No. | Description & Context |
|---|---|---|
| 6/19/2014 | 614 | The U.S. Trustee amended the appointment of the Committee members to expand the Committee membership.  This was the result of extended efforts by Perkins – a task Perkins assumed at the request of many other creditors.  The docket also notes a host of "me too" joinders filed by other creditors, who supported (and obtained the benefit of) Perkins' work. |
| 6/25/2014 | 623 | The Committee requested a Rule 2004 Order with respect to various loan and other documents from the Lenders to begin its expedited review in accordance with the provisions of the cash collateral orders. |

| Date | Bankruptcy Docket No. | Description & Context |
|---|---|---|
| 6/27/2014 | 627 | The Committee objected to the first cash collateral budget that was submitted after its formation. The budget provided funding solely for Debtor professionals and did not provide any funding for Committee professionals to perform their statutory duties. Limited funding was subsequently provided into an escrow account that remains untapped. There were a host of amendments to the cash collateral order, together with monthly budgets that were reviewed during the course of the engagement as the Lenders used the budgets to squeeze the Debtors' and operations while also taking many opportunities to use the cash collateral and other processes to disenfranchise, sideline or otherwise derail the Committee's opposition to the Lenders' efforts to take all of the cash. |
| 7/3/2014 | 634 | After the Debtor abandoned claims against EisnerAmper, the Committee reached a Stipulation with EisnerAmper, the Debtor's former accountants, to provide the Committee's counsel with access to documents that EisnerAmper had previously provided to the Lenders and to the professionals for the Debtor. |
| 7/22 – 23/2014 | 644 – 654 | Various pleadings challenging Perkins' employment by the Committee that were ultimately overruled. The Lenders' objections were obvious attempts to "run out the clock" on the cash collateral orders' lien review period in the hope that their position would never be challenged. |
| 7/28/14 | 656 | The deposition notice of John Dell, an insider and financier whose offshore entities asserted substantial claims against the Debtor was served by the Debtor. The Committee attended the deposition but, counsel for the Debtor and the Lenders "ran out the clock" on the deposition day and precluded the Committee from asking questions as the lien review period wound down. |
| 8/4/2014 8/12/2014 | 662 675 | The Stipulation to grant standing for the Committee to commence litigation to challenge the Lenders was filed and ultimately approved. Drafting of the Complaint was well underway at this point. |
| 8/17/2014 | 675 | The Complaint against the Lenders on behalf of the estate was filed shortly before the lien review period expired. |
| 9/17/14 | 693 | The Third Amended Cash Collateral Order was entered after extensive negotiation with the Committee. |

142033171.5

| Date | Bankruptcy Docket No. | Description & Context |
|------|----------------------|----------------------|
| 9/29/2014 | 696 | The Lenders' Motion to Convert was filed in one of many repeated attacks upon the Committee and the freshly filed litigation against their pre-petition actions. This was an attempt to disenfranchise the Committee and leave the unsecured creditors without anyone working on their behalf. |
| 9/29/2014 | 706 | The Debtor's Motion to Compel and Authorize the Use of Cash Collateral was filed when the Lenders refused to approve a budget to allow for the Debtor's continued operations and receivables collection efforts. The Committee joined the Debtor's efforts to provide funding from the continued collection of receivables, operations and litigation. |
| 10/8/2014 | 724 | The Lenders' motion for summary judgment regarding lien perfection issues was filed as another attempted pre-emptive strike against the Committee's litigation. |
| 10/15/2014 | 748 | The Committee's opposition to the motion to convert was filed to oppose the Lenders' efforts to torpedo the case and litigation. One aspect of the opposition was that the possibility of reorganization was shown by the joint plan that the Committee negotiated and drafted with the Debtor. |
| 10/16/2014 | 753 | Joint Plan of Liquidation, along with a disclosure statement, were filed to oppose the Lenders' attempt to have the case converted to Chapter 7. |
| 10/16/2014 | 754 | The Committee objected to the Lenders' request for a protective order that was intended to shield the Lenders from providing documents that would damaging to their arguments. |
| 11/3/2014 | 779 | The Court's order requiring the Lenders to produce certain bank documents, over their objections, allowed the Committee's efforts to continue. |
| 11/19/2014 | 805 & 806 | Amended Joint Plan and Disclosure Statement were filed by Committee and Debtor to proceed with its liquidation but without the expense associated with a Chapter 7 case. |
| 11/20/2014 | | The summary judgment motion by the Lenders was the subject of a substantial contested hearing. |

142033171.5

| Date | Bankruptcy Docket No. | Description & Context |
|------|------------------------|------------------------|
| 3/19/2015 | 840 | The Court entered a summary judgment on the Lenders' motion regarding lien perfection. The order was subsequently modified to reflect that it was without prejudice to the Committee's litigation. The modification was driven by the Committee, even though the motion was filed by the Debtor. (Docket No. 853 on 4/2/2015 and Docket No. 883 on 4/20/2015). |
| 3/25/2015 | 842 | The Committee's first agreement with EisnerAmper was filed to approve EisnerAmper paying the estate $4.5 million. The Lenders opposed this settlement at a time, after the Debtor abandoned the claim of the estate and when the Lenders were mounting a state court fight with EisnerAmper that was ultimately dismissed with no recovery to them. The result of the Lenders' objection was that the estate lost a $4.5 million recovery. |
| 4/7/2015 | 866 | A letter to Judge Grossman, one of many, outlines the Lenders' unjustifiable failure to provide documents sought in discovery. |
| 4/23 – 5/4 2015 | 885 – 904 | Various documents to initiate and perfect the appeal from the summary judgment were filed by the parties. |
| 5/5/2015 | 905 | Debtor and Committee v. Valley National Bank adversary proceeding was filed as the two-year statute of limitations was about to expire. The Committee led the effort to secure tolling agreements from the vast majority of creditors that would obviate the need to file avoidance actions. The tolling agreements were extended a number of times yet are not referred to on the Court's docket. The Committee eventually negotiated the settlement of this claim for $750,000. |
| 5/5/15 | 906 | Debtor and Committee v. Equilend filed when Equilend did not agree to tolling. |
|  | 907 | Debtor and Committee v. North Mill filed when North Mill did not agree to tolling. |
| 5/13/2015 | 919 | Committee filed its designation of issues and record on appeal in the summary judgment appeal. This appeal was ultimately fully briefed and has been under advisement with the District Court for quite some time. |

142033171.5

| Date | Bankruptcy Docket No. | Description & Context |
|------|------|------|
| 9/4/15 | 963 964 965 | Lenders' Omnibus Objection to substantially all proofs of claim filed by creditors (filing over 1,000 pages). This was another attempt to disenfranchise the Committee and unsecured creditors while also seeking to prevent creditors from receiving any distribution from the estate. It should be viewed in conjunction with the plan that was filed soon thereafter by the Lenders and the Debtor since it would have had the effect of either preventing voting or requiring the temporary allowance of all creditor claims, which was particularly inappropriate in this case where most of the unsecured creditors are unsophisticated individuals, whose counsel were not regularly participating in the case. |
| 9/28/2015 | 980 | Committee's Response to Lenders' Omnibus Objection highlighting that the Lenders were taking a position that was 180 degrees from their prior admissions regarding the how a "true participant" could not have an allowed claim against the Debtor and how the participation agreements did have recourse liability for malfeasance and breaches of the participation agreements – each of which had occurred in this case –and how the Lenders had previously secured final, non-appealable judgments that certain participation holders had general unsecured claims. |
| 10/6/2015 | 1009 | Debtor's unilateral withdrawal of the Joint Plan filed by the Debtor and Committee. |
| 10/6/2015 | 1010 1011 | Debtor and Lenders' Joint Plan of Liquidation and Disclosure Statement. In this plan, the Debtor and the Lenders proposed to pay the general unsecured creditors and "true participants" a total of $2.3 million – plus pay all of the administrative expenses that would be allowed by the Court. At that time, the amount owed to Perkins Coie LLP exceeded $3.4 million. This Joint Plan also proposed to treat the claims based on participation interests owned by Redstone and those owned by the Lenders the same as all other participation interests. This Joint Plan was on file during the entire trial of the first phase of the lawsuit by the Committee on behalf of the estate. |
| 10/6/2015 | 1012 | Committee requests standing to prosecute actions against Jack Dell and Prime Plus. Prime Plus opposed the request, as did the Debtor. |

142033171.5

| Date | Bankruptcy Docket No. | Description & Context |
|---|---|---|
| 12/9/2015 | 1047 | Committee is granted standing to prosecute claims and potential causes of action against Dell and his affiliated entities and Debtor was granted leave to join in any complaint. |
| 12/22/2015 | 1054 | Dell and his entities appeal order granting standing for suit to be filed. |
| 5/9/2016 | 1114 | Motion to approve settlement with Valley National Bank that was negotiated by Committee. |
| 5/24/2016 | 1125 | Motion to approve settlement with Dell and his entities that was negotiated by Committee. |
| | 1126 | Motion to approve second settlement (of $2 million) with EisnerAmper that was negotiated by Committee. |
| 7/1/2016 | 1146 | Debtor's motion to shut down Debtor's business shortly before the trial of the estate's causes of action. |
| 7/12/2016 | 1153 | Debtor's motion to abandon computer equipment.  The shutdown and abandonment motions, prompted by the Lenders, were filed as pretrial discovery was winding down in the litigation with the Lenders and when it was clear that the Debtor's records, including electronic data on its computer systems, contained relevant and material evidence for the trial.  The Committee opposed the Lenders' efforts to obtain Court-approved spoliation. |
| 10/20/2016 | 1208 | Order approving second settlement with EisnerAmper. |
| | 1209 | Order approving settlement with Dell and his entities. |
| 1/12/2017 | 1225 | Debtor's Motion to authorize use of cash collateral to shut down business (while trial was underway). |
| 1/17/2017 | 1230 | Committee's Objection to motion to shut down business.  Hearing was delayed to allow discussions. |
| 4/21/2017 | 1253 | Renewed shut down motion. |
| 4/25/2017 | 1259 | Committee's Response to renewed shut down motion. |

142033171.5

| Date | Bankruptcy Docket No. | Description & Context |
|---|---|---|
| 4/26/2017 | | Hearing granting shut down after Committee negotiated process to preserve data and records to be available for trial and other later litigation (such as the claims objections and third-party complaint filed by the Lenders – see docket 160 of adversary proceeding docket) if needed. |
| 10/5/2017 | 1279 | Lenders' Motion to Authorize Interim Distribution (to distribute substantial funds to Lenders and thereby limit or preclude the ability to distribute funds to unsecured creditors. The Lenders' Motion, made during the trial of the Committee litigation, also glossed over the fact that the litigation was an objection to their claims that precluded any distributions to the Lenders pending allowance. |
| 10/18/2017 | 1286 | US Trustee Objection to interim distribution request. |
| | 1290 | Committee Objection to interim distribution request. |
| 11/7/2017 | 1296 | Order Denying the Lenders' request to receiver (since the Lenders had no allowed claim upon which distributions could be based). |
| 5/3/2018 | 1312 | Disclosure Statement for Joint Plan by Lenders and Debtor |
| 5/4/2018 | 1313 | Joint Plan by Lenders and Debtor |
| 6/7/2018 | 1318 | Committee Objection to Disclosure Statement – including pointing out substantial errors in the description of events and providing text to describe the litigation. |

76.     In the litigation for the estate against the Lenders, the key events on the docket sheet are outlined below.

| Date | Adversary Docket No. | Description & Context |
|---|---|---|
| 8/17/2014 | 1 | Complaint for estate against the Lenders – initially filed under seal and subsequently an unredacted version was filed. |

142033171.5

| Date | Adversary Docket No. | Description & Context |
|---|---|---|
| 9/24/2014 | 15 - 19 | Answers filed by Lenders. In apparent recognition that the Complaint was well grounded and that the Lenders could not easily avoid it, no motions under Rule 7012 were filed. |
| 1/29/2015 | 32 | Committee's motion to compel compliance with discovery requests concerning Lenders' diligence of the Debtor. |
| 1/29/2015 | 37 – 46 | Various subpoenas to obtain documentary evidence and information. |
| 2/25/2015 | 68 | Hearing during which the Motion to Compel was granted with the order ultimately entered on 4/15/2015. |
| 6/23/2015 | 73 | Initial pre-trial scheduling order |
| 9/28/2015 | 77 | Committee's Motion for Sanctions against IDB for failure to provide discovery. |
| 10/1/2015 | 85 | Committee's Motion to Compel production of documents regarding a transaction mentioned in IDB's initial document production. The documents that had been produced referred to that transaction as a quid pro quo between IDB and another bank, that was a member of the bank group at that time. IDB agreed to produce these documents only after the Committee filed the Motion. |
| 11/11/2015 | 103 | Lenders' Joint Motion to file amended answers. |
| 12/11/2015 | 114, 116, 121 & 122 | Lenders' Amended Answers |
| 12/23/2015 | 121 | Amended Pre-trial Scheduling Order (as a result of amended answers being filed and bifurcating trial to try fraudulent conveyance and fraudulent transfer claims in Phase 1 of the trial) |

142033171.5

| Date | Adversary Docket No. | Description & Context |
|------|------|------|
| 1/29/2016 | 122 | Motion to file amended complaint on behalf of the estate was filed under seal. Request to file under seal was denied and the unredacted motion and proposed Amended Complaint were filed. (Docket No. 126 on 2/4/2016). The Committee, in compliance with the Lenders' designation of almost everything that they produced as "Confidential" under the existing protective order, routinely filed documents with a request that they be filed under seal and the Court began to reject the request. Notwithstanding the Court's determination, the Lenders neither changed the designations nor modified the protective order. This is another way that the cost of litigation was unnecessarily amplified by the Lenders' decisions and actions. |
| 4/11/2016 | 143 | Amended Complaint filed after motion was granted. |
| 4/25/2016 | 151 | Order staying litigation for mediation. |
| 5/23/2016 | 157 – 161 | Answers to Amended Complaint filed by Lenders other than IDB. |
| 5/23/2016 | 160 | IDB's Answer to Amended Complaint with "Third Party Complaint" claiming to assert estate's avoidance actions against almost all creditors even though IDB neither requested nor received standing to assert avoidance actions.<br><br>Notably, IDB's avoidance action complaint was based on the assertion that Oak Rock was a Ponzi scheme. |
| 6/22/2016 | 191 & 195 | Committee's response to IDB's action in unilaterally filing "Third Party Complaint" and how it vexatiously multiplied litigation by attempting to add dozens of parties to litigation with a firm trial schedule that had been agreed to by all prior parties. |
| 7/13/2016 | 202 & 203 | Letters by Committee requesting leave to file a summary judgment motion and opposing the Lenders' request for leave to file a summary judgment motion. The Lenders' motion was never granted |
| 8/23/2016 | 210 | Committee Motion in Limine. Lenders refused to admit to the authenticity or admissibility of any documents. Committee moved for, among other things, pretrial ruling from the Court that Lenders' own documents were presumptively admissible. |

142033171.5

| Date | Adversary Docket No. | Description & Context |
|---|---|---|
| 9/9/2016 | 216 | Lenders' Motion for Summary Judgment – filed barely two months before the trial was to start and requiring extensive substantive response in addition to ongoing trial preparations. |
| 9/30/2016 | 238 & 239 | Committee's Pre-Trial Memorandum and Brief on behalf of estate |
| 10/21/2016 | 241 & 242 | Memorandum and Order regarding authentication of documentary evidence. |
| 12/2/2016 | 262 | Lengthy letter from Committee regarding admissibility of key documents used at depositions, including those created by IDB's agent. When the Lenders refused to admit to the admissibility of most exhibits – and neither the Court nor the Parties wished to spend trial time debating admissibility of exhibits – the Committee filed lengthy letters between trial dates offering exhibits into the record. All but a few were ultimately admitted, despite Defendants' objections to the vast majority of them. |
| 6/19/2016 | 274 & 275 | Letters from Committee outlining outstanding issues that needed rulings by Court. |
| 7/14/2017 | 281 | Committee's request for the Court to take judicial notice of specified facts. |
| 9/11/2017 | 286 | Letter from Committee outlining outstanding issues that needed rulings by Court. |
| 9/12/2017 | 287 | Letter from Committee outlining outstanding issues that needed rulings by Court. |
| 9/15/2017 | 288 | Letter from Committee outlining outstanding issues that needed rulings by Court. |
| 9/15/2017 | 289 | Letter from Committee outlining outstanding issues that needed rulings by Court. |
| 2/16/2018 | 307 | Committee's extensive post-trial submission. |
| 3/30/2018 | 319 | Committee's extensive post-trial reply submission. |

**E.    Estimated Fees and Expenses with Reservation of Right to Supplement**

77.    As a result of the November 28, 2018 deadline for filing final fee applications and a matter of practicality, Perkins Coie's last invoices for work in this case reflect the fees and expenses posted through October 31, 2018 while work on this case continued throughout November and is anticipated to extend into December with the confirmation hearing and (hopefully) post-confirmation implementation.  Given that Perkins Coie will receive less than the total amount billed and that the disbursement is contemplated in December 2018, billing for additional work and expenses posted during November and December 2018 will not affect the total amount that Perkins Coie will receive.

78.    Perkins Coie estimates that the additional fees and expenses that will be incurred during November and December 2018 will not be less than $75,000.

79.    As noted elsewhere herein, Perkins Coie reserves the right to supplement this Amended Final Application to reflect the fees and expenses actually incurred during November and December 2018.  Additionally, should the case continue into 2019, Perkins Coie reserves its right to amend this Amended Final Application to request additional fees and expenses.

**F.    Mediation Agreement**

80.    After the most recent plan was filed in this case, Perkins Coie and others participated in a mediation regarding the fees and expenses incurred in this case.  Since creditors have waited since 2013, need funds before all litigation could be concluded, and are willing to take significant discounts to receive recoveries in the near future, Perkins Coie has agreed in this case to accept payment of substantially less than the reasonable fees and expenses incurred in this case.  The agreement for Perkins Coie to receive a cash payment of $5,325,000.00 for fees and expenses for its work in connection with this case was reached at a mediation that involved the Lenders, counsel for

142033171.5

the Debtor and the Chief Restructuring Officer of the Debtor and negotiations that followed thereafter.[13]

81.    As noted below, Perkins Coie (a) requests an order that the fees and expenses requested in this Amended Final Application were both reasonable and necessary when they were incurred and (b) agrees that it will accept $5,325,000.00 on the timetable outlined in the Mediation Agreement for its work in this case.

## G.    Conclusion

82.    Based on the foregoing, Perkins Coie respectfully requests that the Court enter an order substantially in the form attached as **Exhibit D** to this application approving (a) this Amended Final Application under Section 330 of the Bankruptcy Code, including the agreement of Perkins Coie LLP to accept $5,3250,000 as compensation for fees and expenses incurred in this case and (b) the prompt payment (being commercially reasonable efforts to indefeasibly pay in collected funds by wire transfer or check to be received by Perkins Coie no later December 31, 2018, and, in all events, such payments shall be indefeasibly paid in collected funds to be received by Perkins Coie on or before January 31, 2019) of $5,325,000, being the amount that Perkins Coie's agreed to accept; and (e) any additional relief the Court deems appropriate.

---

[13]    The Mediation Agreement executed on November 15, 2018 includes the specific terms of Perkins Coie's agreement with the Mediation Parties (defined therein) regarding its fees and expenses, including that commercially reasonable efforts shall be made to indefeasibly pay in collected funds (by wire transfer or check) to be received by Perkins Coie no later December 31, 2018, and, in all events, such payment shall be indefeasibly paid in collected funds to be received by Perkins Coie on or before January 31, 2019.

142033171.5

Dated: New York, New York

December 7, 2018

**PERKINS COIE LLP**

By: */s/ John D. Penn*
     Schuyler G. Carroll
     John D. Penn
     David F. Olsky
30 Rockefeller Plaza, 22nd Floor
New York, New York  10112-0085
Tel:    212.262.6900
Fax:   212.977.1649
SCarroll@perkinscoie.com
JPenn@perkinscoie.com
DOlsky@perkinscoie.com

Attorneys for the Official Committee of
Unsecured Creditors

**SUMMARY CHARTS**

Chart 1 reflects all fee and expense totals, prior payments, and remaining unpaid amounts pertinent to this Application Period:

**CHART 1 – First Interim Fee Application Summary ($)**

| Retainer | Retainer Remaining Unapplied: | Not Applicable |
|---|---|---|
| APPLICATION PERIOD (6/04/14 – 10/31/18) | Fees Requested: | $10,404,501.95 |
| | Expenses Requested: | $778,982.35 |

Chart 2.1 reflects all attorneys and paralegals rendering services to the Debtor during the Application Period, their applicable hourly rates, and the fees each incurred for the year 2014:

**CHART 2.1 – Fee Summary (2014 Hourly Rates)**

| Name | Bar Year | Hourly Rate ($) | Hours | Fees ($) |
|---|---|---|---|---|
| *Attorneys* | | | | |
| Carroll, Schuyler G. | 1993 (NY) | 855.00 | 403.0 | 344,565.00 |
| Chenetz, Sara L. | 1984 (NY, NJ) 2000 (CA) | 680.00 | 0.5 | 340.00 |
| Cosman, Bradley A. | 2008 (AZ) | 455.00 | 311.5 | 141,732.50 |
| Fang, Anyu | 2013 (NY) | 410.00 | 6.6 | 2,706.00 |
| Gamliel, Amir | 2009 (CA) | 445.00 | 35.4 | 15,753.00 |
| Haider, Shan A. | 2007 (NY) | 490.00 | 128.5 | 62,965.00 |
| Joseph, Jeanine N. | 2015 (NY) | 225.00 | 0.6 | 135.00 |
| Mohammed, Furqan I. | 2012 (IL) | 360.00 | 1.0 | 360.00 |
| Olsky, David F. | 2002 (VA) 2003 (DC) 2009 (NY) 2013 (CO) | 650.00 | 183.5 | 119,242.50 |
| Penn, John D. | 1982 (TX) 2010 (NY) | 795.00 | 650.9 | 517,465.50 |
| Schultz, Christopher M. | 1999 (AZ) 2011 (TX) | 560.00 | 3.9 | 2,184.00 |
| Vanacore, Jeffrey D. | 2001 (CO) 2003 (NJ, NY) | 580.00 | 1.6 | 928.00 |
| | *Subtotal – Attorneys* | | *1,727.00* | *$1,208,376.50* |

| Name | Bar Year | Hourly Rate ($) | Hours | Fees ($) |
|---|---|---|---|---|
| *Paralegals* | | | | |
| Arsiotis, Michael C. | n/a | 225.00 | 7.0 | 1,575.00 |
| Bagatti, Nancy | n/a | 210.00 | 1.7 | 357.00 |
| Balom, Ian P. | n/a | 215.00 | 21.3 | 4,579.50 |
| Borowitz, Rebecca J. | n/a | 250.00 | 11.3 | 2,825.00 |
| Burke, Marty T. | n/a | 160.00 | 1.0 | 160.00 |
| Farmer, Shelley K. | n/a | 290.00 | 3.8 | 1,102.00 |
| Higa, Joel Y. | n/a | 200.00 | 4.1 | 820.00 |
| Johnson, Catherine B. | n/a | 200.00 | 0.7 | 140.00 |
| King, Jessica L. | n/a | 215.00 | 1.2 | 258.00 |
| Lawrence, Matthew H. | n/a | 110.00 | 21.0 | 2,310.00 |
| Manchester, Melinda | n/a | 280.00 | 5.3 | 1,484.00 |
| Miller, Nickalina M. | n/a | 215.00 | 59.3 | 10,814.50 |
| Sandvig, Ann E. | n/a | 290.00 | 20.5 | 5,945.00 |
| Scoggins, Michele B. | n/a | 245.00 | 29.1 | 7,129.50 |
| Terry, Steven L. | n/a | 390.00 | 7.3 | 2,847.00 |
| Vargas, Nelson | n/a | 265.00 | 26.8 | 7,102.00 |
| Weissmeier, William J. | n/a | 260.00 | 16.7 | 4,342.00 |
| | | *Subtotal – Paralegals* | *238.1* | *53,790.50* |
| | | **Total Fees:** | 1,965.1 | **$1,262,167.00** |
| **Blended Hourly Rate ($) (Attorneys Only)** | | **$699.72** | | |

Chart 2.2 reflects all attorneys and paralegals rendering services to the Debtor during the Application Period, their applicable hourly rates, and the fees each incurred for the year 2015:

## CHART 2.2 – Fee Summary (2015 Hourly Rates)

| Name | Bar Year | Hourly Rate ($) | Hours | Fees ($) |
|---|---|---|---|---|
| *Attorneys* | | | | |
| Baker, Ann S. | 1998 (NY) | 695.00 | 27.6 | 19,182.00 |
| Banzhoff, Elizabeth M. | 2009 (FL) 2010 (NC) 2012 (CO) | 470.00 | 4.7 | 2,209.00 |
| Baranowicz, Adrienne C. | 2009 (NY) | 555.00 | 78.6 | 43,623.00 |
| Carroll, Schuyler G. | 1993 (NY) | 895.00 | 462.8 | 414,206.00 |
| Cosman, Bradley A. | 2008 (AZ) | 500.00 | 236.3 | 118,150.00 |
| Delanghe, Benjamin J. | 2011 (CO) | 435.00 | 7.2 | 3,132.00 |
| Haider, Shan A. | 2007 (NY) | 545.00 | 60.3 | 32,700.00 |
| Hopkins, Dennis C. | 1998 (NJ) 1999 (NY) | 750.00 | 8.5 | 6,375.00 |
| Lybecker, Martin E. | 1970 (WA) 1972 (DC) 2001 (PA) | 1,020.00 | 1.0 | 1,020.00 |
| Mohammed, Furqan I. | 2012 (IL) | 395.00 | 68.0 | 26,860.00 |
| Nelson, Mark W. | 2004 (USPTO) 2005 (CA) 2013 (ID) | 195.00 | 5.2 | 1,014.00 |
| Olsky, David F. | 2002 (VA) 2003 (DC) 2009 (NY) 2013 (CO) | 675.00 | 1,155.5 | 776,992.50 |
| Penn, John D. | 1982 (TX) 2010 (NY) | 825.00 | 842.8 | 695,310.00 |
| Vanacore, Jeffrey D. | 2001 (CO) 2003 (NJ, NY) | 625.00 | 1.9 | 1,187.50 |
| | *Subtotal – Attorneys* | | *2,960.4* | *$2,141,961.00* |
| *Paralegals* | | | | |
| Bagatti, Nancy | n/a | 225.00 | 4.6 | 1,035.00 |
| Balom, Ian P. | n/a | 225.00 | 67.2 | 15,120.00 |
| Borowitz, Rebecca J. | n/a | 260.00 | 57.7 | 15,002.00 |
| Butler, John R. | n/a | 255.00 | 5.9 | 1,504.50 |
| Caling, Rey M. | n/a | 245.00 | 2.2 | 539.00 |
| Cochard, Susan L. | n/a | 275.00 | 1.5 | 412.50 |
| DeGuzman, Joel J. | n/a | 255.00 | 22.8 | 5,814.00 |

| Name | Bar Year | Hourly Rate ($) | Hours | Fees ($) |
|---|---|---|---|---|
| Farmer, Shelley K. | n/a | 305.00 | 8.9 | 2,714.50 |
| Gelsey, Alexander H. | n/a | 255.00 | 3.5 | 892.50 |
| Higa, Joel Y. | n/a | 205.00 | 23.3 | 4,776.50 |
| Kernan, Kelly | n/a | 270.00 | 0.6 | 162.00 |
| Lawrence, Matthew H. | n/a | 115.00 | 2.7 | 310.50 |
| Manchester, Melinda | n/a | 295.00 | 1.6 | 472.00 |
| Miller, Nickalina M. | n/a | 225.00 | 0.2 | 45.00 |
| Scoggins, Michele B. | n/a | 255.00 | 25.6 | 6,528.00 |
| Segelbaum, Jeffrey S. | n/a | 255.00 | 0.9 | 229.50 |
| Terry, Steven L. | n/a | 410.00 | 46.0 | 18,860.00 |
| Vargas, Nelson | n/a | 275.00 | 17.9 | 4,840.00 |
| Yeryomenko, Maxim A. | n/a | 255.00 | 5.7 | 1,453.50 |
| | | *Subtotal – Paralegals* | *289.8* | *80,711.00* |
| | | **Total Fees:** | **3,259.2** | **$2,222,672.00** |
| **Blended Hourly Rate ($) (Attorneys Only)** | | **$723.54** | | |

Chart 2.3 reflects all attorneys and paralegals rendering services to the Debtor during the Application Period, their applicable hourly rates, and the fees each incurred for the year 2016:

### CHART 2.3 – Fee Summary (2016 Hourly Rates)

| Name | Bar Year | Hourly Rate ($) | Hours | Fees ($) |
|---|---|---|---|---|
| | | *Attorneys* | | |
| Baranowicz, Adrienne C. | 2009 (NY) | 555.00 | 10.6 | 5,883.00 |
| Carroll, Schuyler G. | 1993 (NY) | 930.00 | 390.9 | 363,537.00 |
| Cosman, Bradley A. | 2008 (AZ) | 550.00 | 123.1 | 67,705.00 |
| Dunn, Lindsey E. | 2016 (CO) | 350.00 | 41.6 | 14,556.50 |
| Jennings, Brian A. | 1998 (MO) 2001 (IL) 2002 (WA) 2016 (OR) | 595.00 | 50.4 | 29,452.50 |
| Mohammed, Furqan I. | 2012 (IL) | 460.00 | 16.3 | 7,498.00 |
| Penn, John D. | 1982 (TX) 2010 (NY) | 865.00 | 1,348.6 | 1,166,539.00 |
| Olsky, David F. | 2002 (VA) 2003 (DC) | 695.00 | 1,755.3 | 1,214,304.00 |

142033171.5

| Name | Bar Year | Hourly Rate ($) | Hours | Fees ($) |
|---|---|---|---|---|
| | 2009 (NY) 2013 (CO) | | | |
| Sink, Michael A. | 2005 (CO) | 560.00 | 20.3 | 10,696.00 |
| Vanacore, Jeffrey D. | 2001 (CO) 2003 (NJ, NY) | 675.00 | 2.5 | 1,687.50 |
| | *Subtotal – Attorneys* | | *3,759.6* | *$2,881,858.50* |
| **Paralegals** | | | | |
| Balom, Ian P. | n/a | 270.00 | 9.0 | 108.00 |
| Borowitz, Rebecca J. | n/a | 270.00 | 227.3 | 61,290.00 |
| Butler, John R. | n/a | 255.00 | 1.1 | 280.50 |
| Caling, Rey M. | n/a | 255.00 | 2.4 | 612.00 |
| DeGuzman, Joel J. | n/a | 255.00 | 7.5 | 1,836.00 |
| Hall, Cary C. | n/a | 100.00 | 13.7 | 1,370.00 |
| Higa, Joel Y. | n/a | 215.00 | 14.5 | 2,988.50 |
| Huston, Kyle L. | n/a | 225.00 | 9.5 | 2,137.50 |
| Lawrence, Matthew H. | n/a | 120.00 | 6.5 | 780.00 |
| Rance, Erin | n/a | 155.00 | 1.6 | 248.00 |
| Schultz, Heather L. | n/a | 195.00 | 15.9 | 3,100.50 |
| Terry, Steven L. | n/a | 425.00 | 565.0 | 240,125.00 |
| Vargas, Nelson | n/a | 285.00 | 15.4 | 4,389.00 |
| Warner, Carol I. | n/a | 260.00 | 2.1 | 546.00 |
| Whitney, Karen | n/a | 155.00 | 0.3 | 0.00 |
| Yeryomenko, Maxim A. | n/a | 255.00 | 0.2 | 51.00 |
| | *Subtotal – Paralegals* | | *892.0* | *319,862.00* |
| | | **Total Fees:** | **4,651.6** | **$3,204,042.50** |
| **Blended Hourly Rate ($) (Attorneys Only)** | **$766.54** | | | |

Chart 2.4 reflects all attorneys and paralegals rendering services to the Debtor during the Application Period, their applicable hourly rates, and the fees each incurred for the year 2017:

**CHART 2.4 – Fee Summary (2017 Hourly Rates)**

| Name | Bar Year | Hourly Rate ($) | Hours | Fees ($) |
|---|---|---|---|---|
| *Attorneys* | | | | |
| Carroll, Schuyler G. | 1993 (NY) | 985.00 | 46.6 | 45,211.50 |
| Dunn, Lindsey E. | 2016 (CO) | 410.00 | 70.3 | 28,773.80 |
| Frenkel, Jessica R. | 2017 (CO) | 410.00 | 20.4 | 8,364.00 |
| Graham, Daniel A. | 2012 (CO) | 525.00 | 24.2 | 12,705.00 |
| Howland, Sarah V. | 2016 (NY) | 265.00 | 0.5 | 132.50 |
| Olsky, David F. | 2002 (VA) 2003 (DC) 2009 (NY) 2013 (CO) | 735.00 | 1,533.6 | 1,125,608.40 |
| Penn, John D. | 1982 (TX) 2010 (NY) | 915.00 | 1,001.3 | 916,189.50 |
| Vanacore, Jeffrey D. | 2001 (CO) 2003 (NJ, NY) | 725.00 | 0.6 | 435.00 |
| | | *Subtotal – Attorneys* | *2,697.5* | *$2,137,419.70* |
| *Paralegals* | | | | |
| Balom, Ian P. | n/a | 270.00 | 0.6 | 162.00 |
| Borowitz, Rebecca J. | n/a | 290.00 | 8.3 | 2,407.00 |
| Cochard, Susan L. | n/a | 300.00 | 0.2 | 60.00 |
| Dorris, Brooke C. | n/a | 240.00 | 81.0 | 19,440.00 |
| Krebs, Robert F. | n/a | 315.00 | 0.9 | 267.75 |
| Neu, Kacie A. | n/a | 250.00 | 0.7 | 0.00 |
| Perkins, Ashley | n/a | 165.00 | 0.5 | 82.50 |
| Terry, Steven L. | n/a | 450.00 | 912.4 | 409,770.00 |
| Thurston, Mary K. | n/a | 250.00 | 0.3 | 0.00 |
| Vargas, Nelson | n/a | 300.00 | 1.8 | 540.00 |
| | | *Subtotal – Paralegals* | *1,006.7* | *432,729.25* |
| | | **Total Fees:** | **3,704.1** | **$2,570,149.00** |
| **Blended Hourly Rate ($) (Attorneys Only)** | | **$792.39** | | |

Chart 2.5 reflects all attorneys and paralegals rendering services to the Debtor during the Application Period, their applicable hourly rates, and the fees each incurred for the year 2018:

142033171.5

## CHART 2.5 – Fee Summary (2018 Hourly Rates)

| Name | Bar Year | Hourly Rate ($) | Hours | Fees ($) |
|---|---|---|---|---|
| *Attorneys* | | | | |
| Carroll, Schuyler G. | 1993 (NY) | 1,035.00 | 80.0 | 81,454.50 |
| Cosman, Bradley A. | 2008 (AZ) | 690.00 | 2.8 | 1,932.00 |
| Dorris, Brooke C. | 2018 (TX) | 410.00 | 8.9 | 3,649.00 |
| Oloomi, Yasamin | 2015 (IL) | 505.00 | 8.7 | 4,393.50 |
| Olsky, David F. | 2002 (VA) 2003 (DC) 2009 (NY) 2013 (CO) | 770.00 | 484.9 | 369,831.00 |
| Penn, John D. | 1982 (TX) 2010 (NY) | 975.00 | 615.7 | 600,307.50 |
| | | *Subtotal – Attorneys* | 1,201.0 | $1,061,567.50 |
| *Paralegals* | | | | |
| Howerton, Debra S. | n/a | 330.00 | 1.7 | 561.00 |
| Huston, Kyle L. | n/a | 225.00 | 24.7 | 5,557.50 |
| Hutchison, Kimberly | n/a | 230.00 | 61.2 | 14,076.00 |
| Jarrell, Amy S. | n/a | 385.00 | 5.3 | 2,040.50 |
| Otake, James M. | n/a | 305.00 | 0.6 | 183.00 |
| Ragsac, Kenneth A. | n/a | 280.00 | 12.0 | 3,360.00 |
| Terry, Steven L. | n/a | 460.00 | 112.9 | 51,934.00 |
| Vargas, Nelson | n/a | 315.00 | 0.5 | 157.50 |
| | | *Subtotal – Paralegals* | 218.9 | 77,869.50 |
| | | **Total Fees:** | **1,419.9** | **$1,139,437.00** |
| **Blended Hourly Rate ($) (Attorneys Only)** | | **$883.90** | | |

Chart 3 reflects hours spent and fees incurred in each work category established for Perkins Coie's services to the Debtor during the Application Period:

## CHART 3 – Work Categories

| Work Category | Hours | Fees |
|---|---|---|
| Committee Representation (.0001) (Exhibit B-1) | 118.6 | $38,685.00 |
| Case Administration (.0002) (Exhibit B-2) | 26.4 | $13,613.50 |

142033171.5

| Work Category | Hours | Fees |
|---|---|---|
| Committee Communication (.0003) (Exhibit B-3) | 229.2 | $191,035.00 |
| Asset Sale/Analysis Recovery (.0004) (Exhibit B-4) | 65.9 | $55,101.50 |
| Business Operations (.0005) (Exhibit B-5) | 0.6 | $591.00 |
| Claims Administration & Objections (.0006) (Exhibit B-6) | 53.4 | $41,774.00 |
| Fee/Employment Applications (.0007) (Exhibit B-7) | 520.7 | $384,035.50 |
| Fee/Employment Objections (.0008) (Exhibit B-8) | 21.8 | $16,107.00 |
| Financing/Cash Collateral (.0009) (Exhibit B-9) | 208.6 | $166,645.00 |
| Litigation - General (.0010) (Exhibit B-10) | 1,698.4 | $1,237,535.00 |
| Plan & Disclosure Statement (.0011) (Exhibit B-11) | 470.8 | $401,708.00 |
| Creditor Inquiries (.0014) (Exhibit B-12) | 22.7 | $19,515.50 |
| Litigation – IDB Litigation and Claims Objection (.0015) (Exhibit B-13) | 11,562.8 | $7,838,155.95 |
| **Totals** | **14,999.9** | **$10,404,501.95** |

142033171.5